1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF WYOMING

3    ------------------------------------------------------------

4    UNITED STATES OF AMERICA,

5         Plaintiff,                    DOCKET NO. 13-CR-004-J
                                        Vol. V of V
6                                       Pages 775 - 873
          vs.                           CHEYENNE, WYOMING
7                                       May 13, 2013
     JACQUELINE M. GARCIA;              9:50 a.m.
8    SIGIFREDO MOLINA VARELA,
     also known as Sigi,

9
          Defendants.
10
     ------------------------------------------------------------
11
                  TRANSCRIPT OF TRIAL PROCEEDINGS
12
              BEFORE THE HONORABLE ALAN B. JOHNSON
13              UNITED STATES DISTRICT JUDGE
            and a jury of twelve and two alternates
14
     APPEARANCES:
15   For the Plaintiff:      MR. STUART S. HEALY III
                             Assistant United States Attorney
16                           UNITED STATES ATTORNEY'S OFFICE
                             District of Wyoming
17                           2120 Capitol Avenue, Suite 4000
                             P.O. Box 668
18                           Cheyenne, WY  82003-0668

19   For the Defendant       MR. THOMAS A. FLEENER
     Garcia:                 FLEENER & VANG, LLC
20                           119 Grand Avenue
                             P.O. Box 913
21                           Laramie, WY  82003

22   For the Defendant       THOMAS B. JUBIN
     Molina Varela:          Attorney at Law
23                           JUBIN & ZERGA, LLC
                             2614 Pioneer Avenue
24                           P.O. Box 943
                             Cheyenne, WY  82003-0943

25

1  Court Reporter:        MRS. JANET DAVIS, RMR, FCRR
                          United States Court Reporter
2                         2120 Capitol Avenue, Room 2228
                          Cheyenne, Wyoming  82001
3                         (307) 635-3884

4  Proceedings recorded by mechanical stenography, transcript
   produced with computer.
5

6
                          I N D E X
7

8  JURY INSTRUCTIONS                                    PAGE

9  Jury Instruction Conference                          777
   Jury Instructions                                    788
10 Jury Instructions                                    850

11
   MOTIONS                                              PAGE
12
   Motion for Judgment of Acquittal
13    The Court                                         870
      Mr. Jubin                                         871
14    Mr. Fleener                                       871

15
   CLOSING ARGUMENTS                                    PAGE
16
   Mr. Healy                                            807
17 Mr. Fleener                                          821
   Mr. Jubin                                            834
18 Mr. Healy                                            845

19

20

21

22

23

24

25

1     (Proceedings reconvened 9:50 a.m. in chambers

2     in the presence of the Court and counsel.)

3          THE COURT:  Let the record reflect that we are meeting

4   in chambers.  We have had an instruction conference that's been

5   off the record, and we're now in the presence of our court

6   reporter, Jan Davis, and I think we are close to having reached

7   a group of instructions that can be given to the jury.

8          I would note that I've marked Defendant Sigi Molina's

9   Instruction No. 9 and Instruction No. 17 as refused, although

10  similar instructions are contained in the instruction package.

11  And those are 9 and 17, again.

12         Does the Government have any objections to the

13  instructions as proposed or the verdict form?

14         MR. HEALY:  No, Your Honor.  Thank you.

15         THE COURT:  Does Jackie Garcia?

16         MR. FLEENER:  Yes, Your Honor.  We would object to

17  Instruction No. 35.  And just for the record, and I made this

18  argument off the record, but my concern is that both defendants

19  are sort of being lumped up together.  And therefore,

20  instructions needed to make sure that the evidence is looked at

21  consistent with the law as it applies to both defendants, I

22  believe the instruction that I submitted, my first instruction,

23  is not only a correct statement of the law, but better

24  separates the two defendants.

25         So I would object to 35.  I believe that 35, the way

1   35 reads, the jury could be confused and would be less likely

2   to do an individualized determination of reasonable

3   foreseeability to each individual defendant.  So I would

4   object.

5          THE COURT:  All right.  The Court will overrule the

6   objection.  We have modified Instruction 30 and Instruction 35

7   to emphasize individual defendant consideration.

8          And we've also given the Defendant Garcia's

9   instruction, short instruction, as 56-A that deals with the

10  statement that was made by Mr. Molina.

11         MR. FLEENER:  Other than that objection, I have no

12  other objections, Judge.

13         THE COURT:  Thank you.

14         MR. JUBIN:  On behalf of Sigi Molina, I don't object

15  to the instructions given.

16         I do object to the exclusion of Molina's proposed

17  Instruction No. 17 which requires unanimity of the object of

18  the conspiracy; not so much that the jury couldn't find one or

19  the other, but that the jury ought to have to be unanimous as

20  to which object it finds.

21         THE COURT:  I overrule the objection, but feel that

22  the issue is sufficiently covered in another instruction

23  dealing with -- I forget the number -- dealing with

24  consideration of the conjunctive.

25         MR. JUBIN:  If I remember correctly, Your Honor, it

1   was Instruction 25 that you referenced off the record earlier

2   as containing the appropriate unanimity requirements.  And I

3   simply disagree and would object.  Thank you.

4           THE COURT:  Thank you.

5           I've told the -- Mr. Lang that noon would be fine for

6   the jurors to go.  It is going to be close, but if they're a

7   little late that's fine.  What arrangements are you making for

8   them?

9           THE CLERK:  Your Honor, we have made reservations for

10  them up at The Egg and I.  I gave them a window 12:00 to

11  12:30ish.

12          THE COURT:  That's good.

13          Do you want to take a few minutes before we go in and

14  get started again and talk to your clients and get warmed up?

15          MR. JUBIN:  I think that would be helpful.

16          Going to read the instructions first?

17          THE COURT:  I will read a portion of the instructions

18  first and then hear our closing statements and then finish with

19  the -- I think it is maybe Instruction 41 is where I start

20  again, something like that.

21          THE CLERK:  And, Your Honor, prior to coming in we

22  were missing a couple of jurors, so I will need to go check on

23  those folks and then make a call to the Marshal.

24          THE COURT:  That's right.  We're right at 10:00 when I

25  told them to be here.

1          MR. JUBIN:  Oh, before we leave the record here, I'm

2     still considering whether or not to put on a defense case, that

3     is, to call a gentleman named Larry Sinning as a witness, and

4     in part my decision depends upon an advanced evidentiary ruling

5     with respect to the scope that the Court may permit on

6     cross-examination.

7          Typically under the rules, once a party has testified

8     the cross-examination is limited to the scope of the direct

9     examination.  My understanding -- my intent in calling

10    Mr. Sinning would simply be to indicate that he never received

11    any controlled substances from Mr. Molina, and, indeed, never

12    met him until he was introduced to him in the jail.

13         My understanding is that the Government's response to

14    that would be the desire to introduce some statements that

15    Mr. Molina apparently and allegedly made to Mr. Sinning that

16    may be very self-inculpatory.  And I don't intend to open that

17    issue, and I'm wondering what the Court's view of that is.

18         MR. HEALY:  Judge, may I respond?  I have two

19    responses to that.  The first is the most concerning to me,

20    that is, that if the indictment is not going back to the jury,

21    the Court never instructed the jury on manner and means.

22    Manner and means are allegations and unlike overt acts do not

23    need to be proved beyond a reasonable doubt.

24         If Mr. Jubin asks that question to Larry Sinning and

25    he says, "No, I don't know him," and then Mr. Jubin gets up and

1    waves the Indictment around in closing and says, "Look, the

2    manner and means here says that he distributed," they don't

3    have to find that he distributed to Larry Sinning, Junior.  So

4    I'm not sure what the relevance is.

5            And any relevance, too, on 403 comes into play here

6    because talk about confusion, if they start looking at the

7    manner and means now, I'm going to ask that the entire

8    Indictment be sent back with them, that they review that.  It

9    seems like there's -- it's -- it is, as some of Mr. Jubin's

10   language before in his jury instructions said, fraught with

11   danger.

12           The other issue is that I think that once this witness

13   is called to discuss whether he ever bought methamphetamine

14   from Mr. Molina, I certainly can stand on cross-examination and

15   say, "How do you know Mr. Molina?"  "I met him in jail."  "Did

16   Mr. Molina say anything to you in jail?"  "Yes, he told me that

17   he never thought Kyle Carothers would testify against him

18   because they helped raise Kyle Carothers."  A.  And B,

19   "Besides, the only thing they can prove I ever did was about 2

20   to 3 pounds, not the 30 that they're trying to prove."

21           But I think the first one is the one that's the real

22   problem, Judge, the relevance and the 403 issue.

23           THE COURT:  Well, I'm also -- suspect that Ms. Garcia

24   has some concern about the Indictment going to the jury.

25           MR. FLEENER:  Yes, Judge.

1          MR. HEALY:  And we will need an instruction on the

2    manner and means if we do that, Judge, at least as far as the

3    Government is concerned, what the manner and means -- and I

4    will need to run up and do the research on that.

5          THE COURT:  Well, I'm not going to preclude you from

6    raising the issue.  I will allow you to question Mr. Sinning.

7          MR. JUBIN:  I will consider that and decide whether or

8    not as a strategic matter it makes sense to call Mr. Sinning or

9    not, and I guess you will know when I either call him or rest.

10          THE COURT:  Fair enough.

11          MR. JUBIN:  I don't think it would be helpful for the

12    jury to have the Indictment.

13          MR. HEALY:  Well, if that's true, then how are we

14    going to do the manner -- if you're going to refer to the

15    Indictment in your closing, refer to something the Judge hasn't

16    instructed them on, how is that going to work?

17          THE COURT:  I don't know.  It is a problem you have.

18    It seems to me that the usual instruction is is that -- you

19    know, I've never liked -- let me start from the beginning.  I

20    hate the idea of presenting indictments to juries that have a

21    long list of manners and means, schemes and overt acts because

22    it does require explanation to the jury.  And in these kinds of

23    cases there is no requirement that you prove a specific overt

24    act.  So you don't have that obligation and all you're asking

25    for is juror confusion.

1            And also, the danger becomes that the Indictment

2     becomes evidence at that point which is a bad thing for a

3     defendant and kind of unfair always in my view.  And so

4     whenever I can, I try to just tell the -- because I'm already

5     giving the count in the instructions, so there's nothing hidden

6     there.  The jury has it, whatever they need.

7            MR. JUBIN:  Short answer is as I sit here, I'm

8     inclined not to call Mr. Sinning.

9            MR. HEALY:  Judge, that's really good to know, I have

10     to tell you, not Mr. Jubin's comment but yours, because we have

11     been going back and forward about this in the office whether we

12     should do speaking indictments or not.  And if you don't mind,

13     I would like to share your concern with management.

14            THE COURT:  Well, I realize you've got to prove an

15     overt act on some conspiracies, and so you have that problem.

16     And I've often wondered maybe just the instruction should kind

17     of cherry-pick the overt act and put -- find some way to put it

18     in the instructions rather than give them a long list.  And

19     I've seen some where we have had a stack of material where

20     there's no evidence on, you know, but here it was in front of

21     that jury.  And some of it is pretty prejudicial stuff.

22            MR. HEALY:  Would you be able to let me know before we

23     convene so that we can get a -- I can at least make a record on

24     the instruction needed for manner and means if you're going to

25     do this, that it is not required the -- the Government is not

1    required to prove each of the manner and means listed?

2            MR. JUBIN:  I will let you know as soon as I make that

3    decision finally, and I'm pretty close.

4            MR. HEALY:  Okay.  Thanks, Judge.

5            THE COURT:  Yeah, and I have no objection to -- John,

6    let me give you these instructions that Mr. Jubin gave to us.

7            You want me to sign yours, too, Tom, the refused?

8            MR. FLEENER:  The -- yes, please, if you would sign --

9    yes, my proposed -- my first proposed instruction and -- just

10   the first proposed instruction, yes, Judge.  Thank you for

11   bringing that up.

12           Yes, sir, thank you.

13           THE LAW CLERK:  Just that one?

14           MR. FLEENER:  Just that one.  We amended the 924(c)s,

15   and we have accepted the Bruton one.  So it is just that one.

16           THE LAW CLERK:  Double-check and make sure all the

17   changes are correct.

18           MR. HEALY:  Did you just give us the new ones?

19           THE LAW CLERK:  Yeah.

20           MR. HEALY:  Are these -- oh, okay.

21           THE LAW CLERK:  I just figured you could substitute

22   them.  I didn't want to print out 10,000 pages.  And I hope

23   that is everything.  Oh, wait, wait, wait.  I missed one.  I

24   missed the 924(c) one, I think -- sorry -- which is 37.  Yeah,

25   I missed 37.  Let me go fix that for you.

1          MR. HEALY:  Thanks, Sherrill.

2          MR. HEALY:  Judge, time on closings?

3          THE COURT:  I think you could do it in 30 minutes.

4          MR. JUBIN:  I think we should all be restricted to ten

5     minutes each.

6          MR. HEALY:  I'm responding to two attorneys.  I will

7     take 30, Judge.  I would be happy with 30.  Don't cut me off.

8          MR. FLEENER:  Can I have your extra?  I will have you

9     go first.  I will take the remaining 27.

10         THE COURT:  Just depends what is said in that ten

11    minutes.

12         MR. HEALY:  Shorter ones are more effective than the

13    longer ones, I think.

14         MR. JUBIN:  We shall see.

15         THE COURT:  We can go off the record.

16    (Discussion off the record.)

17    (Proceedings recesssed 10:15 a.m.)

18    (Proceedings reconvened in open court 10:25 a.m.)

19    (Following in the presence of the defendants.)

20         THE COURT:  Good morning, all.

21         Counsel, have you had an adequate opportunity to speak

22    to your clients this morning?

23         MR. FLEENER:  Yes, Your Honor.

24         MR. JUBIN:  Yes, Your Honor, I have.

25         THE COURT:  You ready to bring the jury in?

1          MR. JUBIN:  Yes.

2          MR. FLEENER:  Yes.

3          THE COURT:  All right.

4     (Following in the presence of the jury.)

5          THE COURT:  Good morning, ladies and gentlemen.  When

6     we recessed last Friday -- I hope you all had a very pleasant

7     and relaxed weekend, were able to catch up on business -- the

8     Government had rested its presentation of the evidence.

9          Does Defendant Garcia have any further evidence she

10    wishes to present in this matter?

11         MR. FLEENER:  No, Your Honor.  We rest.

12         THE COURT:  Mr. Jubin, does Defendant Molina have any

13    further evidence he wishes to present in this matter?

14         MR. JUBIN:  No, Your Honor.  We rest.

15         THE COURT:  Very well, the evidence, then, is closed

16    in this matter.

17         The next step in the proceedings will be to present

18    the instructions or at least some of the instructions of the

19    Court to you.

20         All of the instructions are contained in this

21    instruction booklet and it has tabs in it.  Behind the first

22    tab are the instructions that were given to you at the

23    beginning of this trial, will go into the jury room with you,

24    as I said, and you should feel free to reread those

25    instructions.  I will not be reading them to you now.

1        Behind the second tab are the instructions I will be

2   reading now.  They focus primarily on the substantive law

3   issues that you will be considering.  And I want to tell you

4   that during the closing statements you hear from Counsel, they

5   may refer to any instructions that I will be giving to you this

6   morning.

7        Once those are read to you, Counsel will present their

8   closing statements to you to assist you in analyzing the

9   evidence you've received in this case and applying the law, and

10  then I will give you another group of instructions which deal

11  primarily with just the evidentiary issues that you consider

12  during the course of your deliberations in this matter.

13       And the final instruction -- not instruction that I

14  give to you, but the final document in this book of

15  instructions is the verdict form upon which the jury shall

16  record its unanimous verdict in this case.  And there are

17  really two verdict forms, one for each of the defendants, since

18  you will be considering their cases separately.

19       Now, a little bit about this booklet.  The

20  instructions have a number at the top of each instruction.

21  That number is only the substitute for a name for the

22  instruction so when we have our conference if the Government

23  has an objection, they say, "Judge, will you look at

24  Instruction No. 50?" for example, and we can go right to it

25  because there's the number.  Otherwise, they would have to say,

1    "Judge, will you go to instruction that says something like,"

2    and everyone is scrambling around looking for the language that

3    they might be describing.

4          So there's no significance to the numbers.  I haven't

5    numbered them from the least important to the most important

6    instruction.  They're all equally important and should be

7    considered by you in your deliberation.

8          When this case finally goes to the jury, you will find

9    that certain gaps in the numbering exist.  That simply means

10   that in our deliberations we have talked and decided, well, we

11   don't need that one, so rip it out.  It's gone.  There's no

12   significance in that gap beyond that.

13         There may be some instructions that are not in order,

14   and if so, all we've decided is that it just reads better in

15   the order that we've placed them.  So don't give any

16   significance to those things or the jumping or there may be a

17   missing number or something of that nature.

18         I will be giving you further instructions on these

19   matters as we progress throughout the day.  I'm starting on the

20   second group of instructions at this point, so I will ask you

21   to listen as we read the instructions.

22         I hope everyone can hear.  I will try to keep it

23   going.

24         Members of the jury, now that you have heard all of

25   the evidence, it becomes my duty to give you the final

1  instructions of the Court as to the law that is applicable to

2  this case and which will guide you in your decisions.

3        All of the instructions of law given to you by the

4  Court, those given to you at the beginning of the trial and

5  those given to you during the trial and these final

6  instructions, must guide and govern your deliberations.  It is

7  your duty as jurors to follow the law as stated and all of the

8  instructions of the Court and to apply these rules of law to

9  the facts as you find them to be from the evidence received

10 during the trial.

11        Counsel will quite properly refer to some of the

12 applicable rules of law in their closing arguments to you.  If,

13 however, any difference appears to you between the law as

14 stated by Counsel and that as stated by the Court in these

15 instructions, you, of course, are to be governed by the

16 instructions given to you by the Court.

17        You are not to single out any one instruction alone as

18 stating the law but must consider the instructions as a whole

19 in reaching your decisions.  Neither are you to be concerned

20 with any opinion you may have as to what the law ought to be.

21 It would be a violation of your sworn duty to base any part of

22 your verdict upon any other view or opinion of the law than

23 that given in these instructions of the Court, just as it would

24 be a violation of your sworn duty as judges of the facts to

25 base your verdict upon anything but the evidence received in

1   the case.

2          You were chosen as jurors for this trial in order to

3   evaluate all of the evidence received and to decide each of the

4   factual questions presented by the allegations brought by the

5   United States in the Indictment and the pleas of not guilty by

6   the defendants.  In resolving the issues presented to you for

7   decision in this case, in this trial, you must not be persuaded

8   by bias, prejudice or sympathy for or against any of the

9   parties to this case or by any public opinion.  Justice through

10  trial by jury depends upon the willingness of each individual

11  juror to seek the truth from the same evidence presented to all

12  of the jurors here in the courtroom to arrive at a verdict by

13  applying the same rules of law as now being given to each of

14  you in these instructions of the Court.

15         The Government has the burden of proving the

16  Defendants Jacqueline M. Garcia and Sigifredo Molina Varela

17  guilty beyond a reasonable doubt.  The law does not require a

18  defendant to prove his or her innocence or produce any evidence

19  at all.  The Government has the burden of proving the defendant

20  guilty beyond a reasonable doubt and if it fails to do so, you

21  must find the defendant not guilty.

22         Proof beyond a reasonable doubt is proof that leaves

23  you firmly convinced of the defendant's guilt.  There are few

24  things in this world that we know with absolute certainty, and

25  in criminal cases, the law does not require proof that

1   overcomes every possible doubt.  It is only required that the

2   Government's proof exclude any reasonable doubt concerning the

3   defendant's guilt.

4        A reasonable doubt is a doubt based on reason and

5   common sense, after careful and impartial consideration of all

6   the evidence in the case.  If, based on your consideration of

7   the evidence, you are firmly convinced that the defendant is

8   guilty of the crime charged, you must find the defendant

9   guilty.  If, on the other hand, you think there's a real

10  possibility that the defendant is not guilty, you must give the

11  defendant the benefit of the doubt and find the defendant not

12  guilty.

13       There's nothing particularly different in the way that

14  a juror should consider the evidence in a trial from that in

15  which any reasonable and careful person would deal with very --

16  any very important question that must be resolved by examining

17  facts, opinions and evidence.  You are expected to use your

18  good sense in considering and evaluating the evidence in the

19  case.  Use the evidence only for those purposes for which it

20  has been received and to give such evidence a reasonable and

21  fair construction in the light of your common knowledge of the

22  natural tendencies and inclinations of human beings.

23       If a defendant be proved guilty beyond a reasonable

24  doubt, say so.  If not proved guilty beyond a reasonable doubt,

25  say so.  Keep constantly in mind that it would be a violation

1    of your sworn duty to base a verdict upon anything other than

2    the evidence received in the case and the instructions of the

3    Court.  Remember as well that the law never imposes upon a

4    defendant in a criminal case the burden or duty of calling any

5    witnesses or producing any evidence because the burden of

6    proving guilt beyond a reasonable doubt is always with the

7    United States.

8         An Indictment is but a formal method of accusing a

9    defendant of a crime.  It is not evidence of any kind against

10   the accused.  The defendants have pleaded not guilty to the

11   charges contained in the Indictment.  The pleas of not guilty

12   put in issue each of the essential elements of the offenses as

13   described in these instructions and imposes on the Government

14   the burden of establishing each of these elements by proof

15   beyond a reasonable doubt.

16        The defendants are not on trial for any act or any

17   conduct not specifically charged in the Indictment.  A separate

18   crime or offense is charged against the defendant in each count

19   of the Indictment.  Each offense and the evidence pertaining to

20   it should be considered separately.  The facts that you may

21   find the accused guilty or not guilty of one of the offenses

22   charged should not control your verdict as to any other

23   offense.

24        Count 1 of the Indictment charges that from on or

25   about March 2011 through and including January 15, 2013, in the

1  District of Wyoming and elsewhere, the Defendants Jacqueline M.

2  Garcia (Garcia), and Sigifredo Molina Varela, also known as

3  Sigi Molina, Kyle Lee Carothers, Whitney D. Rose, Travis K.

4  Smith, Larry D. Sinning, Junior, Christopher L. George, Michael

5  J. Adams, Heidi L. Blankenship, and Robert C. Brodie, together

6  with persons both known and unknown to the grand jury, did

7  knowingly, intentionally and unlawfully combine, conspire,

8  confederate and agree to possess with intent to distribute and

9  to distribute 500 grams or more of a mixture or substance

10  containing a detectable amount of methamphetamine, a Schedule

11  II controlled substance, in violation of Title 21 United States

12  Code, Sections 846 and 841(a)(1) and (b)(1)(A).

13        The Indictment charges that the offenses alleged in

14  the Indictment were committed on or about certain dates.

15  Although it is necessary for the United States to prove beyond

16  a reasonable doubt that the offenses were committed on a date

17  reasonably near the date alleged in the Indictment, it is not

18  necessary for the United States to prove that the offenses were

19  committed precisely on dates charged.

20        The charge contained in the Indictment is based upon a

21  statute which is federal law, Title 21 United States Code,

22  Section 846 which reads in pertinent part as follows:  Any

23  person who attempts or conspires to commit any offense defined

24  in this subchapter is guilty of an offense against the United

25  States.

1          A subchapter referred to above includes Section

2     841(a)(1) of Title 21 of the United States Code which provides

3     in pertinent part:  It shall be unlawful for any person

4     knowingly or intentionally to distribute or possess with intent

5     to distribute a controlled substance.

6          An act is done knowingly if done voluntarily and

7     intentionally and not because of mistake or accident or other

8     innocent reason.  The purpose of adding the word "knowingly" is

9     to ensure that no one will be convicted for an act done because

10    of mistake or accident or other innocent reason.  When the word

11    "knowingly" is used in these instructions, it means a defendant

12    realized what he or she was doing and was aware of the nature

13    of his or her conduct and did not act through ignorance,

14    mistake or accident.

15         The intent of a person or the knowledge that a person

16    possesses at any given time may not ordinarily be proved

17    directly because there's no way of directly scrutinizing the

18    workings of the human mind.  In determining the issue of what a

19    person knew or what a person intended at a particular time, you

20    may consider any statements made or acts done or acts omitted

21    by that person and all other facts and circumstances received

22    in evidence which may aid in your determination of that

23    person's knowledge or intent.

24         You may infer, but you are certainly not required to

25    infer that a person intends the natural and probable

1   consequences of acts knowingly done or knowingly omitted.  It

2   is entirely up to you, however, to decide what facts you find

3   from the evidence received during this trial.

4          Possession, as that term is used in this case, may be

5   of two kinds:  Actual possession and constructive possession.

6   A person who knowingly has physical control over a thing at a

7   given time is in actual possession of it.  A person who,

8   although not in actual possession, knowingly has both the power

9   and the intention at a given time to exercise dominion or

10  control over a thing, either directly or through another person

11  or persons, is in constructive possession of it.

12         Possession may be sole or joint.  If one person alone

13  has actual or constructive possession of a thing, possession is

14  sole.  If two or more persons share actual or constructive

15  possession of a thing, possession is joint.

16         You may find that the element of possession as that

17  term is used in these instructions is present if you find

18  beyond a reasonable doubt that a defendant had actual or

19  constructive possession, either alone or jointly with others.

20         The Defendants Jacqueline M. Garcia and Sigifredo

21  Molina Varela are charged in the Indictment with a violation of

22  Title 21 United States Code, Section 846.  This law makes it a

23  crime for anyone to conspire with someone else to violate

24  federal laws pertaining to controlled substances.  In this case

25  the defendants are charged with conspiracy to possess with

1   intent to distribute and to distribute methamphetamine.

2       To find the defendants guilty of this crime,

3   considering each defendant separately, you must be convinced

4   that the Government has proven each of the following elements

5   beyond a reasonable doubt.

6       First, from on or about March 2011 through and

7   including January 15, 2013;

8       Second, in the District of Wyoming;

9       Third, two or more persons agreed to violate the

10  federal drug laws;

11      Fourth, the defendant knew the essential objective of

12  the conspiracy to distribute methamphetamine, a controlled

13  substance;

14      Fifth, the defendant knowingly and voluntarily

15  involved himself or herself in the conspiracy;

16      And six, there was interdependence among the members

17  of the conspiracy, that is, the members in some way or manner

18  intended to act together for their shared mutual benefit within

19  the scope of the conspiracy charged.

20      If the Government fails to prove any of these elements

21  by proof beyond a reasonable doubt, you should find the

22  defendant not guilty.

23      If, on the other hand, the Government proves each of

24  the elements by proof beyond a reasonable doubt, you should

25  find the defendant guilty.

1        You are instructed that when an offense is charged in

2   the conjunctive, the offense may be proven in the disjunctive.

3        For example, Count 1 of the Indictment charges the

4   Defendants Jacqueline M. Garcia and Sigifredo Molina Varela

5   with conspiracy to violate the federal controlled substances

6   statute.  The Indictment charges that the defendants and his,

7   her or their conspirators, cococonspirators, did knowingly,

8   intentionally and unlawfully combine, conspire, confederate and

9   agree with other persons to commit unlawful activity, that is,

10  1, possess with intent to distribute methamphetamine; and/or 2,

11  to distribute methamphetamine.

12       For purposes of the charge contained in the Indictment

13  the Government is required to prove beyond a reasonable doubt

14  that the purpose of the conspiracy included either, 1, to

15  knowingly, intentionally and unlawfully possess with intent to

16  distribute methamphetamine; or 2, to knowingly, intentionally

17  and unlawfully distribute methamphetamine.

18       Thus, in order for you to find the defendants guilty,

19  you must find beyond a reasonable doubt that at least one of

20  these two purposes were objects of the conspiracy, but you need

21  not find that both of the purposes were objects of such

22  conspiracy.

23       A conspiracy is an agreement between two or more

24  persons to accomplish an unlawful purpose.  It is a kind of

25  partnership in criminal purpose in which each member becomes

1    the agent or partner of every other member.  Once a person

2    becomes a member of a conspiracy, that person is held legally

3    responsible for the acts of the other members done in

4    furtherance of the conspiracy, even though he was not present

5    or aware that the acts were being committed.  The evidence in

6    the case need not show that the members entered into any

7    express or formal agreement, nor is it necessary that the

8    evidence show that the members stated between themselves what

9    their object or purpose was to be or the details thereof or the

10   means by which the object or purpose was to be accomplished.

11          In order to establish proof that a conspiracy existed,

12   the evidence must show beyond a reasonable doubt that the

13   members in some way or manner or through some contrivance

14   expressly or impliedly came to a mutual understanding to try to

15   accomplish a common and unlawful plan.

16          Mere similarity of conduct among various persons and

17   the fact that they may have associated with each other and may

18   have assembled together and discussed common aims and interests

19   does not necessarily establish proof of the existence of a

20   conspiracy.  If you are convinced that the charged conspiracy

21   existed, then you must next determine whether the defendant was

22   a member of that conspiracy; that is, whether the defendant

23   knew at least the essential goals of the conspiracy and

24   voluntarily chose to be part of it.

25          The law does not require proof that the defendant knew

1   all of the other members of the conspiracy or knew all the

2   details about how activities were to be carried out.  A person

3   may belong to a conspiracy for a brief period of time or play a

4   minor role.  On the other hand, proof is not sufficient if it

5   merely shows that the defendant knew about the existence of the

6   conspiracy or was associated with members of the conspiracy.

7   Rather, the evidence must show that the defendant knowingly

8   joined the conspiracy with the intent to advance its purposes.

9        You are also required to find that interdependence

10  existed among the members of the conspiracy.  This means that

11  the members intended to act for their shared mutual benefit.

12  To satisfy this element, you must conclude that the defendant

13  participated in a shared common criminal purpose, that his or

14  her actions constituted an essential and integral step toward

15  the realization of that purpose.

16       Count 1 of the Indictment charges that the defendants

17  were all members of one single conspiracy to commit the crime

18  of possession with intent to distribute and to distribute

19  methamphetamine.  Sigifredo Molina Varela has argued that there

20  were really two or more separate conspiracies instead of a

21  single conspiracy charged in the Indictment.  You must

22  determine whether the single conspiracy as charged in the

23  Indictment existed, and if it did, whether the defendant was a

24  member of it.

25       Proof of several separate conspiracies is not proof of

1    a single overall conspiracy charged in the Indictment unless

2    one of the several conspiracies which is proved is the single

3    conspiracy charged in the Indictment.

4         If you find that the defendant was not a member of the

5    conspiracy charged, then you must find the defendant not

6    guilty, even though the defendant may have been a member of

7    some other conspiracy.  This is because proof that a defendant

8    was a member of some other conspiracy is not enough to convict.

9    But proof that a defendant was a member of some other

10   conspiracy would not prevent you from returning a guilty

11   verdict if the Government proved beyond a reasonable doubt that

12   the defendant was also a member of the conspiracy charged in

13   the Indictment.

14        In order to sustain its burden of proof in Count 1 of

15   the Indictment which, as I have said, charges the defendants

16   with conspiracy to distribute methamphetamine, the Government

17   is not required to prove that any particular overt act was

18   performed in furtherance of the conspiracy by one of the

19   members of the conspiracy.  The Government is not required to

20   prove that the parties to or members of the conspiracy or

21   agreement were successful in achieving any or all of the

22   objects of the conspiracy -- of the agreement or conspiracy.

23        You are instructed that as a matter of law that

24   methamphetamine is a Schedule II controlled substance.

25        The term "to distribute" as used in these instructions

1  means to deliver or transfer possession or control of something

2  from one person to another.

3      The term "distribute" includes the sale of something

4  by one person to another.  It is not necessary, however, for

5  the Government to prove that any transfer of money or other

6  thing of value occurred at the same time as or because of the

7  distribution.

8      If you find a defendant guilty of conspiracy to

9  possess with intent to distribute and to distribute

10  methamphetamine as charged in the Indictment, then you must

11  also determine the amount of methamphetamine involved in the

12  conspiracy.  The substantive charge of conspiracy to possess

13  with intent to distribute and to distribute methamphetamine

14  requires the Government to prove beyond a reasonable doubt that

15  the conspiracy involved a detectable amount of methamphetamine.

16      When, as in this case, the Indictment alleges the

17  conspiracy involved more than a detectable amount of

18  methamphetamine, the Government is required to prove an amount

19  of methamphetamine beyond a reasonable doubt.  You do not have

20  to find the exact amount of methamphetamine involved.  On the

21  verdict form, you will be asked to mark the amount of

22  methamphetamine you find has been proved beyond a reasonable

23  doubt.  Your finding must be unanimous.

24      There are two ways the Government can prove the amount

25  of methamphetamine a defendant is accountable for in the

1   conspiracy as charged in the Indictment:  First, by proving the

2   amount of methamphetamine intended to be possessed with intent

3   to distribute, and/or distributed personally by a defendant

4   during the conspiracy; second is based on the legal rule that

5   all members of a conspiracy are responsible for acts committed

6   by other members as long as those acts were committed to help

7   advance the objective of the conspiracy and are acts reasonably

8   foreseeable to a defendant.  Under these circumstances, the act

9   of one conspirator may be treated as the act of all.  To hold a

10  defendant responsible for an amount of methamphetamine

11  possessed with intent to distribute and/or distributed by other

12  members of the conspiracy, you must find beyond a reasonable

13  doubt, 1, that a defendant was a member of the conspiracy; 2,

14  that after that defendant joined the conspiracy and while the

15  defendant was still a member of the conspiracy one or more of

16  the other members of the conspiracy possessed with intent to

17  distribute and/or distributed methamphetamine; 3, that this

18  possession with intent to distribute and/or distribute

19  methamphetamine was done in furtherance of the conspiracy; and

20  4, that the intent to possess with intent to distribute and or

21  distribute was reasonably foreseeable to the defendant.

22      The methamphetamine intended to be possessed with

23  intent to distribute and/or distributed by other members of the

24  conspiracy must be reasonably foreseen as a necessary or

25  natural consequence of the agreement.  This does not require

1    proof that each coconspirator specifically agreed or knew that

2    an actual amount of methamphetamine would be possessed with

3    intent to distribute and/or distributed by all members of the

4    conspiracy, but the Government must prove that the amount of

5    methamphetamine intended to be possessed with intent to

6    distribute and/or distributed by other members of the

7    conspiracy was reasonably foreseeable to the defendants

8    Jacqueline M. Garcia and Sigifredo Molina Varela.  No defendant

9    is responsible for the acts of others going beyond the

10   reasonably foreseeable scope of the conspiracy.

11        If, however, you find that the Government has proved

12   beyond a reasonable doubt the defendants could have reasonably

13   foreseen the methamphetamine intended to be possessed with

14   intent to distribute and/or distributed by other members of the

15   conspiracy, you are instructed to add those amounts to the

16   amount of methamphetamine you find beyond a reasonable doubt

17   the defendant personally intended to be possessed with intent

18   to distribute and/or distributed.

19        Count 2 of the Indictment charges that from on or

20   about March 2011 in the District of Wyoming Defendants

21   Jacqueline M. Garcia and Sigifredo Molina Varela did knowingly

22   possess firearms in furtherance of a drug trafficking crime,

23   namely, conspiracy to possess with intent to distribute and to

24   distribute methamphetamine in violation of Title 21 United

25   States Code, Section 846, as more fully alleged in Count 1 of

1    the Indictment, in violation of Title 18 United States Code,

2    Section 924, Subsection (c)(1)(A).

3         The Defendants Jacqueline M. Garcia and Sigifredo

4    Molina Varela are charged in Count 2 with a violation of Title

5    18 United States Code, Section 924(c)(1).  This law makes it a

6    crime to possess a firearm in furtherance of a drug trafficking

7    crime.  To find the defendants guilty of this crime, you must

8    be convinced that the Government has proved each of the

9    following beyond a reasonable doubt:

10        First, the defendant committed the crime of conspiracy

11   to distribute methamphetamine as charged in Count 1 of the

12   indictment which is a drug trafficking crime;

13        Second, the defendant possessed a firearm in

14   furtherance of this crime.

15        If the Government fails to prove any of these elements

16   beyond a reasonable doubt, you should find the defendant not

17   guilty.  If, on the other hand, the Government proves each of

18   the elements by proof beyond a reasonable doubt, you should

19   find the defendant guilty.

20        You are reminded that you must separately consider the

21   evidence against each defendant on each count and return a

22   separate verdict for each defendant -- or as to each defendant.

23        The term "firearm" means any weapon which will or is

24   designed to or may readily be converted to expel a projectile

25   by the action of an explosive.  The term "firearm" also

1  includes the frame or receiver of any such weapon or any

2  firearm muffler or firearm silencer or destructive device.

3       You are instructed possession in furtherance of means

4  for the purpose of assisting in, promoting, accomplishing,

5  advancing or achieving the goal or objective of the underlying

6  offense.

7       Mere possession of a firearm at the scene is not

8  enough to find possession in furtherance of a drug trafficking

9  crime because the firearm's presence may be coincidental or

10  entirely unrelated to the underlying crime.

11       Some factors that may help in determining whether

12  possession of a firearm furthers, advances or helps advance a

13  drug trafficking crime include, but are not limited to, one,

14  the type of criminal activity that is being conducted; two, the

15  accessibility of the firearm; three, the type of firearm; four,

16  whether the firearm is stolen; five, the circumstances

17  surrounding the acquisition of the firearm; six, the status of

18  the possession, legitimate or illegitimate, or illegal; seven,

19  whether the firearm is loaded; eight, the time and

20  circumstances under which the firearm is found; and nine,

21  proximity to drugs or drug profits.

22       The jury must find a nexus between a defendant's

23  possession of the firearm and the drug trafficking offense

24  after careful consideration of all evidence that has been

25  offered during the trial of this matter.

1          You are the sole judges of the facts based upon the

2     evidence received in the case.

3          I am going to read the possession instruction again to

4     you.  Possession, as that term is used in this case, may be of

5     two kinds, actual possession and constructive possession.  A

6     person who knowingly has direct physical control over a thing

7     at a given time is in actual possession of it.  A person who,

8     although not in actual possession knowingly has both the power

9     and the intention at a given time to exercise dominion or

10    control over a thing, either directly or through another person

11    or persons, is in constructive possession of it.

12         Possession may be sole or joint.  If one person alone

13    has actual or constructive possession of a thing, possession is

14    sole.  If two or more persons share actual or constructive

15    possession of a thing, possession is joint.  You may find that

16    the element of possession as that term is used in these

17    instructions is present if you find beyond a reasonable doubt

18    that a defendant had actual or constructive possession either

19    alone or jointly with others.

20         Those are the initial instructions I give to you this

21    morning.  Each of the parties now has the opportunity to

22    present their closing statement helping you to analyze and

23    understand the evidence that has been presented in this case.

24         MR. HEALY:  Your Honor, may we approach briefly about

25    the instructions?

1          THE COURT:  The Government will proceed first with

2     their opening statement (sic) to you because they have the

3     burden of proof and they may following the instructions --

4     follow the arguments of the defendant with a brief rebuttal and

5     reserve a portion of their time to do so.

6          (At sidebar.)

7          MR. HEALY:  Your Honor, I didn't see Instruction

8     No. -- I didn't hear Instruction No. 39 which came right after

9     the factors to be considered and before the constructive and

10    actual possession.

11         THE COURT:  I gave it.

12         MR. HEALY:  Okay.  I'm sorry.

13         (Sidebar ended.)

14         MR. HEALY:  May it please the Court, Counsel.

15         THE COURT:  Mr. Healy.

16         MR. HEALY:  Ladies and gentlemen, you've heard a lot

17    about a lot of things that you probably haven't heard a lot

18    about in your lives before the last week.  I want to talk to

19    you a little bit about this term of conspiracy.  It has always

20    been helpful for me in explaining conspiracies and thinking

21    about them to think of one of my favorite things to do which is

22    reading, reading novels.  And I always think of a conspiracy as

23    the book, the novel itself, and the evidence and the testimony

24    that you hear, the testimony from witnesses, the evidence as

25    collected and brought before you, they're chapters in this

1   book.  Some of those chapters as we all know from reading, we

2   read right through and we think it is great and it captures us.

3   Some of it in the book gets a little slow, but they're all

4   critical to an understanding of the entire book.  So I want you

5   to think about that as you hear about the evidence.

6         And there's another thing I want you to think about,

7   too.  One of defense counsel in his opening statement mentioned

8   that you would hear the Government's version of the truth.

9   Now, this bothers me, this idea of truth being malleable or

10  subject to chance.  But ultimately what the Government thinks

11  is the truth or what defense counsel thinks is the truth.

12  Doesn't matter really what even Judge Johnson thinks doesn't

13  matter.

14        You are the sole judges of the truth and the

15  credibility of the witnesses.  The instruction says justice

16  through trial by jury depends upon the willingness of each

17  juror to seek the truth.  So what my opinion of the truth is

18  doesn't matter.  Your opinion matters.

19        So what kind of story do we have?  What is this novel

20  all about?

21        You've heard a story about these individuals in

22  particular.  It is a sad story.  The courtroom was moved by

23  some of the testimony.  It is a detailed story.  Details are

24  important, very important.  And it's ultimately and I think

25  unavoidably a question of guilt for Jaqueline Garcia and Sigi

1   Molina.

2          MR. JUBIN:  I object, Your Honor.  Personal

3   expressions of guilt are improper, and I would ask the jury be

4   so instructed.

5          THE COURT:  That is accurate and you will disregard

6   any personal opinion from any of the counsel concerning what

7   their belief is in that regard.

8          MR. HEALY:  Ladies and gentlemen, let me just be very

9   specific and tell you that this is the direction of the

10  evidence, not any personal opinion.  I just spent a

11  considerable amount of time detailing that and stressing the

12  importance of it.

13         Okay.  You will be looking at two types of evidence,

14  direct and circumstantial.  And the law makes really no

15  distinction between the two.  Direct evidence is testimony that

16  you will hear from -- that you heard from the stand:  Kyle

17  Carothers, Blankenship, Brodie, Rose, Chris McDonald, Troy

18  Hipsag.  That's direct evidence, although the testimony -- and

19  we will talk about this in a moment, the testimony of Troy

20  Hipsag and Chris McDonald.  There was some circumstantial

21  evidence involved in that, too, where one fact or one

22  reasonable inference leads to an ultimate conclusion.

23         So you will -- you will be hearing all of those things

24  briefly in my closing.

25         So Count 2 is the gun count, and I chose to start with

1   this rather than the -- I guess the logical starting point

2   which would be Count 1 because evidence in Count 2 demonstrates

3   in part some of the proof required for Count 1.  Let me

4   explain.

5          Okay.  Here are the elements of a 924(c).  First, you

6   need to find that the defendants, both of them, Mr. Molina and

7   Ms. Garcia, committed the crime charged in Count 1, conspiracy

8   with intent to distribute methamphetamine.

9          And second, you need to determine beyond a reasonable

10  doubt that the defendants possessed firearms in furtherance of

11  the crime.  Okay.  The Judge already read twice to you

12  possession, actual possession, you hold it in your hand.

13  Constructive possession, you have the ability and the intent to

14  take it if you want it.  You can read those instructions in

15  more detail.

16         Now this is important, this instruction on the factors

17  that help in determining whether possession of a firearm

18  furthers, advances or helps advance a drug crime, these are

19  some of the factors, ladies and gentlemen.  It is up to you

20  ultimately, as I've said, to make that decision.  These are

21  some of the factors that you can consider, but one of the most

22  important here is the circumstances surrounding the acquisition

23  of the firearm.

24         You heard with respect to three of the firearms in

25  this case from Heidi Blankenship, Robert Brodie.  Heidi

1   Blankenship said that she had a .380 that she believed didn't

2   work somehow, which is another one of the factors that you can

3   consider.  You don't have to, but look at the definition of a

4   firearm.  She said that she had a .380 and she had a pretty

5   considerable drug debt.  She gave that .380 to Jackie Garcia.

6   And at first she said she gave it to Garcia and Molina.  When

7   asked to specify, she said, "Okay, I gave it to Garcia."

8          Now, again, you judge the credibility of the witnesses

9   there.  There's no question about that.  And you judge

10  Blankenship's credibility.  It was not easy, as it was

11  demonstrated in this courtroom, for her to testify against

12  Garcia and Molina.  She did it anyway.  She certainly had

13  motive in that she wanted a lesser sentence, but she testified

14  against them and she talked about this gun that she traded to

15  Jackie Garcia for a gun debt.

16         There was also testimony that that gun, or at least

17  another .380, was later given to Raul by Mr. Molina.  Now with

18  respect to Mr. Brodie in particular, he testified that there

19  were two firearms that were exchanged to Mr. Molina that he did

20  personally and this is outside of the testimony, again, of Kyle

21  Carothers who said he saw a Tech 9 and a .22 and a .40 caliber

22  and a 9 millimeter, or Whitney Rose who said she saw an AK-type

23  gun and another gun that was about this size (indicating).

24         But Mr. Brodie said that there were two occasions when

25  he gave guns for drugs.  One, personally, to help pay off a

1   debt, and the second time he said it was a .40 caliber that he

2   gave to Mr. Molina to -- to middle the purchase of a gram of

3   methamphetamine for Nate last name unknown who was waiting for

4   him at the Shell station.  And he told you -- he told you, he

5   said, "I did not talk about that in my proffer.  I didn't

6   mention it in my proffer.  I mentioned my possession of guns

7   and my trading of a gun to Mr. Molina, but I didn't talk about

8   that one.  I just didn't recall it until now."

9           And then he said, of interest, "It's difficult" --

10  paraphrasing -- "It's hard for me to get up here and put this

11  stuff on them," referring to Mr. Molina and Ms. Garcia.  He

12  wasn't happy to be testifying.

13          So -- so you have all these factors.  And again, this

14  is a nonexclusive list.  You can consider the circumstances

15  surrounding the acquisition of the firearm.  The type of the

16  criminal activity being conducted, this methamphetamine being

17  traded back and forth.

18          The accessibility of the firearms.  Consider this open

19  safe upstairs where all these drug transactions took place and

20  the guns were always available; not wrapped in plastic, but in

21  the safes, okay.

22          The type of firearms:  Pistols, a Tech 9, all of these

23  things.  You go through each of these.

24          Proximity to drugs or drug profits.  Remember,

25  don't -- don't let -- don't let yourselves be stuck in a

1   certain point in time.  That is not what a conspiracy is.  It

2   runs the course of time.  Remember.

3           So when you're -- you're told to consider that the

4   firearm is found on January 16th, 2013.  We're only close to a

5   little bit of methamphetamine, and no money, no ledgers, that's

6   one point in time.  That's a single chapter, ladies and

7   gentlemen.  Think about the story.  And all of the people who

8   were up in that bedroom buying methamphetamine, seeing the

9   guns, trading guns for methamphetamine.  Think of the story.

10          Okay.  Let's go to Count 1.  Again, the Court has read

11  this instruction to you.  I'm not going to go through the

12  actual count in any detail other than to say the Government's

13  required to prove these elements.  Nothing more.  The

14  Government must prove these elements beyond a reasonable doubt.

15          When you think about the elements of conspiring to

16  possess with intent to distribute, go through this.  There's

17  no -- there's no evidence other than that all of this happened

18  in Gillette.  That's -- that's the easy one for you, the

19  District of Wyoming.  These others are going to require careful

20  consideration of the testimony and the witnesses and the

21  evidence.

22          Interdependence:  Supplier.  Supplier takes

23  methamphetamine to one tier below.  One tier below gives the

24  methamphetamine for money to others on a front.  That

25  methamphetamine is then distributed in smaller amounts to other

1    people on a front and partly on cash basis.  That

2    methamphetamine is then distributed to users.  Users take that

3    money, give it to the next level, give it to the next level,

4    and so on.  That is interdependence.

5           Consider the instruction, too, on proving weight, and

6    I will go back.  No. 6 of these elements is very important.

7    They're all equally important, but No. 6, the overall scope of

8    the conspiracy involves 500 grams or more of a mixture or

9    substance containing a detectable amount of methamphetamine.

10   You have to determine that for each defendant.  So you need to

11   think about the evidence that came in with respect to that.

12          But when you do that, you are allowed under this

13   second factor is based on the legal rule that all members of a

14   conspiracy are responsible for acts committed by the other

15   members as long as those acts were committed to help advance

16   the objective of the conspiracy and are acts reasonably

17   foreseeable to the defendant.

18          So when people are conspiring -- if, for example, Kyle

19   Carothers knows that 10 ounces is coming in on occasion to the

20   Garcia Molina home and you believe that all of the other

21   elements are met in this conspiracy, then that weight can be

22   reasonably attributable to Kyle Carothers.  That's an example

23   of what is reasonably foreseeable to someone.

24          Okay.  Again, this issue of the truth that keeps

25   coming up.  I put up a quote from one of my favorite writers,

1   Mark Twain:  "If you tell the truth, you don't have to remember

2   anything."  I want you to think about that as we review the

3   testimony of these witnesses:  "If you tell the truth, you

4   don't have to remember anything."

5        Okay.  Heidi Blankenship.  She has been a long-time

6   friend of Mr. Molina and Ms. Garcia.  She said she began buying

7   from Garcia in 2010 in larger amounts.  Before that she

8   admitted to you that she sold methamphetamine to Ms. Garcia and

9   Mr. Molina on occasion.

10       She said she was buying quarter-ounce amounts about

11  every other week from the early part of 2010 until her arrest

12  in September of 2011.  She talked about Robert Brodie helping

13  her to distribute.  She talked about the gun she gave to

14  Ms. Garcia to help pay off her debt.  And then, interestingly,

15  in cross-examination when I believe Mr. Fleener was asking her

16  about how when she had first spoke about the gun in her proffer

17  she said she gave it to Garcia and Molina, and her statement,

18  again, paraphrasing, was this to me, "They are a unit.  They're

19  a couple.  They come together."

20       Okay.  Now, Robert Brodie's statement isn't that much

21  different.  He was clearly a smaller role in this little

22  agreement between Mr. Molina, Ms. Garcia and Heidi Blankenship.

23  He was a driver at first.  Then a girlfriend -- he told you

24  that at first he wasn't trusted to even go into the house.  He

25  said to you that they would go into the house with no

1    methamphetamine.  He would be downstairs.  Ms. Blankenship

2    would go upstairs with Ms. Garcia, and she would come back down

3    with methamphetamine.

4         He was never up in that room until -- until after her

5    arrest, but again, circumstantial evidence leading to

6    reasonable inferences.

7         So what happens after Ms. Blankenship's arrest?  He

8    gets involved.  And when he gets involved, to make some money

9    with eightballs here and there, he goes directly to

10   Mr. Molina.  And he describes, then, because he's seen it at

11   this point, what he sees:  The upstairs bedroom, the scales,

12   the meth.

13        And then you have Whitney Rose.  Whitney Rose

14   testifies that she's distributing methamphetamine.  She's an

15   addict.  She gives you all of the -- all of the information out

16   front about her criminal history and about her life.  She was

17   even asked by one of these defense counsels about her

18   relationship when she was 12 and she talked about that.  She

19   tells you that she and Kyle Carothers were buying an ounce a

20   day from the defendants until there was too much traffic.  And

21   she -- she gave -- interestingly enough, she gave another story

22   like Mr. Brodie.  There were two people that Molina and Garcia

23   trusted closely, Ms. Blankenship and Mr. Carothers.  It wasn't

24   until they had met Mr. Brodie and Ms. Rose, the significant

25   others, and gained some trust in them that they let these

1  people into their home.

2       So Ms. Rose told you the same thing.  She told you

3  that after this ounce a day, it was 2 to 3 ounces a day, every

4  other couple days or ever how long it took them to get rid of

5  it, just so that there wasn't as much traffic at the Garcia

6  Molina home.  She saw dope in the safe in the upper bedroom.

7       Garcia told her that she flushed 3 eightballs down the

8  toilet before DCI could get in.  That's an interesting point

9  that is made.  Garcia told her that she flushed 2 to 3

10 eightballs down the toilet before DCI could get in.  So

11 Ms. Rose knew from Ms. Garcia that DCI had a tough time getting

12 into that house and during that period of time I believe Agent

13 McDonald testified that a couple minutes, two minutes, there

14 was time to do a lot of things.  And this, according to

15 Ms. Rose, this is what Ms. Garcia said she did.

16       She talked about this time that she saw Molina and

17 Garcia's source where they brought 10 ounces to the house, and

18 she described it in almost exactly the same detail as

19 Mr. Carothers.  She talked about seeing the rifles.  She talks

20 about all the things; again, relationships, trust, where the

21 dope was kept, video cameras, all of these things, the source.

22 And Mr. Brodie mentioned that, that a source would show up and

23 drive into the garage and the -- Garcia and Molina wouldn't

24 have methamphetamine before they got there and when they left,

25 they would have it.

1          So all of these things are, are contributing to all of

2     these stories that are told by each of the defendants.

3          And then we have Kyle Carothers.  Kyle Carothers got

4     up here, and he talked about his life.  He talked about how

5     he -- he had to graduate from high school early because his

6     mother was in prison and his father had left him.  He talked

7     about how while he was in high school, in junior high, he had

8     met the Garcia family and the Molina family, those children,

9     and he had actually even dated one of the -- of the daughters.

10    And during that relationship things occurred and eventually by

11    the time he was 15 he was using methamphetamine with Ms.

12    Garcia, first with Ms. Garcia and then later with Mr. Molina.

13         He told you that before he started dating Whitney Rose

14    who hooked him up with his source -- his customer base, he was

15    buying eightballs in August and September of 2011.  But by

16    November of 2011, he was buying an ounce a day until January

17    and March of 2012, and then after March, 2 ounces every other

18    day or so.  And he gave you the same price that Whitney Rose

19    gave you, 2500 to 2800 an ounce.

20         And here's another thing.  If Whitney Rose and Kyle

21    Carothers were simply interested in getting Mr. Molina and

22    Ms. Garcia in trouble, wouldn't they just have said that that

23    was their only source throughout that entire time?  No, they

24    both recall a period of time.  Mr. Carothers says between

25    January and March.  Ms. Rose says she thinks in January, when

1  Mr. Molina and Ms. Garcia for whatever reason they both had --

2  I think Ms. Rose said that they wanted to quit, the defendants

3  wanted to quit.  Mr. Carothers's explanation was a little more

4  practical, the source was in Mexico, but for whatever reason,

5  they stopped.

6              THE CLERK:  Ten minutes, Counsel.

7              MR. HEALY:  Thank you.  They needed another source.

8  So with the help of Mr. Molina and Ms. Garcia's money, they

9  found other sources.  Chris George drove them to -- drove Kyle

10 to Denver on one occasion.  Mike Adams drove him down with some

11 of Mr. Molina's money on another occasion.  They -- Adams and

12 Carothers also drove to Casper.

13             And there was no evidence submitted to you or

14 suggested to you that there was money provided by -- again, you

15 will be the ultimate judges of that and whether the facts

16 recall the way that I'm telling you, but they didn't -- Mr.

17 Carothers never said that money was going to -- from Mr. Molina

18 to Casper.  He told you it went to Denver.

19             He talked to you about the firearms he saw, a Tech 9;

20 a .380, the same firearm that Blankenship and Brodie talked

21 about; a 9 millimeter High Point; the .40 caliber, the firearm

22 that Mr. Brodie talks about; the .22 pistol, the firearm that

23 Mr. Brodie talks about.  Talks about all of these.

24             And then finally, we have this interviewed confession

25 with Mr. Molina, and all of these things that Carothers and

1   Rose and Brodie and Blankenship are telling you about

2   Mr. Molina are ultimately confirmed by him.

3         He has a source named Raul.  You saw from the -- the

4   January 16, 2013 search, it was still in his wallet, all of

5   those numbers and Raoul's information.

6         He told you the prices that he was charging.  He told

7   you about this trip to Denver for which he contributed money

8   with Mr. Adams and Mr. Carothers.

9         Over the course of the next several years he said that

10  he received 10 to 20 shipments.  Three were 10 ounces, so if

11  you think about this 500 grams you have it right there, and the

12  rest were 5 ounces.  Even at a minimum, even if you take the

13  minimum, 10 ounces -- or ten trips and three of those are 10

14  ounces, element 6 is met.

15        He said he distributed to Carothers and Rose in ounce

16  quantities.  He distributed to Brodie and Blankenship in

17  quarter-ounce quantities.  He distributed to Mike Kain whose

18  number is found at the home on January 16th, remember six

19  months, seven months, eight months after the arrest of his

20  primary distributors and he admitted to trading methamphetamine

21  to others for guns.

22        So, ladies and gentlemen, I submit to you that all of

23  that evidence, direct and circumstantial -- all of that

24  evidence that you will consider, the entire story, this novel

25  that was put together over the last week for you,

1   overwhelmingly demonstrates the guilt of Jackie Garcia and Sigi

2   Molina for conspiring to possess with intent to distribute over

3   500 grams of methamphetamine and possessing a firearm in

4   furtherance of a drug trafficking count, Count 1.  Thank you.

5           MR. FLEENER:  May it please the Court, Mr. Healy,

6   Mr. Jubin.

7           THE COURT:  Mr. Fleener.

8           MR. FLEENER:  Ladies and gentlemen, we appreciate your

9   time over the last few days.  I don't expect my argument to be

10  as long as Mr. Healy's, but I'm going to start by showing the

11  instruction the Court gave you:  A separate crime or offense is

12  charged against the defendant in each count of the Indictment.

13  Each offense and the evidence pertaining to it should be

14  considered separately.  The fact you may find the accused

15  guilty or not guilty of one of the offenses charged should not

16  control your verdict as to any other offense.

17          If you recall during my opening statement, I mentioned

18  that one of the concerns I had in this case was the Government

19  sort of lumping people together, lumping Jackie and Sigi, Sigi

20  and Jackie, putting what the truth means aside.  The word that

21  looked key, at least to the Government's presentation of its

22  evidence, was the word "they."  And Mr. Healy is a good lawyer,

23  smart guy, good friend of mine.  So you can't blame him for

24  this, but if you notice whenever, every time he would ask the

25  witness a question, he would include the word "they":  So what

1    did they do next, what happened when they did X, Y, Z,

2    regardless of what the answer was.

3           Even when I would ask, "Did you ever see Sigi" --

4    excuse me -- "Jackie Garcia give any drugs to anybody?"  And

5    the answer was always no, on redirect the word "they" would

6    come up.  "So after Jackie and Sigi gave drugs to so-and-so,

7    after they gave drugs to so-and-so, what happened next?"  And

8    that's what you do, you use the word "they" because you don't

9    want -- if you're the United States in this case, you don't

10   want -- you don't want the jury to follow that particular

11   instruction and look at individual responsibility.

12          Now, Mr. Healy is absolutely right, when you're

13   dealing with some facts may affect both players, there's this

14   concept of reasonable foreseeability as far as of the actions

15   of one member of the conspiracy and how it may affect another

16   member of the conspiracy and you will have a long, detailed

17   instruction to take back with you and read, but the word "they"

18   became very important for the United States.

19          And like Mr. Healy, I'm going to start with the guns

20   and work my way backwards, too, and I guess it is probably just

21   a coincidence, his is a PowerPoint presentation and mine was

22   drafted last night and we ended up starting at the same count.

23   And I am going to start at the guns as well.

24          And while I mean no disrespect to my colleagues on the

25   United States side, they were a little dirty on the guns.  And

1    I'm showing you Government Exhibit 30 which they showed over

2    and over and over and over and over again.  And remember that?

3    That was the gun.  They even had the photo -- I don't remember

4    what exhibit it was -- where the agent circled the chamber to

5    indicate that there was a round in there?

6         And throughout four days of testimony you, I assume,

7    assumed the same thing that would be understandable which is

8    that when the agent found this particular firearm, this is what

9    it looked like, right?  It was a weapon with a round in the

10   chamber sitting there somewhere in a safe.  And it wasn't

11   until -- what's interesting and another aspect -- look at

12   this -- look at this exhibit right here where you see the --

13   sort of the piece of whatever, that no-excuses piece of paper

14   there, bumper sticker, whatever.  But for four days you thought

15   that there was a weapon outside a holster that had a round

16   jammed in the chamber.

17        And Agent Budd testified that he found Ms. Garcia up

18   in that upper bedroom, and you would think that Ms. Garcia had

19   taken a round, tried to load it in that chamber and was trying

20   to shoot somebody.  And that's what he wanted you to think.

21   And what did we have to do the very last day of trial?  I had

22   to offer this particular exhibit.  Remember this one?  The only

23   exhibit offered by either of us, Defendant's Exhibit A, and

24   what is that?  There's the no-excuses bumper sticker.  And

25   there's the weapon in the holster.  They weren't going to tell

1    you about the weapon in the holster.

2          And I got mad and I stuttered a bit and then Agent

3    Budd and I butted heads a bit and we quit.  But what does that

4    show you?  They wanted you to think that the gun was sitting in

5    the safe or sitting outside the safe with a bullet lodged in

6    the chamber and that you would as people who have firearms and

7    as their police officers testified, when you're -- to have a

8    round in the chamber or to have a round stuck sideways in the

9    chamber, looked like someone was trying to jam one in.

10          Well, it wasn't true because the gun was sitting there

11    in a holster the whole time, meaning that -- and you were never

12    told that, again, until we made it clear.  You were led to

13    believe the gun was outside the holster.  And is that relevant?

14    Absolutely it is relevant because it is common sense.

15          What happened here was -- well, one thing we don't

16    know.  We have no idea what happened.  What we know that didn't

17    happen.  We know that Jackie didn't take the gun and put a

18    bullet in the chamber as she was protecting her drug source or

19    going to kill law enforcement or whatever other insinuation the

20    United States makes.  We know that's not the case because why?

21    The gun is sitting in the holster.  Terrible.

22          And they were caught on it, and there's really no

23    explanation for it other than oops, we got caught.  But it

24    shows the -- the -- how far you will go to get a conviction in

25    a certain count.  And in this case it is just how far they went

1    to get a conviction on the gun count.  They went so far as to

2    not offer in evidence the one piece of evidence which shows the

3    gun in the condition it was when the law enforcement officer

4    entered the house.  They didn't offer that.  They offered the

5    photo of after the law enforcement officer took the gun out of

6    the holster and laid it down to make it look like there was a

7    readily available, loaded firearm.

8          And it is not the first time they did that.  I mean,

9    remember Government Exhibit 50.  This was the firearm that

10   wasn't found anywhere.  They just offered that in evidence

11   because it is a scary gun.  And then you've got Government

12   Exhibit 53.  This was interesting.  These are the -- these are

13   the -- the jacks to raise the car.  And again, this is just a

14   demonstrative aid.  Actually, it wasn't offered into evidence.

15   It was just used as a demonstrative aid to show what the jack

16   looked like if it was hollowed out.

17         Interestingly enough they didn't find -- well, they

18   found jacks in Mr. Molina's garage.  They were all functioning

19   jacks, so, you know, that never came up as well.

20         Remember -- recall Heidi Blankenship's testimony about

21   the firearm.  First, you have to believe it beyond any and all

22   reasonable doubt.  Any and all reasonable doubt.  Not any and

23   all doubt.  But any and all reasonable doubt you have to

24   believe that Heidi Blankenship somehow gave some firearm to

25   Jackie Garcia.

1          Now, this comes after she told the United States that

2     she gave -- she says, "I gave a firearm to Sigi and Jackie."

3     While Mr. Healy in his closing, you know, used the phrase that

4     I considered them a couple or whatever it was to sort of tie

5     them together, I'm emphasizing that as well.  It shows what the

6     various witnesses, unless you actually get in there and break

7     it down, what did you give to whom, who gave -- which

8     particular defendant gave you what, which is absolutely

9     important in a case like this -- unless you dig deep in that,

10    it is they, they, they, they, they.

11         Well, as Ms. Blankenship decides to try to pin a

12    firearm on Jackie Garcia, first, you have to believe her beyond

13    a reasonable doubt.  Then there's the question -- and you will

14    look at Instruction 38 and you will -- when you're handed the

15    jury instructions as to what a firearm is.

16         This mystery gun, first of all, didn't exist because

17    no one found it anywhere.  There was no 38 -- .380, rather, in

18    their home.  She said that it was broken, something was broken

19    about it, so if the gun was never seized by anybody, was found

20    inside -- if it was actually -- if it was actually given to

21    Ms. Garcia, there's a question as to whether it is a

22    functioning firearm.  We don't know what condition it was.

23         And while the firearm doesn't have to -- you don't

24    have to have a fully functioning firearm in order to be -- to

25    be defined as having a firearm, you will read the Instruction

1   38 and determine for yourselves whether you can -- whether you

2   can find beyond any and all reasonable doubt that whatever it

3   is that Ms. Blankenship may or may not have given to Ms. Garcia

4   satisfies that definition.

5           And we are comfortable that you're not going to be

6   able to find that.

7           And that's even -- and even then you're still stuck

8   with the fact that Sigi Molina told the police how he got guns,

9   how he did this, how he did that.  Sigi talked about the guns.

10  These are -- if there are guns available, one thing is clear,

11  isn't it?  They're Sigi's guns.  They're not Jackie's guns.

12  Don't put guns in Jackie's hands.  No fingerprints of Jackie

13  Garcia on any round, on any drug bag.  There's no fingerprints

14  at all in this case one little bit.  But there certainly aren't

15  Jackie's fingerprints on anything.  These guns, whatever guns

16  were found, were not found, the mystery guns were Sigi's guns

17  and that shouldn't be that difficult.

18          And the next question is whether they were being held

19  or used in furtherance of a drug trafficking crime.  And you

20  will look at that instruction carefully.  I'm convinced the

21  Court will give you that instruction.  At the close of your

22  deliberations we're confident that you should be able to

23  dispense with this count fairly quickly and find Ms. Garcia not

24  guilty of possession of firearms in furtherance of a drug

25  trafficking crime.

1              I can't speak for Mr. Molina.  That's Mr. Jubin's job.

2    But as for Ms. Garcia, she's not guilty of Count 2, absolutely

3    no way.

4              Going to the drugs, it was interesting because is

5    there any doubt that Jackie Garcia -- well, let's step back.

6    The Government presented four, I guess, corroborating

7    witnesses.  And they're all drug addicts.  And that's terrible

8    and -- but it is what it is.  And I would submit, and I don't

9    think you will find any objection from anybody in the

10   courthouse that Sigi Molina and Jackie Garcia are also drug

11   addicts.  They're really no different than anybody else in this

12   process except they're sitting at this table while the other

13   witnesses were testifying from the -- from the stand.

14             But when you're looking at drug quantities -- and Mr.

15   Healy is correct and the instructions are absolutely clear, how

16   you do it in this case in a drug conspiracy it is a two-part

17   test.  And you will have the instruction that describes the

18   process that you should take when you go back and deliberate.

19   The two-part test, first you look at the drugs -- if I misstate

20   the actual instruction, please follow the instruction.  You

21   folks know that.

22             Two parts:  First you look at the drugs the person

23   actually possessed with the intent to distribute.  Then you add

24   to that amount whatever drugs may have been possessed in the

25   entire conspiracy that were possessed -- that were reasonably

1  foreseeable to that particular defendant.  And we are all going

2  to go back -- you all are going to go back and debate what

3  reasonable foreseeability means.

4          And it is important in this case and we know why.

5  Because even if you take all of the Government's evidence in

6  its most -- and don't really contest it at all.  And you look

7  at the amount of drugs that Jackie Garcia had in her possession

8  that a witness said went into some -- went to them, you're

9  really stuck with 1.8 gram controlled buy back in 2011 that

10 Jimmy Hernandez person we never heard from, but let's just

11 assume that's true.  You have 1.8 grams.

12         Then you have Heidi Blankenship, and what did Heidi

13 say?  She testified a couple -- and your memories and your

14 notes are the best -- the best recollection of all of us.  My

15 notes were different than what Mr. Healy had in his that he

16 argued as far as the timing of these various events.  My notes,

17 I had -- I believe in Mr. Healy's notes he had Heidi

18 Blankenship getting a quarter of an ounce for about 16 months

19 from 2010 till the end of 2011.  I had it from the middle of

20 2011 to the beginning of 2012, about six months.  But the

21 amounts were the same.

22         So let's assume Heidi Blankenship is telling the God's

23 honest truth which is that she got between an eightball and

24 eighth of an ounce, 3 and a half grams, and a quarter of an

25 ounce, 7 grams, every week from Jackie Garcia.

1        If that's the case, you're talking about roughly an

2   ounce a month, which is 26 and a half grams a month.  My math

3   puts it at 140 grams, six months, times 26 and a half.  Mr.

4   Healy's math, even if you use his math, you're still well under

5   500 grams.

6        So that's the methamphetamine that even if you believe

7   the witnesses, that's not -- that's not controverted by other

8   witness' testimony.  I'm going to give you an example.  Even if

9   you believe just sort of the uncontroverted testimony of the

10  witnesses, you end up with less than 500 grams, well less than

11  500 grams.  You probably end up greater than 50 grams, which is

12  one of the questions you're going to be asked on the special

13  verdict form.  You're going to have to find -- if you find Ms.

14  Garcia, or Mr. Molina, for that matter, guilty of the drug

15  conspiracy is Ms. Garcia less than 50 grams, more than 50 grams

16  or more than 500 grams, and you're going to have to choose

17  where in this area they fall.

18        But if you look at the drugs that were directly placed

19  by Ms. Blankenship or the 1.8 grams by Mr. Hernandez, you're

20  still well under, well under 500 grams.  You're above 50 but

21  under 500 for Ms. Garcia.

22        As far as, you know, Kyle Carothers goes, the

23  interesting aspect is Kyle Carothers was a "they" guy and he

24  was -- and he -- well, his answers were "they," Jackie and Sigi

25  were "they."  The specifics, specificities of where he got the

1    drugs never came out.  It was a "they."  But you can figure out

2    where he got his drugs by listening to whom?  His girlfriend.

3    And that's why when Whitney Rose is up testifying I asked

4    Whitney Rose, "Did you ever see Kyle get any drugs from Jackie

5    Garcia?"  Of course the answer was no.  Kyle would disappear

6    with Sigi -- no disrespect to Mr. Molina -- come back with

7    drugs.

8         So Kyle, Kyle Carothers' drugs comes from Sigi.  If

9    you want to believe Heidi Blankenship beyond any reasonable

10   doubt they come from Jackie.  And the amounts are well, well,

11   well under 500 grams.

12        What's interesting about this case, really, when you

13   look at the -- I mean, it actually came -- it played out in a

14   fairly easy to understand -- I appreciate the story of the

15   book.  That's -- that makes good sense.  The witness' testimony

16   played out in a fairly easy to understand way.  You have two

17   sets of girlfriends and boyfriends.  You have Kyle and Whitney.

18   You have Heidi and Brodie.  And the interesting thing about

19   that and one thing that I would argue certainly helps

20   Ms. Garcia is that you're able to look at -- Brodie is the

21   boyfriend.  Brodie is essentially Whitney.  You have Kyle

22   buying drugs and you have Whitney -- excuse me.  You have Kyle

23   and you have Heidi getting drugs and you have their boyfriend

24   and girlfriend just sort of watching.

25        Now Brodie gets involved a little bit later on.

1    Whitney doesn't necessarily get involved at all, but Whitney is

2    certainly able to provide some context and understanding as to

3    what Kyle is doing.  And if you listen to Whitney, Kyle's

4    getting his drugs from Sigi.  Assuming he's getting any drugs

5    at all, he's getting them from Sigi, that's what she says.  Any

6    money to Jackie?  No, any drugs from Jackie?  No.  Did you see

7    Kyle -- or when I asked Whitney, "Did you either get drugs or

8    give money to Kyle -- to Jackie?"  The answer was no.

9         I asked her if you saw Kyle either give money or get

10   drugs from Jackie, the answer was no.  Kyle was getting his

11   drugs from Sigi.  We know that because we have Whitney, who has

12   really no dog in the fight, watching it and observing this.

13        It is the same for Brodie and Heidi, isn't it, where

14   you have Heidi, who apparently was getting drugs from somebody

15   in that house.  Now Heidi says she was getting her drugs from

16   Jackie.  Of course Brodie said he never saw Jackie give Heidi

17   any drugs either, so, again, you're going to have to -- even to

18   convict Jackie of the -- even to convict Jackie of the

19   conspiracy and put the amount of drugs that Heidi was getting,

20   you're going to have to disregard the testimony of Brodie who

21   said, "I -- I watched her.  She wasn't getting drugs from

22   Jackie."

23        But it made -- it makes it easy to understand, because

24   you have each boyfriend/girlfriend sort of corroborating or

25   explaining the "they."

1          At the end of the day, what this case -- as far as

2   Ms. Garcia goes, again, we're confident on the 924(c) charge.

3   She didn't possess any firearms in furtherance of a drug

4   trafficking crime.  Not close.  And she certainly didn't do it

5   beyond any and all reasonable doubt.

6          As far as the drug conspiracy, it is a tougher call,

7   and it may not be as tough a call to convict her, to be honest.

8   It may be a tough call to figure out what kind of drug quantity

9   am I going to attribute to Jackie Garcia in this process?  And

10  you're going to have to rely on the concept of reasonable

11  foreseeability.  We fully expect that's what you will be doing

12  in the deliberation room.

13         Remember, remember, one of the instructions the Judge

14  gave early on, and if I'm not mistaken he gave it again,

15  argument isn't evidence.  Sometimes we -- the lawyers, we like

16  to think it is and I like to think we're more important than we

17  actually are, but argument isn't evidence.  So all the argument

18  about reasonable foreseeability and what is reasonably

19  foreseeable and what isn't reasonably foreseeable, again that's

20  just argument.  Ask yourself this question:  What evidence did

21  the United States present -- evidence, not argument -- what

22  evidence did the United States present that Sigi Molina's drugs

23  are reasonably foreseeable to Jackie Garcia?  Not argument.

24  Evidence.

25         And Mr. Healy gets to go again.  I'm sure he's going

1    to come up with something, and I don't get a chance to respond.

2    He gets the final word.  It is his burden and that's how it is

3    supposed to be.  Keep that in mind.  Not argument about

4    reasonable foreseeability, but evidence as to reasonable

5    foreseeability.  Because what we do know is this:  Sigi told

6    the police, "I got the guns."  Sigi told the police, "I bought

7    drugs and I sold drugs."

8         We would ask that you listen to the Court's

9    instructions.  We appreciate your time over this last week.

10   You have been very, very patient.  And render an appropriate

11   and just verdict in this case.  As for Ms. Garcia it is not

12   guilty on the 924 -- the federal gun count that you will see.

13   And it is also not guilty on the conspiracy charged as far as

14   the drugs for -- as far as the drugs as to Ms. Garcia.  If you

15   do believe that she's guilty of a drug conspiracy, she's guilty

16   of no more than 50 grams.  Thank you.

17        MR. JUBIN:  Good morning, ladies and gentlemen.  May

18   it please the Court.

19        THE COURT:  Mr. Jubin.

20        MR. JUBIN:  Mr. Healy, Mr. Fleener, Mr. Molina.  You

21   know, one of the things that you folks got to see was this

22   photograph of Mr. Molina that was hanging on the wall, hanging

23   on the wall in the office there where the safes were.  And

24   what's he doing?  He's got a knife in his mouth.  He's posing.

25   He's got a lever-action rifle in his hand.  He's got this old

1   leather belt with a -- with a holster kind of slung low on one

2   side and a piece of leather coming off.

3          Why were you shown that?  Do you think that's really

4   evidence of anything here?  Or is it an effort to try to

5   misdirect you, to make you think that somehow guns and Sigi

6   Molina are connected?  Well, they are.  He had guns.  He had a

7   couple in his safe.  He had ammunition in the garage.  But it

8   wasn't any AK, AKK, whatever it was, that Whitney Rose talked

9   about.  There wasn't the -- you saw the demonstrative of the

10  Tech 9 that supposedly some witness claimed.  There weren't

11  those things.

12         What you had was two firearms in a safe.  And

13  according to the evidence and the witness, Mr. Molina believed,

14  genuinely believed those guns were unloaded.

15         So what's the significance of that?  Well, the one

16  bullet that you saw, remember it was kind of at an angle.  It

17  wasn't seated in the chamber.  There was some testimony about

18  that.  It wasn't even really in the right position.  For that

19  matter, we don't even know it was the right caliber.  All we

20  know, it was a big surprise to Mr. Molina and he said,

21  eventually said, "Yeah, the last time I looked at that gun,

22  last time I did anything with that was a couple weeks ago I

23  went out shooting that and maybe that's why it is not all

24  wrapped in plastic.  We went out to that Sleepy Hollow place he

25  had and I shot it, and maybe that's why it wasn't wrapped up."

1          But, so, what was it doing?  Was it there

2    strategically located, armed, ready to go so he could protect

3    his guns -- or protect his drugs?  No.  Where was the clip?

4    Can't fire the gun without the clip except for the one bullet

5    he didn't know was there?  Where was the clip?  In the garage.

6    Where was the ammunition?  In the garage.  Was the .22 loaded?

7    No.  It was wrapped up.  How strategically located is that to

8    protect his guns?  It isn't.  And, as Mr. Fleener pointed out,

9    the .40 caliber gun was in a holster.

10          So is it protecting his drug proceeds?  Is it

11    protecting his drugs?  Is it to threaten people with drug

12    debts?  You heard none of that.  And the circumstances simply

13    don't bear that out whatsoever.

14          If you -- you will get a chance to listen to the -- or

15    to look at the instruction again that talks about what the

16    factors are.  Well, one of the important factors is

17    accessibility of the firearm, and that's because, as the Courts

18    have indicated, is it strategically located in such a way as

19    you can grab it.  Remember Kyle Carothers, he had it right

20    under the couch.  Not Mr. Molina.

21          Is it stolen?  No evidence of that.

22          Type of firearm.  Well, it is a .40 caliber pistol and

23    a -- in a holster and a .22 pistol.  These are standard kind of

24    weapons.

25          What are the circumstances surrounding the acquisition

1   of the firearm?  Now there's an interesting one.  Nobody said

2   that the .22 was traded for drugs.  There was testimony that

3   Brodie said he owed some money, and he just gave him the .22.

4   Did that further a drug crime?  Well, if you think about it, if

5   the drug crime, this little piece of methamphetamine that

6   Mr. Healy has referenced, if that had already occurred and it

7   was a done deal, using the gun to pay off a debt, a past debt,

8   not an actual trade right there, but a past debt, doesn't do

9   anything to further it.  The events have already occurred.

10          And then we come to the .40 caliber.  Suddenly, on the

11  witness stand, Mr. Brodie, who has one aim in life, avoid a

12  pine box sentence, avoid spending the rest of his breathing

13  days in a prison cell, suddenly he comes up and he tells you,

14  "Oh, yeah, yeah, that .40, must be traded for -- traded for

15  drugs, yeah.  Well, I never mentioned that before.  I'm just

16  kind of right now, right before trial and then right here in

17  front of the jury."  And, well, was it this gun?  What did he

18  tell you?  He said, "I don't know."  And then at one point he

19  looked at it and said, "That's it," but he also told you, "I

20  don't know if it was that gun," kind of like that.

21          And he also testified, "I never gave Mr. Molina a gun

22  in exchange for dope."  Some of you may have written that down

23  when he said that, "I never gave Molina a gun in exchange for

24  dope."  And then he had to be reminded, oh, yeah, yeah, he had

25  a sudden new claim that -- perhaps his lifesaving claim that,

1    yeah, the .40 was -- was traded for the gram of drugs to some

2    guy named Nate and -- yeah, uh-huh.

3           Compare that to what Agent McDonald said, that Sigi

4    Molina told him where that gun came from.  He said it was for

5    rent.  Two weeks later Brodie wanted the gun back.  Molina

6    wouldn't give it to him because he didn't have the rent money.

7           So proximity to drugs or profits, time and

8    circumstances under which the firearm was found, the status of

9    the possession, was it legitimate or illegal, no evidence that

10   any of those things contribute to the notion that those guns in

11   that safe furthered drug trafficking.

12          What did Whitney Rose say about guns?  Saw this AAK or

13   whatever it was, saw another like this, and she indicated.  We

14   don't know if she was talking about a pistol or a rifle or

15   what.  And she said on a single occasion she was shown guns,

16   perhaps with the idea of going out shooting at the range.  She

17   said the guns weren't used to threaten anyone.  She didn't use

18   any guns to trade for drugs.

19          Heidi Blankenship talks about -- she was a mess, an

20   opiate addict, heroin addict.  And there was some broken gun

21   she talked about, and she didn't say that she traded that gun

22   for methamphetamine.  She said, rather, that gun was given to

23   take $200 off of her debt.  Again, any transaction that might

24   have occurred that created that debt, the actual drug

25   trafficking was long gone.  That was done and over with.

1    Paying somebody with a gun after the fact, that doesn't further

2    the trafficking.

3         Couple things to remember.  We talked around it

4    about -- around it a little bit, but take a look at that

5    (indicating).  That's the .22.  Does it look like it's

6    strategically placed and located to be available to protect

7    proceeds?

8         And here's a gun you've seen many times.  Remember

9    that line there that was drawn to show the direction of the

10   bullet (indicating).  This is Exhibit 30, the .40 caliber

11   handgun, how that wasn't seated in there.  And there you can

12   see it is kind of weird, weirdly placed in there.  Mr. Molina

13   didn't know it was there.  It was in the holster.  It is

14   clearly not strategically in such a position as to protect

15   anything.

16        And then we had Exhibit 38, tool chest out in the

17   garage.  You can see the tool chest.  There's a drawer full of

18   ammunition.  That's where the ammunition was, the garage.  The

19   ammunition is separate from the gun, makes the gun or its

20   possession not in any way strategically connected to protecting

21   drugs or drug proceeds.

22        And you know, there's another thing.  Do you remember

23   when Agent McDonald talked about, "Oh, yeah, Sigi Molina told

24   us about his source.  His source is Raul.  And he -- we found

25   this note with the phone numbers to Mexico."

1          Take a look at that.  It is Exhibit 10-A.  There's no

2   Raul.  It says, "My cell number Alex."  I don't know what this

3   has to do with.  It certainly doesn't say Raul.

4          The key evidence -- and I'm sorry if I'm repeating

5   this but it's pretty key -- Sigi Molina was genuinely

6   surprised, number one, that the .40 caliber pistol was

7   unwrapped.  He just didn't remember it as being unwrapped.

8          Number two, that there was a bullet that was

9   associated with that gun because there was no clip in it, no

10  clip even in the room.

11         You heard about these bottle jacks.  Remember Agent

12  Budd, he told you, these jacks all had hydraulic fluid in them.

13  They were operable.  You heard testimony about Sigi Molina

14  going out to work on a car at one point, and you also heard

15  evidence from Agent Budd that you bet if these things had been

16  hollowed out in some way where those jacks would have been used

17  to transport methamphetamine, you would have seen them as

18  exhibits here.  Well, you didn't.

19         Well, so who is the main person who puts Sigi Molina

20  into this drug trafficking conspiracy?  Kyle Carothers.  Where

21  was he getting his drugs?  He got drugs from his father, Dan

22  Carothers.  He said he used with him about ten times.  And on

23  multiple occasions Dan Carothers, his very own father, was his

24  source for drugs.

25         Where else did he get drugs?  From Adams, a guy named

1    Michael Adams, who had sources in Casper.  And you heard the

2    testimony.  He -- Kyle Carothers went regularly to Casper, and

3    he even told you, Sigi had nothing to do with it, at least on

4    one or some of those occasions.

5          Kyle Carothers went to Denver with Adams.  He went to

6    Denver because a guy named Chris George had a source down

7    there.

8          He had Jacinto who he was best friends with who used

9    to date Whitney Rose and that was a source of drugs.

10          And look at Kyle Carothers.  You know, he has the gun

11    loaded underneath the couch where he's got the drugs where it's

12    clearly strategically placed or could be to protect his drugs

13    or drug proceeds.  And he's got no gun charges.

14          And what else did he tell you?  He had 1 to 1 and a

15    half gram a day habit, smoking multiple times per day.  Stayed

16    high all day.  Never sold or bought drugs from Heidi, Heidi

17    Blankenship or Robert Brodie.  Didn't provide or obtain any

18    guns from Sigi Molina.  Now this is Sigi's main guy.  He just

19    saw Sigi pull a gun out of a safe to put drugs in it.  Okay.

20    He was invited to go to a shooting range but never went.

21          No threats.  Rose said nobody was threatening anybody

22    with a gun.  Ten-year mandatory minimum for Kyle.  No gun

23    charge.  Ten-year mandatory minimum for Whitney Rose.  No gun

24    charge.

25          You remember what Kyle Carothers told you about his

1    drug use and his memory?  He started out saying, "Okay, I got

2    no problems with my memory."  That was his testimony.  Under

3    oath.  And then later on he said, "Well" -- he ended his

4    testimony telling you he was confused by drugs.  "I get

5    confused.  I've always been that way."  You probably put that

6    in your notes.

7          I would ask you to take a look at Instruction 27:

8    "Mere similarity of conduct among various persons, the fact

9    they may have associated with each other, may have assembled

10   together, discussed common aims and interests does not

11   necessarily establish proof of the existence of the

12   conspiracy."

13         These folks were all using drugs.  They were trading

14   drugs, at times selling drugs.  Does that make them involved in

15   the conspiracy charged?  Well, take a look at Instruction 30.

16   You have to determine whether the single conspiracy, the one

17   that's charged in this Indictment, existed with all these other

18   people.

19         What did you hear about Larry Sinning?  What did you

20   hear about all these other people who they talked to you about

21   in this Indictment?  You have to determine whether that

22   existed, and if it did, whether the defendant was a member of

23   it.

24         And the instruction says proof of several separate

25   conspiracies is not proof of the single overall conspiracy

1   charged in the Indictment unless one of the several

2   conspiracies which is proved is the single conspiracy charged

3   in the Indictment.

4          So if you've got Kyle Carothers over here and over

5   there with various people, and you've got Sigi Molina over

6   here, over there with various people, but it is not the big

7   thing that they've charged saying all these people conspired

8   together, then you have to find him not guilty.

9          It says if you find the defendant was not a member of

10  the conspiracy charged, then you must find the defendant not

11  guilty, even though the defendant may have been a member of

12  some other conspiracy.  This is because proof that a defendant

13  was a member of some other conspiracy is not enough to convict.

14  That's Instruction 30.

15         You know, we talked a little bit about the drug use

16  and the incentives and inducements that some of these witnesses

17  had.  Instruction 54 tells you you should receive this type of

18  testimony with caution and weigh it with great care, and you

19  all could see there's good reasons for that.

20         And Instruction 55 told you that the testimony of a

21  drug abuser here must be examined and weighed with greater care

22  than the testimony of witnesses who does not abuse drugs.  Why

23  is that?  They can't remember?  No memory formation?  They were

24  high?  Never formed a memory to begin with.  And also, the

25  person might have a need for drugs and they want to get out as

1    soon as they can to satisfy that insatiable need.

2         In the big scheme of things here is Sigi Molina guilty

3    of something?  You bet he is.  He was using drugs and he was

4    trading drugs with people and he was selling some drugs.  He's

5    not a perfect human being.  He's done some things wrong.  If

6    you believe his statement, it's a lot of drugs.  But that

7    statement was given in a circumstance where he was under

8    interrogation, where he was high.

9         MR. HEALY:  Your Honor, there's no evidence of that

10   final statement, and I ask that it be stricken and the jury

11   disregard it.

12        THE COURT:  They will disregard it.  There was no

13   evidence.

14        MR. JUBIN:  You remember that the agent said that he

15   told him, "I will take these -- I won't take these charges away

16   right now," and then Mr. Molina signed and talked.  So was it

17   voluntary?  Well, that's your call.  You will see an

18   instruction that allows you to decide did he make that

19   statement voluntarily, or was it a statement that was made

20   based upon that improper inducement?

21        When we're talking about what your job is here you

22   have to make determinations beyond a reasonable doubt.  It

23   means that if there are two reasonable conclusions, one

24   conclusion is consistent with guilt and the other conclusion is

25   consistent with innocence, you must, of course, adopt the

1    conclusion of innocence.  That's your job.  That's what it

2    means to find beyond a reasonable doubt.

3         I ask when you return to the jury room, take a careful

4    look at all the evidence, say was this one big conspiracy or

5    not.  If you think it was one conspiracy, the charged

6    conspiracy, and Sigi Molina was involved in that conspiracy,

7    then you should find him guilty.  That's your duty.

8         On the other hand, if you think they showed a bunch of

9    different conspiracies and they didn't prove the conspiracy

10   that's charged, you should find him not guilty.  And when it

11   comes to the guns, in furtherance of drug trafficking, none of

12   the guns that he possessed and were in his safe furthered any

13   kind of drug trafficking.  Thank you.

14        MR. HEALY:  Ladies and gentlemen, I'm not going to

15   belabor this.  I'm going to try to go through this pretty

16   quickly and just clarify a couple of things that are so -- so,

17   I guess, hard to believe that they need clarification.

18        You have heard the testimony.  You've seen the

19   evidence.  You've taken notes.  You've listened.  Rely on what

20   you heard.  But there are a couple of things that I need to

21   discuss.

22        One of Mr. Fleener's main premises was that the

23   Government just tried to throw up this .40 caliber with this

24   gun, with this round in the chamber and somehow sort of taint

25   the jury with that.  What Mr. Fleener didn't mention was

1   Government's Exhibit 28 which Agent McDonald testified to, I

2   think on the first day, maybe the second day of this trial,

3   where he pointed out both firearms and said, "This firearm on

4   the right-hand side as you're looking at it, ladies and

5   gentlemen, was a .40 caliber in a holster with a round in the

6   chamber," (indicating).  That's the testimony.

7         Mr. Fleener also made a big deal about they, they;

8   everybody said they, they.  Well, that's just not true.  Kyle

9   Carothers said he dealt personally with Jackie Garcia.  And

10  Whitney Rose never testified that she was with Kyle Carothers

11  every time he bought dope.  In fact, she said that a lot of

12  times she isolated herself.

13        So Heidi Blankenship, now, one of the last statements

14  Mr. Fleener told you is that -- is that Brodie said she was not

15  getting drugs from Jackie.  Robert Brodie never said that.

16  Robert Brodie said they would go into that house, they wouldn't

17  have drugs.  He would watch Heidi go upstairs with Jackie.

18  Heidi would come down and she would have drugs.  Your job is to

19  take the inferences and make reasonable conclusions, and

20  consider the evidence and the Government's burden, which the

21  Government accepts, to prove the defendants guilty beyond a

22  reasonable doubt.

23        "Any and all" is not a phrase that I see in the

24  instructions.  Read the instruction on reasonable doubt.

25  Common sense, reason, reasonable doubt.

1          And then, moreover, they, this they -- Heidi

2    Blankenship, Kyle Carothers, Hernandez -- you heard the audio.

3    You will have it in there.  You can listen to it in the jury

4    room as long as you need to.  Consider what's going on with

5    Jackie Garcia and Hernandez at the beginning of this charged

6    conspiracy.

7          Mr. Jubin asked why would the Government show a

8    firearm in a case -- show the defendant holding a firearm and

9    carrying another one in a case where the defendant is charged

10   with possessing firearms in furtherance of a drug trafficking

11   crime.  The question is why wouldn't the Government show that

12   photo?  It is part of one of the elements of the offense, the

13   very things the jury needs to be most concerned about when it's

14   deliberating on the guilt or innocence of these people.

15         There's also what I warned you about.  Mr. Jubin was

16   trying to isolate everything to January 16th, 2013.  Those two

17   firearms are circumstantial evidence supporting the testimony

18   of Kyle Carothers, of all the firearms he saw; the defendant's

19   own statement that he had a .25 auto that he exchanged to --

20   for meth; that he had another firearm that he exchanged for

21   meth, a .40 caliber which happened to be the one in there.

22         I mean, certainly, the Government isn't trying to

23   convince the jury that all the firearms that were mentioned

24   that were in the possession of either Jackie Garcia or Mr.

25   Molina were in the safe that day.  That is not what the

1    Government is suggesting, which is also why the demonstrative

2    exhibit that so offends Mr. Fleener was showed to the jury.

3    Kyle Carothers testified he saw a Tech 9.  He knows what a Tech

4    9 is.  A demonstrative exhibit is to help understand testimony.

5    Not everybody in the world knows what a Tech 9 is.

6         Also, like -- you may recall in the Kyle Carothers

7    testimony when Mr. Jubin was cross-examining Mr. Carothers on

8    his plea agreement and Mr. Jubin said, "Isn't it true that it

9    is the Government -- the Government will only do this if you

10   meet their criteria," and then he left out what the rest of the

11   Government's criteria is -- you judge the witness' credibility.

12   You judge whether they're right or wrong about what happened,

13   whether their addiction affected their memory.  That's your

14   job.  But you need to read everything when you read these

15   instructions.

16        And when Mr. Jubin goes on and on about this if he was

17   involved in another conspiracy, he's not guilty.  That's not

18   right, ladies and gentlemen.  You have to read the instruction,

19   Instruction 30.  But proof that a defendant -- this was the

20   part that Mr. Jubin left out -- but proof that a defendant was

21   a member of some other conspiracy would not prevent you from

22   returning a guilty verdict if the Government proved beyond a

23   reasonable doubt that the defendant was also a member of the

24   conspiracy charged in the Indictment.

25        Now, you can, I guess -- it is up to you how you

1    decide to do this.  There was a point in time when Mr. Molina,

2    at least Mr. Molina and Mr. Adams and Mr. George and

3    Mr. Carothers were running down to Denver and getting dope.

4    Now, whether taking Mr. Molina's source out changes the

5    conspiracy or not, that's up to you to decide.  But there's no

6    question that at some point that conspiracy was going on.  It

7    stopped for a brief period of time, or at least the source

8    dried up, and it started again as soon as the source came back.

9          Finally, there was all sorts of talk about whether

10   this firearm was strategically placed or whether Jackie Garcia

11   meant to grab the gun out of the holster or put the holster

12   back in.  You will all talk about this.  Put the gun back in

13   the holster, had it out and put it back in.  The safe was open.

14   There's all this talk about strategy and whether it was

15   strategically placed to grab and protect gun proceeds and

16   threaten people.

17         The instruction is this -- and those are all factors

18   of course you can consider, but the instruction is this:  You

19   are instructed possession in furtherance of means for the

20   purpose of assisting in, promoting, accomplishing, advancing or

21   achieving the goal or objective of the underlying offense.  A

22   conspiracy is trading a gun and relieving a drug debt or giving

23   a small amount of methamphetamine in exchange for it.

24         Part of a story of a conspiracy?  That's for you to

25   decide, ladies and gentlemen.  The Government submits to you

1    that it is.  Thank you.

2          THE COURT:  Ladies and gentlemen, we are now into your

3    lunch hour.  There are a number of instructions yet to give to

4    the jury.  I think I will go ahead and read the instructions

5    and get this case submitted to the jury.

6          Unless you are otherwise instructed, the evidence in

7    this case consists of the sworn testimony of the witnesses,

8    regardless of who may have called them, and all exhibits

9    received in evidence, regardless of who may have produced them.

10   Any evidence to which an objection was sustained by the Court

11   and any evidence ordered stricken by Court must be entirely

12   disregarded.  Anything you may have seen or heard outside the

13   courtroom is not evidence and must be entirely disregarded.

14         You have been chosen and sworn as jurors in this case

15   to try the issues of fact presented by the allegations of the

16   indictment and the denial made by the not guilty pleas of the

17   Defendants Jacqueline M. Garcia and Sigifredo Molina Varela.

18         You are to perform this duty without bias or prejudice

19   as to any party.  The law does not permit jurors to be governed

20   by sympathy, prejudice or public opinion.

21         Both the defendants, Jaqueline Garcia and Sigifredo

22   Molina Varela, and the public expect that you will carefully

23   and impartially consider all the evidence in the case, follow

24   the law as stated by the Court and reach a just verdict

25   regardless of the consequences.

1        Generally speaking, two types of evidence from which a

2   jury may properly find the truth as to the facts of a case, one

3   is direct evidence, such as the testimony of an eyewitness.

4   The other is indirect or circumstantial evidence, the proof of

5   a chain of circumstances pointing to the existence or

6   nonexistence of certain facts.  As a general rule, the law

7   makes no distinction between direct and circumstantial

8   evidence, but simply requires that the jury find the facts in

9   accordance with all of the evidence in the case, both direct

10  and circumstantial.

11        If any evidence by the Court or counsel through

12  matters or testimony or exhibits does not coincide with your

13  own recollection of that evidence, it is your recollection

14  which should control during your deliberations and not the

15  statements of the Court or of counsel.

16        You are the sole judges of the evidence received in

17  the case.  Questions asked by a lawyer for either party to this

18  case are not evidence.  Therefore, if a lawyer asks a question

19  of a witness which contains an assertion of fact, you may not

20  consider the assertion by the lawyer as any evidence of that

21  fact.  Only the answers are evidence.

22        Inferences are simply deductions or conclusions which

23  reason and common sense lead the jury to draw from the evidence

24  received in the case.  You as jurors are the sole judges of the

25  credibility of the witnesses and of the weight to be given to

1   their testimony.  You may be guided by the appearance and

2   conduct of the witnesses or the manner in which the witness

3   testifies or by the character of the testimony given or

4   evidence to the contrary of the testimony given.

5       You should scrutinize all of the testimony given, the

6   circumstances under which each witness has testified and every

7   matter in evidence which tends to show whether a witness is

8   worthy of belief.

9       Consider each witness' intelligence, motive, state of

10  mind, demeanor and manner while on the witness stand.  Consider

11  the witness' ability to observe the facts as to which he or she

12  has testified and whether he or she impresses you as having an

13  accurate recollection of these matters.

14      Consider also any relation each witness may bear to

15  either side of the case, the manner in which each witness might

16  be affected by the verdict and the extent to which, if at all,

17  each witness is either supported or contradicted by other

18  evidence in the case.

19      Inconsistencies or discrepancy in the testimony of a

20  witness or between the testimony of different witnesses may or

21  may not cause the jury to discredit such testimony.  Two or

22  more persons witnessing an incident or transaction may hear or

23  see it differently and innocent misrecollection, like failure

24  of recollection, is not an uncommon experience.  In weighing

25  the effect of a discrepancy, always consider whether it

1    pertains to a matter of importance or an unimportant detail and

2    whether the discrepancy results from innocent error or

3    intentional falsehood.

4            After making your own judgment, you will give the

5    testimony of each witness such weight, if any, as you may think

6    it deserves.

7            The rules of evidence ordinarily do not permit

8    witnesses to testify as to opinions or conclusions.  An

9    exception to this rule exists as to those whom we call expert

10   witnesses.  Witnesses who by education and experience have

11   become expert in some art, science, profession or calling may

12   state their opinions as to relevant and material matters in

13   which they profess to be expert and may also state their

14   reasons for the opinion.

15           You should consider each expert opinion received in

16   evidence in this case and give it such weight as you may think

17   it deserves.  If you should decide that the opinion of an

18   expert witness is not based upon sufficient education,

19   experience, or if you should conclude that the reasons given in

20   support of the opinion are not valid, or if you feel that it is

21   outweighed by other evidence, you may disregard that opinion

22   entirely.  As I have told you several times, you, the jury, are

23   the sole judges of the facts.

24           In weighing the weight to be given to an opinion

25   expressed by any witness who did not testify as an expert

1    witness, you should consider his or her credibility, the extent

2    of his or her opportunity to perceive the matters upon which

3    his or her opinion is based and the reasons, if any, given for

4    it.  You're not required to accept such an opinion but should

5    give it such weight to which you think it is entitled.

6            A witness may be discredited or impeached by

7    contradictory evidence or by evidence that at some other time

8    the witness has said or done something or has failed to say or

9    do something that is inconsistent with the witness' present

10   testimony or by evidence that the witness has been convicted of

11   a felony.

12           If you believe any witness has been impeached and thus

13   discredited, it is your exclusive province to give the

14   testimony of that witness such credibility, if any, as you may

15   think it deserves.

16           The testimony of a witness may be discredited or

17   impeached by showing that the witness previously has been

18   convicted of a felony, that is, of a crime punishable by

19   imprisonment for a term of years.  A prior conviction does not

20   mean that a witness is not qualified to testify, but is merely

21   one circumstance that you may consider in determining the

22   credibility of the witness.

23           You may decide how much weight to give any prior

24   felony conviction that was used to impeach a witness.

25           You have heard the testimony of certain witnesses who

1  are providing evidence for the Government in exchange for a

2  promise from the Government that the prosecution will recommend

3  lenient treatment for them in their own cases.  They told the

4  Government what they would testify to in exchange for these

5  promises.

6          The Government may present the testimony of someone

7  who has been promised favorable treatment in his or her own

8  case in exchange for his or her testimony.  Some people in this

9  position are entirely truthful when testifying.  Still, you

10  should consider the testimony of these witnesses with more

11  caution than the testimony of other witnesses.  They may have

12  had reason to make up stories or exaggerate what others did

13  because they want to strike a good bargain with the Government

14  about their own cases.  In deciding whether you believe the

15  testimony of these witnesses you should keep these comments in

16  mind.

17          The Government has called among its witnesses alleged

18  accomplices who have been named as codefendants in the

19  indictment.  The Government has entered into plea agreements

20  with the codefendants, providing in some cases to forgo certain

21  charges and/or a recommendation of a lesser sentence.  Plea

22  bargaining is lawful and proper, and the rules of this court

23  expressly provides for it.

24          An alleged accomplice, including one who has entered

25  into a plea agreement with the Government, is not prohibited

1    from testifying.  On the contrary, the testimony of an alleged

2    accomplice may by itself support a guilty verdict.  You should

3    receive this type of testimony with caution and weigh it with

4    great care.  You should never convict a defendant upon the

5    unsupported testimony of an alleged accomplice unless you

6    believe that testimony beyond a reasonable doubt.  The fact

7    that an accomplice has entered a guilty plea to the offense

8    charged is not evidence of the guilt of any other person.

9         The testimony of a drug abuser must be examined and

10   weighed by the jury with greater care than the testimony of a

11   witness who does not abuse drugs.  The jury must determine

12   whether the testimony of the drug abuser has been affected by

13   drug use or the need for drugs.

14        The evidence has been presented about a statement

15   attributed to the defendant alleged to have been made after the

16   commission of the crimes charged in this case but not made in

17   court.  Such evidence should always be considered by you with

18   caution and weighed with care.  You should give any such

19   statement the weight you think it deserves after considering

20   all of the circumstances under which the statement was made.

21        In determining whether any such statement is reliable

22   and credible, consider factors bearing on the voluntariness of

23   the statement.  For example, consider the age, gender,

24   training, education, occupation, and physical and mental

25   condition of the defendant and any evidence concerning his

1    treatment while under interrogation if the statement was made

2    in response to questioning by government officials and all

3    other circumstances in evidence surrounding the making of the

4    statement.  After considering all this evidence, you may give

5    such weight to the statement as you feel it deserves under all

6    the circumstances.  If you determine that the statement is

7    unreliable or not credible, you may disregard the statement

8    entirely.

9         The Government has presented evidence that Defendant

10   Sigifredo Molina Varela may have made admissions to law

11   enforcement in this case.  To whatever extent you choose to

12   believe Sigifredo Molina Varela's admission -- admissions as

13   they pertain to him, they are to have no bearing on the guilt

14   of Jacqueline M. Garcia.

15        The defendants Jacqueline M. Garcia and Sigifredo

16   Molina Varela did not testify, and I remind you that you cannot

17   consider the decision not to testify as evidence of guilt.  You

18   must understand that the Constitution of the United States

19   grants to the defendant the right to remain silent.  That means

20   the right not to testify.  That is a constitutional right in

21   this country.  It is very carefully guarded.  And you must not

22   presume or infer guilt from the fact that a defendant does not

23   take the witness stand and testify or call any witnesses.

24        As stated before, the law never imposes upon a

25   defendant in a criminal case the burden or duty of calling any

1    witnesses or producing any evidence.

2         It has been the duty of the attorney on each side of

3    the case to object when the other side has offered testimony or

4    other evidence which the attorney believes is not properly

5    admissible.  You should not show prejudice against any attorney

6    or his client because the attorney has made an objection.  Upon

7    allowing testimony or other evidence to be introduced over the

8    objection of any attorney, the law does not, unless expressly

9    stated, indicate any opinion as to the weight or effect of any

10   such evidence.

11        As stated before, the jurors are the sole judges of

12   the credibility of all witnesses and the weight and effect of

13   all evidence.  When the Court has sustained an objection to a

14   question addressed to a witness, the jury must disregard the

15   question entirely and may draw no inference from the wording of

16   it or speculate as to what the witness would have said if he

17   had been permitted to answer any question.

18        During this trial, you have heard sound recordings of

19   certain conversations.  These conversations were legally

20   recorded.  They are a proper form of evidence and may be

21   considered by you as you would any other evidence.

22        You were also given transcripts of those recorded

23   conversations.  Keep in mind that the transcripts are not

24   evidence.  They were given to you only as a guide to help you

25   follow what was being said.  The recordings themselves are the

1   evidence.  If you noticed any difference between what you heard

2   on the recordings and what you read in the transcripts, you

3   must rely on what you heard, not on what you read.  If you

4   could not hear or understand certain parts of the recordings,

5   you must ignore the transcript as far as those parts are

6   concerned.

7          During this trial I have permitted you to take notes.

8   Many courts do not permit note taking by jurors and a word of

9   caution is in order.  There's always a tendency to attach undue

10  importance to matters which one has written down.  Some

11  testimony which is considered unimportant at the time presented

12  and thus not written down takes on greater importance later in

13  the trial in light of all the evidence presented.  Therefore,

14  you are instructed that your notes are only a tool to aid your

15  own individual memory and you should not compare your notes

16  with other jurors' in determining the content of any testimony

17  or in evaluating the importance of any evidence.

18         Your notes are not evidence and are by no means a

19  complete outline of the proceedings or a list of the highlights

20  of the trial.  Above all, your memory should be your greatest

21  asset when it comes time to deliberate and render a decision in

22  this case.

23         The punishment provided by law for the offenses

24  charged in the Indictment is a matter exclusively within the

25  province of the Court and should never be considered by the

1  jury in any way in arriving at an impartial verdict as to the

2  guilt or innocence of a defendant.

3        During your deliberations you must not communicate

4  with or provide any information to anyone by any means about

5  this case.  You may not use any electronic device or media such

6  as a telephone, cell phone, smart phone, iPhone, BlackBerry or

7  computer, the Internet, any Internet service or any text or

8  instant messaging service, or any Internet chatroom, blog or

9  website such as Facebook, MySpace, LinkedIn or Twitter to

10  communicate to anyone any information about this case or to

11  conduct any research about this case until I accept your

12  verdict.

13        Upon retiring to the jury room, you will select one of

14  your number to act as the presiding juror.  The presiding juror

15  will preside over your deliberations and will be your spokesman

16  here in court.  Your verdict must reflect the collective

17  agreement of the jury.  In order to return a verdict, it is

18  necessary that each juror agree to it.  Your verdict, in other

19  words, must be unanimous.

20        It is your duty as jurors to consult with one another

21  and to deliberate with one another with a view towards reaching

22  an agreement if you can do so without violence to individual

23  judgment.  Each of you must decide the case for himself and

24  herself, but do so only after impartial consideration of the

25  evidence in the case with your fellow jurors.  In the course of

1    your deliberations, do not hesitate to reexamine your own views

2    and to change your opinion if convinced it is erroneous.

3            Do not surrender your honest conviction, however,

4    solely because of the opinion of your fellow jurors or for the

5    mere purpose of returning a verdict.  Remember at all times

6    that you are not partisans.  You are judges, judges of the

7    facts of the case.  Your sole interest is to seek the truth

8    from the evidence received during the trial.

9            Your verdict must be based solely upon the evidence

10   received in the case.  Nothing you have seen or read outside of

11   court may be considered.  Nothing that I have said or done

12   during the course of this trial is intended in any way to

13   somehow suggest to you what I think your verdict should be.

14           Nothing said in these instructions, nothing in any

15   form of verdict prepared for your convenience is to suggest or

16   convey to you in any way or manner any intimation as to what

17   verdict I think you should return.  What the verdict shall be

18   is the exclusive duty and responsibility of the jury.  And as I

19   have told you many times, you are the sole judges of the facts.

20           The Court has prepared a verdict form for your

21   convenience.  You will take the verdict forms to the jury room,

22   and when you have reached a unanimous agreement as to your

23   verdict, you will have your presiding juror fill in, date and

24   sign the verdict forms upon which you have unanimously agreed.

25   When you have reached unanimous agreement as to your verdict,

1    the presiding juror shall inform the bailiff and you shall

2    return to the courtroom.

3         If it becomes necessary during your deliberations to

4    communicate with the Court, you may send a note signed by your

5    presiding juror or by one or more members of the jury through

6    the bailiff.  No member of the jury should ever attempt to

7    communicate with the Court by any means other than a signed

8    writing, and the Court will never communicate with any member

9    of the jury on any subject touching the merits of the case

10   other than in writing or orally here in open court.

11        You will note from the oath about to be taken by the

12   bailiff that the bailiffs, too, as well as all other persons

13   are forbidden to communicate in any way or manner with any

14   member of the jury on any subject touching the merits of the

15   case.

16        Bear in mind that you are not to reveal to the Court

17   or to any person how the jury stands numerically or otherwise

18   on the question before you, whether or not the United States

19   has sustained its burden of proof, until after you have reached

20   a unanimous verdict.

21        And these are the verdicts.  There are several of them

22   in this case.  First is the verdict form with regard to

23   Jacqueline M. Garcia:  We, the jury, duly impaneled in the

24   above entitled case, do unanimously find, beyond a reasonable

25   doubt, as follows:  1, as to the charge contained in Count 1 of

1  the Indictment, conspiracy to possess with intent to distribute

2  and to distribute methamphetamine, we unanimously find beyond a

3  reasonable doubt Defendant Jacqueline M. Garcia to be, not

4  guilty, guilty.  And you signify your verdict by marking an X

5  in the space in front of the verdict that is unanimous.

6         If the jury has found the Defendant Jacqueline M.

7  Garcia guilty of the charge contained in Count 1 of the

8  Indictment, conspiracy to possess with intent to distribute and

9  distribution of methamphetamine, please proceed to answer the

10 question in part 1-A.

11        Part 1-A, we unanimously find beyond a reasonable

12 doubt that the quantity of methamphetamine Defendant Jacqueline

13 M. Garcia possessed with intent to distribute and to distribute

14 in the conspiracy charged in Count 1 of the Indictment was,

15 check one only -- or check only one, and then there are three

16 choices:  500 grams or more, 50 grams or more, less than 50

17 grams.

18        Question 2:  As to the charge contained in Count 2 of

19 the Indictment, possess a firearm in furtherance of a drug

20 trafficking crime, we unanimously find beyond a reasonable

21 doubt Defendant Jacqueline M. Garcia to be not guilty, guilty,

22 dated this 13th day of May, 2013, and it will be signed by the

23 presiding juror.

24        The verdict of Sigifredo Molina Varela, also known as

25 Sigi, we, the jury, duly impaneled in the above-entitled case,

1    do find unanimously beyond a reasonable doubt as follows:  1,

2    as to the charge contained in Count 1 of the Indictment,

3    conspiracy to possess with intent to distribute and to

4    distribute methamphetamine, we unanimously find beyond a

5    reasonable doubt Defendant Sigifredo Molina Varela, also known

6    as Sigi, to be not guilty, guilty.

7         If the jury has found the defendant guilty of the

8    charge contained in Count 1 of the Indictment, please proceed

9    to answer the question in part 1-A.

10        1-A, we unanimously find beyond a reasonable doubt

11   that the quantity of methamphetamine Defendant Sigifredo Molina

12   Varela, also known as Sigi, possessed with intent to distribute

13   and to distribute in the conspiracy charged in Count 1 of the

14   Indictment was:  500 grams or more, 50 grams or more, less than

15   50 grams.

16        Question 2:  As to the charge contained in Count 2 of

17   the Indictment, possess a firearm in furtherance of a drug

18   felony, we unanimously find beyond a reasonable doubt Defendant

19   Sigifredo Molina Varela, also known as Sigi, to be not guilty,

20   guilty, dated this 13th day of May, 2013, signed by presiding

21   juror.

22        I see Gary Oedegaard in the back of the courtroom, one

23   of our CSOs.  Each of these gentlemen wearing the blue coats

24   has taken the oath to protect the jury and prevent anyone from

25   overhearing your deliberations during the time you are in the

1    jury room.  And I can tell you, each of these gentlemen has a

2    distinguished career behind them as a law enforcement officer

3    and are perfectly capable of carrying out that duty without any

4    problem at all to attend to you.

5         Mr. Oedegaard, would you take the oath?

6         (Bailiff sworn.)

7         THE COURT:  Now, we come to a very awkward time in

8    this entire proceedings, one that I've never looked forward to

9    because it is somewhat hurtful.  During every jury trial I

10   think each juror discovers that their fellow citizens, no

11   matter what their station in life, are serious about their duty

12   as jurors and are more than willing to contribute all of their

13   efforts towards reaching a fair verdict based upon the evidence

14   and weight of the evidence.

15        However, the separation is difficult because we suffer

16   a little bit of separation anxiety.  But our tradition and

17   culture supports the number of 12 jurors to decide every case.

18   And we have two alternates who have provided assurance that we

19   would have 12 jurors throughout this case, and we're now

20   sending you to deliberate, and I must separate those two

21   alternate jurors from the rest of you who have provided the

22   same quality of service, been present and worked throughout and

23   paid careful attention in this case.

24        Alternate Juror No. 33 and Alternate Juror No. 19 are

25   excused at this time from your jury service.  I will tell you

1   that you only need to inform the clerk of court's office that

2   you have served for this term, and you will be excused from

3   further service during this term.  However, if you would care

4   to serve in another case, we would be very pleased to have you

5   continue on with your jury service.

6          Also, if you wish to know what your fellow jurors

7   decide in this case, I will have John, if you leave your

8   number, call you and advise you what the outcome of this trial

9   is.  So just let John Lang here who is serving as courtroom

10  deputy now, and he will make that call.

11         As tempting as it would be to include you in the free

12  government lunch that you're going to get, the rest of the

13  jurors are going to get, I am afraid that now that I've

14  submitted this case to the jury, I will have to exclude you

15  from that.  I'm sorry.

16         Ladies and gentlemen of the jury, this case is now

17  submitted to you to agree upon unanimous verdicts in this case.

18  Actually, if you wanted to go ahead and get your coats out of

19  the jury room, I will let you go ahead and release you both so

20  that you're free.

21         The case is now submitted to you to agree upon a

22  verdict.  You will take into the jury room your memories and

23  your notes that you have taken throughout this case.  You may

24  take no other books, newspapers, dictionaries, computers, or

25  anything else touching upon the merits of this case without the

1    permission of the Court.

2            Confine your deliberations to the jury room.  There

3    will be times -- couple smokers in the group -- when you take a

4    break for a smoke out in front of the building.  It is a nice

5    day.  Use that time to kind of recharge the battery and relax a

6    little bit, and then resume your work back in the jury room.

7    It would be terrible if anybody would say later that the case

8    was decided while they were in the bathroom or having a smoke

9    outside.

10           So when somebody leaves your presence, just relax a

11   little bit until they're back and then everybody gets to

12   participate in arriving at the verdict in this matter.  All of

13   you should feel that you have been able to contribute to it

14   during this case.

15           You set your own hours of work and time that you wish

16   to work.  If you arrive at a time that you feel you need to

17   recess the jury and the jurors, everyone agrees, that's fine.

18   Just announce to the bailiff when you will be reconvening.  And

19   remember this instruction:  While you're outside of the jury

20   room, you are not to discuss this case or permit anyone to

21   discuss it with you or attempt to learn about this case from

22   any sources which I have referred to endlessly throughout the

23   course of this proceedings.

24           Use the lunch hour to have a nice meal.

25           Counsel, I believe this jury will be going to the Egg

1   and I up the street, so, ladies and gentlemen, don't go to the

2   Egg and I for lunch today.  Let the jurors eat in peace and

3   outside of any improper influence from outside of this

4   courtroom.  I'm sure there's something I should have said to

5   the jury.  Can you think of anything, Mr. Healy?

6           MR. HEALY:  No, I can't, Your Honor.

7           THE COURT:  Mr. Jubin.

8           MR. JUBIN:  No.

9           MR. FLEENER:  No, sir.

10          THE COURT:  Thank you, Mr. Fleener.

11          You will take with you the instructions and the

12   evidence.

13          Make sure, Counsel, that you go through the evidence

14   before it goes into the jury room to exclude those items.  Will

15   a special machine be needed to play the tape if the jury wants

16   to have that tape played or play the disk?

17          MR. HEALY:  Just a computer probably, Your Honor.

18          Your Honor, with respect to the guns and the

19   controlled substances, Agent Budd will probably take custody of

20   those unless the jury wants to see them at some point and then

21   could we bring them back down for the --

22          THE COURT:  That would be fine.  We will bring them

23   back into the courtroom to let the jury examine them if they

24   wish to do that.

25          There was something I forgot.

1              MR. HEALY:  Thank you.

2              THE COURT:  Occasionally there are questions and the

3       question oftentimes is this:  Could we have the testimony of

4       Witness X read back to us?  Jan Davis, this lady in front of

5       us, can do that.  In fact, she was the president of the

6       national organization of court reporters two years ago and is

7       one of the finest realtime reporters that I have ever

8       encountered.  I have been watching everything come across my

9       screen here as it has gone on.

10             But when that happens, we all gather with the

11      attorneys and the Court and read the question and the attorneys

12      think, "Oh, my God, what are those people thinking about about

13      this case?"

14             And one side or the other will say, "By all means,

15      read this important testimony back."  And the other side will

16      immediately chime up and say, "Well, Your Honor, you are unduly

17      emphasizing that limited amount of testimony over all the

18      important testimony in this case.  If you do that, we're going

19      to have to read back all of the evidence."

20             Well, I'm not going to spend another week doing that

21      and you wouldn't want to do another several days.  So usually I

22      will say, "Continue your deliberations, use your memory and

23      keep working."

24             If you are truly stuck, candidly, we will end up

25      reading back whatever you need read back to you at some point.

1    But first of all we want you to consult your memories and

2    decide this case.

3        The second thing is more than once during my life the

4    jury has come back with a question about the instructions and

5    we have all sat around and said, "How could we have missed it,

6    you know?  There's something missing."  And if that happens, we

7    will draft an instruction and bring you back in and read that

8    instruction to you.  That's happened.  So I'm not telling you

9    not to ask questions.  But sometimes the instructions are

10   adequate, we look them over and we will say, "Continue your

11   deliberations."  Ultimately you're going to have to decide your

12   case with unanimous verdicts.

13       We will stand in recess until the jury returns its

14   verdict.

15       (Following out of the presence of the jury.)

16       THE COURT:  Let the record reflect that the Court

17   persists in all rulings that it has made prior to commencement

18   of this trial.  As to objections made during the course of the

19   trial, the Court persists in those.

20       The record should reflect that the defendants have

21   renewed their motions of judgment of acquittal in this case,

22   and the Court has determined that this matter should go to the

23   jury for their decision, and there is a sufficient evidence to

24   go to the jury and that reasonable minds could differ.

25       I further find, I think there was only one occasion in

1   this matter where a statement was received that might

2   questionably be subject to an 801(d)(2)(E) determination, and

3   the evidence in this case does -- is sufficient to establish a

4   conspiracy.  Further, that the statement was made by a

5   coconspirator and was made during and in the course of the

6   conspiracy and in furtherance thereof.

7          All objections to instructions are renewed and the

8   Court persists in its rulings on those and has tendered copies

9   of instructions that were tendered by counsel and refused are

10  now in the custody of the courtroom deputy.

11         Anything else we need to cover?

12         MR. JUBIN:  Your Honor, should the record require an

13  affirmative statement by counsel for Mr. Molina, this is the

14  affirmative statement making that post-trial motion that you

15  indicated the record would reflect.  Thank you.

16         THE COURT:  Thank you.

17         MR. FLEENER:  I will join.

18         THE COURT:  Thank you, Mr. Fleener.

19         Anything further?  Going to be headed out pretty

20  quick?

21         THE CLERK:  They are going to be headed out pretty

22  quick, Your Honor.  I passed on to them the appropriate letter.

23         Do you have everybody's phone numbers?

24         THE CLERK:  I will collect those in a moment, Your

25  Honor.

 1          THE COURT:  All right.  Thank you.

 2      (Proceedings recessed 1:00 p.m.)

 3      (Proceedings reconvened 4:45 p.m.)

 4      (Following in the presence of the defendants.)

 5                  *   *   *   *   *   *   *   *   *   *

 6      (Rendition of verdict transcribed and

 7      contained in Volume V(a) filed separately.)

 8                  *   *   *   *   *   *   *   *   *   *

 9      (Proceedings concluded 5:10 p.m., May 13, 2013.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5          I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Merit Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I reported by machine

9    shorthand the foregoing proceedings contained herein on the

10   aforementioned subject on the date herein set forth, and that

11   the foregoing pages constitute a full, true and correct

12   transcript.

13

14          Dated this 15th day of October, 2013.

15

16

17

18                      /s/ Janet Davis

19          _____

20                      JANET DAVIS
                  United States Court Reporter
21                Registered Merit Reporter
              Federal Certified Realtime Reporter
22

23

24

25