1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3   ----------------------------------------------------------------

4   UNITED STATES OF AMERICA,          Case No. 13-CR-00004-J

5          Plaintiff,                  Volume I(a) of V
                                       (Pages 1 through 67)
6          vs.                         Cheyenne, Wyoming
                                       May 7, 2013
7   JACQUELINE M. GARCIA, SIGIFREDO    9:43 a.m.
    MOLINA VARELA, aka SIGI,

8          Defendants.                 **CERTIFIED COPY**

9   ----------------------------------------------------------------

10

11
                  TRANSCRIPT OF TRIAL PROCEEDINGS
12
                      (MOTIONS IN LIMINE)
13
              BEFORE THE HONORABLE ALAN B. JOHNSON
14                 UNITED STATES DISTRICT JUDGE

15

16  APPEARANCES:

17  For the Plaintiff:       MR. STUART S. HEALY III
                             Assistant United States Attorney
18                           UNITED STATES ATTORNEY'S OFFICE
                             P.O. Box 668
19                           Cheyenne, WY 82003-0668

20  For the Defendant        MR. THOMAS A. FLEENER
    Garcia:                  Attorney at Law
21                           FLEENER & VANG LLC
                             P.O. Box 913
22                           Laramie, WY 82073-0913

23

24

25          OFFICIAL COURT REPORTER - (307)778-0078

    Proceedings recorded by mechanical stenography,
    transcript produced by computer.

1    APPEARANCES:  (Cont.)

2

     For the Defendant            MR. THOMAS B. JUBIN
3    Molina Varela:               Attorney at Law
                                   JUBIN & ZERGA, LLC
4                                  2614 Pioneer Avenue
                                   P.O. Box 943
5                                  Cheyenne, WY 82003-0943

6    Court Reporter:              JULIE H. THOMAS, RMR, CRR
                                   2120 Capitol Avenue, Room 2228
7                                  Cheyenne, WY 82001
                                   (307)778-0078    CA CSR No. 9162
8

9                      *      *      *      *      *

10
                                <u>I N D E X</u>
11

12   <u>MOTIONS</u>                                                <u>PAGE</u>

13   Government's Motion in Limine
          Mr. Healy                                         4
14        Mr. Fleener                                      14
          Mr. Jubin                                        24
15        Mr. Fleener                                      25
          Mr. Healy                                        27
16        Ruling of the Court                              32

17   Defendant Molina's Motion in Limine re Expert
     Testimony on Gun Possession
18        Mr. Jubin                                        38
          Mr. Healy                                        40
19        Ruling of the Court                              42

20   Defendant Molina's Motion in Limine to Prohibit
     Introduction of Statements by the Defendant
21        Mr. Jubin                                        46
          Taken Under Advisement                           67

22

23

24

25

1                          I N D E X (Cont.)

2

GOVERNMENT'S WITNESS                                    PAGE

3

CHRIS MCDONALD
4      Direct - Mr. Healy                                 48
       Cross - Mr. Jubin                                  60
5


6

DEFENDANTS' WITNESSES                                   PAGE
7

CHRIS MCDONALD
8      Direct - Mr. Fleener                               20
       Cross - Mr. Jubin                                  25
9   SIGIFREDO MOLINA
       Direct - Mr. Jubin                                 65
10     Cross - Mr. Healy                                  66

11

12  GOVERNMENT'S EXHIBITS                             RECEIVED

13  40                                                    59

14  49                                                    51

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced 9:43 a.m., May 7, 2013,

2        in the presence of the defendants, outside the

3        presence of the jury panel.)

4            THE COURT:  Thank you.  Please be seated.

5            Motions in limine have been filed by all sides of

6   this case.  Mr. Healy, you may proceed with regard to yours.

7            MR. HEALY:  Thank you, Your Honor.

8            THE COURT:  The first involves the misdemeanor

9   convictions of various witnesses for offenses that do not

10  implicate untruthfulness.

11           MR. HEALY:  This is pretty straightforward, Your

12  Honor.  I gave a pretty comprehensive Giglio list to both

13  attorneys last week.  I updated that yesterday after speaking

14  with another witness because it was unclear from her criminal

15  history if she had been convicted of a prior felony, and she

16  had.

17           What I'm asking the Court here to do is that I -- I

18  provided a lot of information about the various witnesses that

19  is not subject to impeachment under 608 or 609.  I've provided

20  the case law for the Court in my motion.  I won't go into any

21  detail about that unless I need to in rebuttal, but I just

22  want it to be made clear that the fact that I'm producing that

23  information is, is so that there is full disclosure and

24  there's no question about what was withheld or anything like

25  that.

1          So I've verified the felonies.  I've verified any

2   misdemeanor crimes that are crimes of untruthfulness.  I think

3   it's clear that instances of conduct can't be inquired into

4   that did not arrest -- or did not involve arrest or that don't

5   have -- or that did not involve conviction or that don't have

6   as an element an indication of untruthfulness.

7          Your Honor, I am marking as Government's exhibits the

8   e-mails that I sent to counsel.  I wasn't intending on doing

9   this, but I think rather than speak in the abstract to the

10  Court I'd let the Court have this so it has a record of it.

11  One thing that's not mentioned in this is that Whitney Rose

12  was subject to family court, a juvenile proceeding, because it

13  was determined that her daughter was around methamphetamine.

14  That is not in this particular document, but I do not think

15  that that's proper impeachment, a confidential matter in

16  juvenile court.  It was eventually disposed of in that Whitney

17  Rose admitted that there was methamphetamine around her child,

18  and then there were dispositions after that that the family

19  court ruled on.

20         Those are the matters, Your Honor.  I've marked the

21  first Giglio notice as Government's Exhibit 62 and the second

22  Giglio notice as Government's Exhibit 63.  And those obviously

23  have been provided to counsel.

24         That's the first matter, Your Honor.  The second is

25  this matter of the informant that we do not have.  And

1   Mr. Fleener has filed a response to this.  Here's the

2   background.  On March 23rd, 2011 Troy Hipsag, who was a

3   special agent with the task force for DCI at that time in

4   Gillette, and Chris McDonald, who is here today, and Agent

5   Hipsag will be prepared to testify as well, conducted a

6   recorded telephone call from a CI named Jimmy Hernandez to

7   Jackie Garcia.  The telephone calls, which we don't intend to

8   play for the jury, although we do intend to admit as exhibits,

9   offer as exhibits, are basically discussion between

10  Mr. Hernandez and Miss Garcia about the purchase of 2 grams of

11  methamphetamine for $400.  Over the course of a couple of

12  calls -- and there are two calls when no one answers the phone

13  when the CI, Mr. Hernandez, calls Jackie Garcia.  But over the

14  course of several calls, I think four, in the fourth call it's

15  determined that Mr. Hernandez will go to Jackie Garcia's home

16  to pick up the methamphetamine.

17          When that's arranged, the agents, as they will,

18  checked the CI for contraband, checked the CI's car for

19  contraband, put a wire on the CI, and again I'm talking about

20  Mr. Hernandez when I say CI, followed him to the home that we

21  know is the home of Jackie and Molina Garcia [sic].  When he

22  goes to the door, Shane Draper answers the door.  Shane Draper

23  was living with Mr. Molina and Miss Garcia at that time.

24  Mr. Molina and Miss Garcia are not there, which during the

25  phone calls is something that is foreseen possibly by

1    Miss Garcia because she couldn't just go, quote, in and out of

2    her source's residence.

3            So the agents, Agent McDonald and Agent Hipsag and a

4    couple of others, but Agent McDonald and Agent Hipsag have

5    their eyes on the house, wait.  The CI at one point comes out

6    and smokes a cigarette, goes back in.  All of this is recorded

7    on the wire.

8            Eventually Agent McDonald and Agent Hipsag see

9    Mr. Molina and Miss Garcia arrive at the home, get out of the

10   truck, go into the home.  At that time the transaction occurs

11   between Miss Garcia and Mr. Hernandez.  During that

12   transaction there's a discussion that the weight is a little

13   light, and it turns out it is, that is, it was less than

14   2 grams.  Miss Garcia says that it's good quality, it's better

15   than she thought it would be.  They arrange another purchase

16   for $500 the next day, which purchase never occurred, but it

17   was arranged during that meeting.  The CI leaves the home, and

18   the CI is -- drives back to DCI.  He's checked again.  The car

19   is checked.  The methamphetamine is collected.  It's sent off

20   to the lab, and we'll have a lab analyst here today, or

21   probably not today, but we'll have a lab analyst discuss the

22   test results.

23           Troy Hipsag will also testify that he had -- not that

24   it matters because whether the voice identification is based

25   on previous or subsequent contact to the actual buy the courts

1    have said doesn't matter as long as there's some minimal

2    familiarity, but he will also testify that he had had contact

3    with Jackie Garcia in the past, that he recognized her voice,

4    that it's a distinctive voice, that he recognized her voice on

5    the call, not to mention the fact the CI told him this is

6    Jackie Garcia I am calling, and they arranged to have him call

7    Jackie Garcia's phone number that the CI knew.

8            So that's the evidence, Your Honor.  The law is

9    pretty clear here.  The Government does not need to call the

10   informant in order to bring the statements of the defendant in

11   and use them against her under 801(d)(2)(A).  I've listed

12   several cases that are published from other circuits that are

13   right on point, but I have another case that I think

14   is -- it's unpublished from the Tenth Circuit, but it's very

15   instructive for this Court.  This is at 243 Fed Apps 441.

16   It's entitled United States v Gaines, and it's really the

17   compilation of this case against Mr. Gaines in addition to

18   Mr. Gaines's 2255 motion.  Let me just give the Court a little

19   background about Mr. Gaines, and I think that the similarities

20   will become quite apparent.

21           Beginning in late 2004 the Kansas Bureau of

22   Investigation began taping telephone calls between a

23   confidential informant and Gaines as part of a drug

24   investigation.  On January 5th, 2005 using three-way telephone

25   technology agents initiated and monitored a telephone call to

1    an individual the confidential informant identified as

2    Rose -- identified to Rosebrough, who is the agent

3    investigating this case, as Gaines, the defendant.  Four days

4    later the agent, Agent Rosebrough, and another agent observed

5    a controlled purchase of crack cocaine which had been

6    prearranged by the confidential informant over these phone

7    calls.  Using a photograph, Agent Rosebrough identified the

8    person from whom the CI was purchasing the crack cocaine,

9    Mr. Gaines, as Mr. Gaines.

10           I should say that it should go without saying, Your

11   Honor, that Agent Hipsag could identify Miss Garcia when she

12   got out of her car, as well as Mr. Molina, from prior

13   contacts, as could Mr. McDonald or Agent McDonald.  Excuse me.

14           So during the course of this they hear the

15   confidential informant speaking to Gaines by cell phone, and

16   they hear the confidential informant speaking to Gaines over

17   the wire.  And at the trial Mr. -- or Agent Rosebrough, excuse

18   me, from the Kansas Bureau of Investigation takes the stand,

19   and he says, first of all, the CI told us that he or she was

20   calling Mr. Gaines, and then we observed Mr. Gaines, and I

21   became familiar with Mr. Gaines's voice during the course of

22   these conversations, so I knew it to be Mr. Gaines, in

23   addition to having a photograph that I could look into this

24   car and say that was Mr. Gaines that he was meeting with

25   during this undercover purchase.

1         So all of these were tape-recorded and admitted

2    against him, and ultimately the District Court out of Oklahoma

3    admitted these.  Mr. Gaines argued in his first appeal that

4    because the -- that because the confidential informant was

5    unavailable to testify at trial, SA Rosebrough provided

6    testimony that shouldn't have come in because the confidential

7    informant wasn't available.  Mr. Gaines said that because

8    Rosebrough didn't have firsthand knowledge -- and in this

9    case, of course, Agent Hipsag and Agent McDonald did -- of the

10   defendant's voice, the tape could not be authenticated.  And

11   the court in this first Gaines case said that's completely

12   wrong, that it only takes a minimal familiarity with the

13   voice, and it cites United States v Bush, 405 F.3d 909 at 918,

14   Tenth Circuit 2005.  It also cites Federal Rule of Evidence

15   901(a), (b)(5) for the authentication or identification as a

16   condition precedent to admissibility of audiotaped evidence by

17   means of voice identification.  So the court goes through the

18   analysis and says the agents became familiar with the voice

19   during the calls, and the CI told them that it was the -- that

20   it was Mr. Gaines, so this was perfectly admissible evidence.

21        The second thing that bears on this case or that may,

22   and it wasn't raised in Mr. Fleener's motion, but I want the

23   Court to know that really as a matter just of oversight

24   these -- the Government didn't get possession of these tapes

25   until -- from the agents until last week.  And it wasn't the

1    agents' fault.  It wasn't really anyone's fault.  It was just

2    an oversight.  But we tried to remedy that immediately,

3    contacted Mr. Fleener and even Mr. Jubin, who really isn't an

4    issue here, his client.  We made them available, in fact,

5    dropped them off on Sunday, yesterday -- or excuse me, two

6    days ago in Laramie to Mr. Fleener.  And I think now he's had

7    an opportunity to review those.

8           So Gaines's second argument in this first Gaines

9    matter was that these audiotapes weren't provided to defense

10   counsel until the second day of the jury trial, and he said

11   this was a Brady violation and should result in a dismissal of

12   the case, reverse and dismissal.  The court rejected this

13   argument, too, and when it did it said when exculpatory

14   evidence is disclosed during rather than after trial, the

15   material inquiry focuses on whether early disclosure would

16   have created a reasonable doubt of guilt.

17          So to suggest that there's anything exculpatory in

18   this audio is I think difficult for Mr. Fleener to do.  He may

19   say that because Shane Draper answered the door it could be

20   Shane Draper that gave the dope to Miss Garcia.  I don't want

21   to make his arguments for him, but maybe he was thinking about

22   that.  But there's very little that's exculpatory.  We have

23   Miss Garcia talking about this $400 purchase of

24   methamphetamine and then talking about the quality of it,

25   talking about the weight, and then talking about another deal

1    to set up.

2            The court also noted that the Government was willing

3    to have the trial continued for a brief period of time, for a

4    week, to allow defense counsel to investigate the matter if it

5    wanted to investigate it more.  And there was plenty of

6    cross-examination on the agent who testified about the

7    recordings and what the agent heard, and in that case the tape

8    wasn't introduced into trial.

9            So what I have here, Your Honor, today is

10   Government's Exhibit 2, which are the first calls,

11   Government's Exhibit 3, which are the second set of calls, and

12   Government's Exhibit 4, which are the wire.  And I am offering

13   all of these.  And these will be also -- foundation will be

14   laid for these, but these are for the motions hearing record,

15   Your Honor, but foundation will be laid at trial for these.

16           Okay.  So Gaines goes on.  He decides that his

17   attorney didn't do a good job.  He should have raised what

18   Mr. Fleener did.  He should have raised the Crawford issue.

19   So in his 2255 motion he says that Crawford was an issue here.

20   Well, the Tenth Circuit in 358 Fed Apps 34 rejected this

21   argument as well.  And in doing so it basically followed the

22   precedent that I cited for the Court in the motion in limine

23   that I filed with the Court.  What the Tenth Circuit said in

24   the Gaines matter is that the CI's identification of

25   Mr. Gaines' voice in the January 5 phone call was not admitted

1   at trial to prove the truth of that identification but only to

2   establish the background for Agent Rosebrough's ultimate

3   identification of Mr. Gaines as the participant in the

4   January 9 drug sale for which he was convicted.  As such,

5   admission of the CI's identification of Mr. Gaines constituted

6   neither a Crawford nor a confrontation clause violation.

7           So that's the -- I guess we'll do this in order, Your

8   Honor.  That's the Government's motion in limine, the law

9   supporting the motion in limine, and I'm happy to answer any

10  questions the Court may have at this time.

11          THE COURT:  All right.  Well, I guess the first one

12  is:  What's happened to Mr. Hernandez?

13          MR. HEALY:  We do not know where Mr. Hernandez is.

14  There's been no contact with Mr. Hernandez over some time.  In

15  fact, Mr. Fleener gave me information today about

16  Mr. Hernandez that I didn't even know, that he had some sort

17  of disability.  But his whereabouts are unknown.  He is

18  unavailable.

19          THE COURT:  So if we look in the phone book, we

20  wouldn't see Mr. Hernandez's number or . . .

21          MR. HEALY:  I don't believe so, Your Honor.  Would

22  you like testimony from Agent McDonald on this matter?

23          THE COURT:  Yeah, I'm just wondering if there's been

24  any effort to find -- to locate him.

25          MR. HEALY:  There was effort.

1          THE COURT:  As a CI, I assume he was doing this for

2     some good reason, to avoid prosecution.

3          MR. HEALY:  I'm sure -- he was not -- I wouldn't call

4     him -- this would not be akin to U.S. v Keck, Your Honor,

5     where we had coconspirators during the course of the

6     conspiracy speaking with Mr. Keck and we offered their

7     testimony as contextual and also 801(d)(2)(E) testimony.  In

8     this case there was certainly no conspiracy because Jimmy

9     Hernandez was working for the special agents, DCI.

10         THE COURT:  All right.  Thank you.

11         MR. FLEENER:  Judge, I'll respond to both of

12    Mr. Healy's points in his motion in limine, I guess, in turn.

13         As far as what cross-examination is available under

14    Federal Rule of Evidence 608 and 609 as far as misdemeanors

15    and felonies and the rules that apply there, thereof, I will

16    follow Rule 608 and 609, and if it's an area that the

17    conviction itself can be offered as impeachment, then I'll do

18    so.

19         I would, I would note, and I haven't thought this

20    thing through completely yet, but I'm sure there's going to be

21    instances where the conviction itself won't be relevant but

22    the underlying conduct could be evidence of, of untruthfulness

23    or something else that may be proper to impeach the witness on

24    even though the conviction itself would be improper.  If

25    that's the case, how -- and I can picture this.  Um, a -- some

1   sort of misdemeanor drug conviction that's outside of the

2   limit that's necessary under 608 or 609 that the sub -- that

3   the underlying conduct was when he was on bond and not

4   permitted to use drugs by court order, I would impeach him by

5   saying:  And isn't it true that you were on probation and you

6   weren't to use -- the court told you not to use drugs?  Yes, I

7   was.  And isn't it true that you actually did -- and you told

8   the judge that you weren't going to use drugs, that you were

9   going to be a good boy?  And he says, Yes, I did.  And isn't

10  it true that you lied because you subsequently did use drugs?

11  That would be an example.  I wouldn't get into the conviction

12  of it, but I think that there's certainly areas that would be

13  proper to impeach -- the conduct itself would be proper to

14  impeach while the conviction itself would not be proper to

15  impeach.  But I intend to follow the Federal Rules of Evidence

16  regardless.

17          THE COURT:  Very well.

18          MR. FLEENER:  And then as far as the second point,

19  which I think is more, more important I guess, and it's the

20  point that -- regarding the confidential informant.  I don't

21  dispute anything that Mr. Healy said regarding the law in the

22  case and the facts in the case.  You know, I would point out

23  that in his -- there may be a difference between -- Mr. Healy

24  said he intended to admit the recordings but not play them for

25  the jury, and I'm not sure what that means.  I'm afraid what

1  he means, what he intends to do, is try to admit the recording

2  and then have the agent testify about what he heard on the

3  recording and what that means.  That's what -- I don't know if

4  that's Mr. Healy's intention or not, but I think that

5  draws -- that's a different analysis than simply whether the

6  recording itself can be played.

7         First, I don't -- I'm not fighting Mr. Healy

8  regarding delays and things of that nature.  I've had adequate

9  time.  I've known about the recording -- or I've known about

10  this purported controlled buy.  I didn't know who it's with,

11  but we've been able to sort of sort this mess out a little

12  bit, but the delay isn't an issue in my, in my case.  And the

13  United States -- we were able to sort this mess out the last

14  minute.

15         I am -- but I do believe there's a difference

16  between -- and I want the Court to understand, and it

17  may -- this probably won't come up today, but it's good for

18  the Court to have it for the future.  There's two different,

19  my understanding is that there's two different recordings or

20  three different recordings.  There's phone calls -- purported

21  phone calls, purported phone calls controlled buy.  And my

22  listening of the purported phone calls, purported phone calls

23  controlled buy leads me to believe that there may be a

24  different analysis between the phone calls and the controlled

25  buy, meaning that the controlled buy, at least as far as I've

1   been able to listen to the thing, is completely inaudible, and

2   I don't know what was said.  I've listened to the thing twice.

3   It's an hour and a half long.  There's -- you can hear little

4   blurbs of things, but it's, um -- if I didn't know what I was

5   listening for, I'd have absolutely no idea what was happening.

6   And in that case I'm afraid that what Mr. Healy and the United

7   States want to do is have the agent testify about what he's

8   hearing or what actually took place.  Not only would his

9   testimony be truth -- it would be the words that -- the words

10  that Mr. Hernandez would be saying or he believes that

11  Mr. Hernandez is saying would now be offered for their truth.

12  They wouldn't simply be offered to put Mrs. Garcia's words

13  into context.

14          So as far as the phone calls go, I think that if the

15  agent is properly able to authenticate and identify

16  Miss Garcia and the phone numbers and it's a regular Rule 900

17  authentication issue, and assuming that happens which I

18  believe it probably can, and those calls are audible, you can

19  hear what's going on there, they could be admitted.  The

20  problem is going to be this, is where the agent is then going

21  to want to testify about what he believes the -- what he

22  believes the confidential informant, that's Danny

23  Hernandez -- not Danny Hernandez, Jimmy Hernandez; Danny

24  Hernandez is from the Bulldog trial -- what Jimmy Hernandez

25  and Ms. Garcia mean when they're saying what is being said

1   between them.  That's objectionable.  And I believe if they

2   want to get into the substance of what actually is said other

3   than Ms. Garcia's words being offered against her as an

4   admission under the 800 series, but if they want to, if they

5   want to interpret what is being said and what Mr. Hernandez

6   believes Ms. Garcia is saying to him, then they're going to

7   need Mr. Hernandez to do that.  We can't impeach Mr. -- we

8   can't impeach an agent on what he interprets Mr. -- these

9   words mean when there's actually a declarant out there, they

10  just have made him unavailable.

11        So -- and then as far as the actual controlled buy

12  itself, even assuming this Court allowed over the objections

13  of Crawford and hearsay, assuming they get through

14  authentication issues -- and they probably will be able to

15  authenticate the tape, even the recorded buy, because they

16  could say that they hear their voice at the very beginning of

17  the thing, for instance.  I believe the agent says hi, I'm

18  Agent So-and-So, today is so-and-so, here we are, and then

19  it's just all gravel and scribbles after that.  So there may

20  not be a problem authenticating it, but there's going to be an

21  objection, I did object, and I believe that to admit the

22  substance of a purported controlled buy especially when you

23  can't hear what's actually happening, you need the person who

24  did the buy, and you need -- otherwise you have -- otherwise

25  what the agent's offering is actually what he believes

1    somebody is saying and it's being offered as the truth, that a

2    controlled buy took place and Mr. So-and-so, because you can't

3    even hear what's happening, what had to have happened is that

4    after the controlled buy or purported controlled buy took

5    place they had to have a debriefing where, because you

6    couldn't hear anything on the tape, they had to say, okay,

7    tell us what happened in there, and he says, yeah, yeah,

8    here's what happened, and I got the drugs, and here's the

9    stuff, and here's that.  All that is being offered for its

10   truth.

11            So this is a complicated issue, and it's a little

12   bit -- well, it's a complicated issue, but I believe there's a

13   different analysis between the phone calls and the controlled

14   buy.  I believe it's going to be -- and even if the, even if

15   the phone calls are properly authenticated and even if the

16   purported controlled buy is properly authenticated, when the

17   agent tries to explain either what was meant by the words on

18   the phone call, because you can at least hear those words, you

19   can hear the conversation that took place between Ms. Garcia

20   and Mr. Hernandez, you can hear those words, but when he tries

21   to explain it, I believe it's objectionable.  And certainly

22   when you get to the actual controlled buy where you can't hear

23   any words whatsoever, then there is a Crawford issue.

24            So that is that particular issue.  And I do believe

25   that I'd like to call Agent McDonald to see what efforts were

1  taken to find the confidential informant.  I'm not necessarily

2  certain that it's dispositive of anything, but I think a

3  record needs to be made.  I don't know if you can just say a

4  guy's not here, I want to play my agent.  So I would call

5  Agent McDonald, unless the Court objects.

6          THE COURT:  I don't object.

7          MR. FLEENER:  I'd call Agent McDonald to the stand,

8  please.

9      (The witness was sworn.)

10          COURTROOM DEPUTY:  Please take the stand, sir.

11          Sir, for the record would you please state and spell

12  your name.

13          THE WITNESS:  My name is -- pardon me.  My name is

14  Chris McDonald, C-h-r-i-s, M-c-D-o-n-a-l-d.

15      CHRIS McDONALD, DEFENDANT'S WITNESS, DIRECT EXAMINATION

16  Q.  (BY MR. FLEENER)  Agent McDonald, you're the lead agent, I

17  assume, on this case.

18  A.  Yes, sir.

19  Q.  And were you the lead agent on this case back in 2011 when

20  the controlled buy purportedly took place between Jimmy

21  Hernandez and Jackie Garcia?

22  A.  No, sir.

23  Q.  Who was?

24  A.  SA Hipsag.

25  Q.  Were you actually present for the phone calls that were

1    made between -- allegedly made between Mr. Hernandez and

2    Miss Garcia?

3    A.  No, sir.

4    Q.  Were you present during the alleged controlled buy?

5    A.  Yes, sir.

6    Q.  And Mr. Hernandez to you is whom?  That wasn't a very good

7    question.  Who is Mr. Hernandez?

8    A.  Uh, a confidential informant.

9    Q.  And --

10   A.  Or was, I should say.

11   Q.  And what -- how long had he been a confidential informant

12   for you?

13   A.  Uh, very briefly.

14   Q.  While he was a confidential informant, did he do any other

15   controlled buys or make any other workings with DCI other than

16   this particular controlled buy?

17   A.  He attempted another controlled buy with --

18   Q.  Jackie?

19   A.  -- with Miss Garcia which did not occur.

20   Q.  Other than his involvement in this particular case, did he

21   work any other cases for you?

22   A.  No, sir.

23   Q.  Why?

24   A.  He, he disappeared shortly, shortly after the failed

25   attempt, second attempt.

1  Q.  What was his background like as far as his criminal

2  history, drug abuse, things that would render his

3  testimony -- render his work either reliable or unreliable to

4  you?

5  A.  In relation to working as an informant, sir?

6  Q.  Well, his life.  I mean, what made you believe what he

7  said was true?

8  A.  Via corroboration.

9  Q.  Do you know of his criminal history?

10  A.  I don't off the top of my head.

11  Q.  Do you know of substance abuse issues?

12  A.  Yes.

13  Q.  I assume he had substance abuse issues.

14  A.  Correct.

15  Q.  Are you aware of any mental health issues that would go

16  towards either his believability or unbelievability?

17  A.  I do not, sir.

18  Q.  Is it safe to say that since Jimmy Hernandez left your

19  employ as a CI, very little thought had been put into who's

20  Jimmy Hernandez and where Jimmy Hernandez is, except for this

21  trial?

22  A.  That would be true, yes.

23  Q.  And when you, when you realized that Jimmy Hernandez may

24  be an important player in this, involved in the confidential

25  informant, being a confidential informant, what actions did

1  you or your office take to try to find him?

2  A.  We went through, uh, previous contacts, contacted the

3  other agents or other officers in and around -- or in Gillette

4  without success if anyone had contacted Mr. Hernandez.

5  Q.  Did you actually go to his prior address?

6  A.  I did.

7  Q.  Did you call his prior phone numbers, if he had any?

8  A.  I did not, no.  I don't believe -- I don't know that

9  anyone did, but I know I did not.

10 Q.  Did you -- I assume in his, in his -- when he became a

11 confidential informant, he had to sign a contract?

12 A.  Yes.

13 Q.  And in the contract I assume he listed things like full

14 name, aliases, Social Security number, things of that nature.

15 A.  Yes.

16 Q.  Did you use -- using his Social Security number, attempt

17 to find him in any particular way, either looking for Social

18 Security benefits or -- Social Security benefits?

19 A.  No, sir.

20 Q.  Did you use his Social Security number to contact the IRS

21 to determine whether -- what the IRS -- if it had a last known

22 address for Mr. Hernandez as far as --

23 A.  No.

24 Q.  -- income taxes go?

25 A.  I apologize.  No, sir.

1  Q.  Did you contact any other state or federal agencies,

2  federal unemployment, Wyoming state unemployment, Wyoming

3  state disability, any other agencies to determine whether

4  Jimmy Hernandez -- whether they had any information on Jimmy

5  Hernandez?

6  A.  No, sir.

7  Q.  Did you run his contact information or at least his Social

8  Security number and his name through NCIC to determine whether

9  he'd been arrested somewhere else that would help you

10  determine his location?

11  A.  No, sir.

12  Q.  When's the last time you've actually tried to find Jimmy

13  Hernandez?  And I say you, you meaning DCI, you, that you know

14  of.

15  A.  Approximately a month ago maybe.

16  Q.  And -- okay.

17       MR. FLEENER:  I have, I have no further questions.

18  Mr. Healy may.

19       MR. HEALY:  I have no questions, Your Honor.

20       MR. FLEENER:  Thank you.

21       MR. HEALY:  Thank you.

22       THE COURT:  Very well.  You may step down.

23       MR. JUBIN:  Your Honor, I have one question.

24       THE COURT:  Yes.

25       MR. JUBIN:  I suppose I should also note my joinder

1   in the motion.  This is charged as a conspiracy.  I recognize

2   that the alleged buy occurred with a codefendant, but as a

3   charged coconspirator I think the issue inures to my client's

4   benefit, so I would join Mr. Fleener's arguments and motion in

5   limine.

6                        CROSS-EXAMINATION

7   Q.  (BY MR. JUBIN)  Was Jimmy Hernandez working off criminal

8   charges?

9   A.  Yes, sir.

10          MR. JUBIN:  I have nothing further.

11          MR. HEALY:  No questions, Your Honor.

12          THE COURT:  Thank you.  You may step down.

13          MR. FLEENER:  I'd like to, with the Court's

14  permission, I'd like to just argue for another 30 seconds or

15  so on the issue.  One of the differences between this

16  particular case and the --

17          THE COURT:  Gaines?

18          MR. FLEENER:  I apologize?

19          THE COURT:  Gaines?

20          MR. FLEENER:  No, not Gaines, the Van Nays.

21  Van Nays?  The Van Sach from the Seventh Circuit that --

22  Mr. Healy's lead case, I guess, on page 4 of his motion, is

23  the ability for -- one reason why the court said that you

24  could use the CI's -- you could use the agent's -- the agent

25  could admit the CI's words through him, I guess, or allow the

1   recording to be played is that the defense attorney has the --

2   the defense has the opportunity to cross-examine the agent

3   regarding Mr. Hernandez or regarding the CI and all of the

4   motives and whatnot that took place that would provide

5   incentive for the CI to have fabricated something.  And we're

6   not going to have that opportunity here as well.  I mean, I

7   think the agent -- based on his testimony, it's pretty clear

8   that a couple years ago this guy showed up to burn off

9   criminal charges.  He doesn't know of any -- he doesn't know

10  his record, doesn't know of substance abuse.  He knows he has

11  substance abuse issues, but doesn't know of anything else, put

12  very little effort into trying to find him.  I mean no

13  disrespect.

14          But there's a difference in that case in that at

15  least the confidential informant who bought the gun in

16  Van Sach had worked with these agents, at least according to

17  the case, had worked with them and developed a, a -- there is

18  reason to believe him.  Here this is -- apparently his

19  involvement only with this case two alleged purported attempts

20  at controlled buys, one may have been successful, one may not,

21  and now the man is gone for two years.  We would believe that

22  any information regarding this controlled buy without the

23  actual individual who purportedly conducted the controlled buy

24  would violate confrontation, Crawford, and also is

25  inadmissible hearsay, Judge.

1           THE COURT:  Thank you.  Anything further?

2           MR. HEALY:  Yes, Your Honor, there are a couple

3    things.  First of all, I just want to make sure it's clear on

4    the record.  Mr. Fleener said that we just made this witness

5    unavailable.  I think that it's clear from Special Agent

6    McDonald's testimony that we did not, the Government did not

7    make this witness unavailable.

8           MR. FLEENER:  Oh, I'm not saying that he did.  I

9    apologize.

10          MR. HEALY:  It was -- that's a quote, but that's

11   okay, maybe you didn't mean --

12          MR. FLEENER:  I didn't mean you made the witness

13   unavailable.  He just happens to be not here.

14          MR. HEALY:  Okay.

15          THE COURT:  I think that's true.  I don't think there

16   was any significant effort to find him or bring him here into

17   court.

18          MR. HEALY:  Well, but the question is, Judge, not

19   whether that's true or not.  Agent McDonald testified he

20   looked for him.  He made contact with other agents to find out

21   if they knew where he was.  They --

22          THE COURT:  Walked into the coffee room and said,

23   hey, anybody seen Hernandez around?

24          MR. HEALY:  They went by his house.  So there were

25   efforts, but regardless of whether there were efforts or not,

1   if it's admissible under the Federal Rules of Evidence, Your

2   Honor, it's admissible under the Federal Rules of Evidence.

3   It's not a requirement that there be proven unavailability.

4   There's no requirement of that.  There just isn't.

5        The question is whether the statements of the

6   defendant come in.  And really the only statement -- I'm not

7   sure how many statements we even need of this CI.  I mean, we

8   have people identifying her voice.  We have her identifying

9   her going into the house.  We have the audio in the house,

10  which I take exception to Mr. Fleener's statement that nothing

11  is -- you can hear nothing.  You can -- there's a lot of it.

12  There's an hour and a half almost, Judge, which is why we

13  don't have any intention of admitting it, but -- well, we do

14  have intention of admitting it but not playing it.  If the

15  jury wants to listen to it, they can.  If Mr. Fleener wants to

16  cross-examine on it, he can.  He can play it.  But in my

17  opinion it's not an efficient use of time to play those tapes

18  when they can be testified about.

19       And that reminds me of two other issues.  That's

20  exactly what happened in Gaines.  The agent took the stand and

21  testified about what was said during those conversations.  The

22  second thing is --

23       THE COURT:  It seems to me it has to be made -- the

24  risk is making it up.  In other words, you take out, you take

25  out the tape.  You know, they've listened to the tape.  And

1   they want to listen to the tape because they've got Jimmy

2   Hernandez in there, and Jimmy Hernandez may be endangered, and

3   they want to respond if he is endangered, and they want to

4   rush in there and save Jimmy Hernandez if Jimmy Hernandez is

5   threatened in some way.  So there's a real reason, it seems to

6   me, beyond the fact, oh, well, we don't care about Jimmy

7   Hernandez, they can do whatever they want with him, we just

8   want to put another scalp up on the wall and collect some

9   evidence.  No, I think there are very good reasons that they,

10  they do this with CIs.

11       They searched Jimmy Hernandez before he goes in

12  because they know that Jimmy Hernandez is a problem, he has a

13  criminal record, and he's working off a charge, and so they

14  search him very carefully.  They send him in.  And they have

15  the previous telephone calls which they've listened to.  They

16  identified the voices, et cetera.  They're there.  Hernandez

17  is right in front of them.  They're witnessing what's being

18  said.  And they can be cross-examined about the whole thing,

19  about all the facts and circumstances of those telephone

20  calls.  Hernandez comes out eventually.  The problem here is

21  he's been in there a long time, and he goes in there and

22  there's only Draper who answers the door.  So minutes or hours

23  or however long passes before they see Sigi and Mrs. Garcia

24  drive back in the truck and go into the house, people who they

25  know, people who I'm sure he can testify he recognizes her

1    voice very well.  Hernandez comes out.  They search him again.

2    Now he's got methamphetamine on board.  You know, all that,

3    all that, all that's good evidence, it seems to me.  That's,

4    that's what they -- you know, that's how it's been testified

5    about in the past.

6         We're going to listen to that tape, it seems to me,

7    have to.  The jury has to hear it to decide if, in fact, what

8    the agent is saying he heard is truthful and the spin that the

9    agent puts on it because he's an interested party.  He wants

10   to get a conviction.  His credibility is as much at evidence

11   as any other witness in this case, if not more so because

12   he's -- he wants to, he wants to get a conviction.  And so --

13        MR. HEALY:  Your Honor -- go ahead.  Sorry.

14        THE COURT:  The evidence in this case are the

15   statements that are made by Mrs. Garcia.  Now, if the witness

16   Hernandez is saying -- conducting some sort of narrative in

17   this whole process, well, I think, rather than simply being

18   the background or the occasion for the meeting, then it seems

19   to me we've got a problem.  In other words, if I can't

20   hear -- we're not hearing Mrs. Garcia, but we're hearing all

21   the talk of Mr. Hernandez in this thing setting it up, that's

22   a problem.

23        MR. HEALY:  I'd just like to advise the Court, too,

24   that the narrative, the written report narrative of the phone

25   calls and the controlled buy were provided to defense counsel

1   on February 7th of this year.  That was something very

2   important that I forgot to let the Court know.  We just --

3   again, the oversight of not providing the recording.  So I

4   think that's why -- and I appreciate Mr. Fleener saying he has

5   no problem with the timing on this.  He was well aware of what

6   we had prior to trial.

7          THE COURT:  You say a narrative.  It's a -- what is

8   it, somebody transcribed or something like --

9          MR. HEALY:  Not a transcription.  It is a report.

10  This is what happened on this date.  We contacted Jackie

11  Garcia.  It was -- arrangements were made to purchase $400

12  worth of methamphetamine.

13         THE COURT:  We sent in the undercover agent or

14  undercover person.

15         MR. HEALY:  CI went to the house, exactly.

16         Your Honor, the other thing is just -- I want to just

17  clear up.  I know this is sort of almost an anticipatory

18  objection, but the reason why it's so important in this case

19  is the Government -- we usually provide -- because we're not

20  allowed to provide NCIC reports of witnesses, what we try to

21  do is we go through and we take the presentence investigation

22  report and we do all these things to try to find what is

23  admissible under 608 or 609, and then we send the letter.  In

24  this particular instance just because, honestly, I was just

25  trying to disclose everything so that Mr. Jubin and

1  Mr. Fleener wouldn't later say, well, there wasn't something

2  disclosed, I could say that it was not something I knew about.

3  The only thing that I have added is this juvenile court

4  proceeding, which I don't think is anywhere even in the realm,

5  and that wasn't in there.

6           But the reason I bring it up is there are these

7  misdemeanor thefts, and we have law on this that under 608 and

8  609 these misdemeanor thefts, especially the ones that aren't

9  even convictions, but either convictions or acquittals, are

10  not proper inquiry.  So I highlighted that, but there's other

11  things.  I mean, it's obvious that a misdemeanor drug offense

12  doesn't go to a person's veracity.  I completely agree with

13  Mr. Fleener when he says that he can question somebody about

14  bond violations.  I intend to do that myself.  And, in fact,

15  during my direct examination they may talk about misdemeanor

16  arrests.  These witnesses had a lot of stuff going on during

17  this period of time.  So that may come in, and obviously I

18  wouldn't be objecting.  But the reason for the motion in

19  limine is I don't want these questions of misdemeanor thefts

20  that occurred back in 2003 and all that stuff coming in.  So

21  that's where that motion is.

22           That's all, Your Honor.  Thank you.

23           THE COURT:  All right.  Well, it looks to me like

24  we've got a jury sitting out there we need to get started.

25  I'll go ahead and rule on what's before me so far.  I will

1    grant the motion in limine concerning the misdemeanors.

2    Should Mr. Fleener have evidence in his possession of false

3    statements that were made, rather than just simply out on a

4    fishing expedition, he can approach the bench when he wants to

5    present that evidence, as can Mr. Jubin, and make his offer,

6    and we'll decide whether to give him relief from the motion in

7    limine that's in place.

8            Secondly, with regard to the testimony in this case

9    concerning the calls that were -- and it sounds to me that, I

10   think, that the testimony is clear of Special Agent McDonald

11   that he wasn't in charge of this at that time.  Hipsag is

12   going to be the person who's going to be providing the

13   testimony in this regard and probably is the one who is most

14   familiar with voices and so forth as of that time.

15           MR. HEALY:  Your Honor, that -- Agent Hipsag will be

16   discussing the telephone calls.  Agent McDonald will testify

17   regarding his observations.  He was also familiar with the

18   Molinas and the Garcias at that time.  But he was -- he'll

19   bring in the, the wire.  Well, I'll think about it, but one

20   way or another it will come -- we'll present it the way it

21   should be presented, Your Honor.

22           THE COURT:  Well, that was my -- my assumption was

23   that the telephone calls would be primarily Agent Hipsag, just

24   from your presentation here, not from any personal knowledge

25   that I have.  And I'm assuming that this is an environment

1    where telephone calls were set up at a location where Agent

2    Hipsag was present, that Jimmy Hernandez was present, that the

3    telephone was dialed, the telephone calls eventually were

4    answered by an individual.  Agent Hipsag in some way was able

5    to overhear the telephone calls, either by an extra pair of

6    earphones or a set or just simply listening, getting up close

7    to Mr. Hernandez and listening over the receiver, or over a

8    speakerphone is another way that that can be done.  None of

9    that's been explained here today.  I'm assuming something like

10   that occurred because I haven't been given the information and

11   that he was able to recognize the voice and lay a foundation.

12   I recognize the voice because on five or six other occasions

13   we either had telephone conversations or I had occasion to see

14   her and talk to her, so I know who -- with whom I'm listening

15   to and can lay just the, as you say, the bare foundation for

16   voice recognition.

17          I think the parties should be thinking about an

18   appropriate instruction that needs to be given at that point

19   in terms of the significance of any statements that are made

20   by Mr. Hernandez, but I just don't see a problem with those

21   telephone calls.

22          Now, I take Mr. Fleener at his word that you can't

23   hear a thing on the observed buy.  Well, if that's true, I'm

24   not sure how an agent making it up can be of any great help.

25   And so maybe I need to listen to that tape and hear what's

1    going for myself.  But if it is, if it is a tape that or a

2    disc that can be well understood and is clear or relatively

3    clear, then it seems to me that the objection is, is

4    overruled.

5            MR. HEALY:  Your Honor, if the Court does wish to

6    listen to Government's Exhibit -- it's marked as -- is it 3,

7    or is it 4?  It might be marked as Exhibit 4, the wired buy.

8            THE COURT:  I don't know.  I just --

9            MR. HEALY:  They should be in order.

10           THE COURT:  First call, second call, wire buy, 4.

11           MR. HEALY:  Okay, Exhibit 4.  What, what the

12   Government believes is clear at 1 hour and 7 minutes is

13   Miss Garcia talking about the 2 grams.  At 1 hour and

14   8 minutes the sound of the defendant, Miss Garcia, weighing

15   the methamphetamine out on a scale, although that will not

16   be -- I will not ask the agent to discuss that because that

17   was told to them by the CI later.  It wasn't contemporaneous,

18   and it doesn't provide context for what was going on really.

19   I guess it could.  But the next thing is at 1:09 Miss Garcia

20   says it will be a quarter gram shy.  At 1:10 Miss Garcia says,

21   How much did I give you there?  At 1:11 she says, It looks

22   better than it should.  And at 1:13 there is a -- there is an

23   indication of a call from someone else.

24           There's also -- one second, Your Honor.

25           The agent just wanted to remind me that those were

1   not direct quotes but those are the -- that is the substance

2   of it.  He didn't want you to think he was misleading you,

3   Your Honor, or me.

4          So that's basically where the information comes in.

5   And we may be able to, if the Court hears -- I know the Court

6   wants the jury here, but if the Court wants us to we

7   could -- I'm sure that Mr. Fleener is going to want the

8   information about Mr. Draper, but there's a long period of

9   time where absolutely nothing happens.  And I guess if the

10  whole thing needs to be played, we'll just play it.  We've got

11  a week of trial.  Thank you, Your Honor.

12         THE COURT:  Well, I'll leave it up to counsel.

13         MR. JUBIN:  Your Honor, I do have the motion in

14  limine with respect to the gun expert and also Mr. Molina's

15  statement, which I think is probably a pretty important one to

16  hear in advance.

17         THE COURT:  Well, let's select the jury, and if we

18  have the jury selected then we can work tonight.  I suspect,

19  Mr. Jubin, you'd like to get those resolved prior to the time

20  you make an opening in this case.

21         MR. JUBIN:  That's right, Your Honor.  Part of my

22  motion is to prohibit the Government from referencing any kind

23  of statements by Mr. Molina in its opening.

24         MR. HEALY:  And we'll need to put Agent McDonald on

25  for testimony.  That will be -- that hearing will take a

1   while, Your Honor.

2          THE COURT:  I recognize it will.  I viewed the disc

3   yesterday, so I'm -- I've seen all two-plus hours of it.

4          The question that I suspect has not been asked at

5   this point deals with the peremptory challenge situation.

6   Each defendant will have five, and the Government will have

7   its six.

8          John, will we be qualifying these jurors?

9          COURTROOM DEPUTY:  Yes, sir.  They're a new panel.

10         CLERK GALIK:  Are we ready, Your Honor?

11         THE COURT:  Yes.

12         MR. FLEENER:  Judge, may we approach, please?

13         THE COURT:  Sure.

14     (Side bar off the record.)

15     (Jury panel in at 10:45 a.m.  Jury selection

16      contained in Volume I(b).)

17              *      *      *      *      *

18     (Jury out at 5:48 p.m.)

19         THE COURT:  Thank you.

20         All right.  There are a couple of motions from

21  Mr. Molina, one involving voluntariness and the other -- and I

22  don't think there's any issue concerning the law in particular

23  concerning that matter in that it's a totality of the

24  circumstances appraisal that is made by the Court, and the

25  other is a motion in limine that deals with so-called expert

1    testimony to the effect that there was a rumor there were guns

2    around, therefore, guns were used in furtherance or something

3    of that nature.

4         MR. JUBIN:  First with respect to the motion in

5    limine pertaining to the expert testimony as to guns, as I

6    indicated in my motion in limine, there is a Tenth Circuit

7    pattern jury instruction which talks about the kinds of facts

8    and factors a jury is supposed to use to evaluate whether the

9    presence of a firearm would indicate that its presence was in

10   some way connected to the drug-trafficking offense such that

11   it would be, quote/unquote, in furtherance of that offense.

12        THE COURT:  I don't think that's an all-inclusive

13   list.  In fact, in most cases some of those items wouldn't

14   even apply.

15        MR. JUBIN:  Your Honor, correct.  In fact, I think

16   the instruction says that it's not an exclusive list.  The

17   problem that I see here is the Government suggests that it

18   wants to use an expert witness, quote/unquote, expert witness

19   to tell the jury the facts that they're supposed to determine

20   on their own.  The jury ought to be getting evidence on these

21   facts one way or the other or indifferent and making its own

22   determination.  The great concern that I have is that if the

23   Government puts an agent on to say, well, gee, I've

24   investigated a lot of drug conspiracies, and, you know, I've

25   seen cases where they've got guns there, and, you know, those

1  guns when they're around they're used to protect the dope,

2  they're used to secure money, they're used to intimidate

3  people or threaten people, and that's the kinds of things that

4  we see here, and that's why you've got to find these folks

5  guilty.  I think that just runs a huge risk of usurping the

6  jury's function of weighing any facts on those issues --

7       THE COURT:  Also usurps the function of an attorney,

8  doesn't it?

9       MR. JUBIN:  Sure, to argue those things.  And I think

10 it would be highly prejudicial because it would be simply

11 allowing, through the guise of expert opinion, a witness to

12 take the stand and do the jury's job for them or try to do it.

13 It doesn't require any particular expertise beyond the ken of

14 a layperson to figure out that drugs -- or that guns can be

15 used for protection, for security, or for intimidation.  And

16 for that reason I think the danger of unfair prejudice by

17 using that kind of evidence greatly outweighs any potential

18 probative value.  Thank you.  If we can deal with these one at

19 a time, that might make most sense.

20      THE COURT:  Could you find the precise language in

21 any of the cases that said that testimony is, is proper?

22      MR. JUBIN:  Quite honestly, um --

23      THE COURT:  I had trouble finding that express

24 language that a law enforcement officer can get up and just

25 say whatever he wants about it --

1          MR. JUBIN:  I don't --

2          THE COURT:  -- and his opinion be expert.

3          MR. JUBIN:  I didn't find any such authority.

4          MR. HEALY:  May it please the Court, Mr. Jubin.  Your

5   Honor, did the Court take a look at these cases that I cited?

6          THE COURT:  Yeah, I did, and I couldn't find what you

7   were pointing to.

8          MR. HEALY:  Well, I'd like an opportunity to -- these

9   are cases that I -- I mean, I can print the cases out and

10  bring them to the Court.  I didn't bring them with me.  But

11  the tools of the trade -- I mean, I've read this multiple

12  times in these cases, and it's mentioned in some of these

13  cases that when a law enforcement officer who is properly

14  offered as an expert because of his training, and the Tenth

15  Circuit says that drug trafficking and a specialty in

16  investigating drug trafficking is a specialty under 702 and

17  properly admissible as expert testimony --

18         THE COURT:  Well, then I think we need to put that

19  witness on the stand tonight and spend an hour or two figuring

20  out just exactly how many cases he's tried, how many have had

21  firearms, how many have not had firearms, how he has

22  documented that sort of service to be an expert.

23         MR. HEALY:  How many he's tried, Your Honor, or you

24  mean investigated?  And both, I guess.

25         THE COURT:  Yeah.

1          MR. HEALY:  Yeah.

2          THE COURT:  The whole works.

3          MR. HEALY:  Well, I'm happy to do that.

4          THE COURT:  And whether he's published and the whole

5    deal as an expert.

6          MR. HEALY:  The Tenth Circuit hasn't required that of

7    other law enforcement --

8          THE COURT:  I don't think you can dodge it.  I think

9    you can ask the questions about it.  Has he published?  Has he

10   written things about it?  Has he studied other manuals and

11   books and records and so forth?  It seems -- don't get me

12   wrong, but it just seems to me that all you are asking this

13   guy to do is take over your job and put a badge on it and say

14   I took a law enforcement oath, believe me if you don't believe

15   the lawyer, because he just makes a closing statement, in

16   effect, about guns.  What's wrong with my instruction?

17         MR. HEALY:  Judge, you know, I guess I take some

18   exception to that because the Tenth Circuit has ruled that

19   this is admissible evidence and it's a specialty.  And I'm not

20   saying that Agent McDonald is going to get up and say in my

21   opinion as an expert these two defendants possessed firearms

22   in furtherance of a drug-trafficking crime.  No.  But do I

23   have an opportunity to say:  During the course of your

24   investigations as a drug-trafficking narcotics officer over

25   the last so many years, 11, 10, 12 years, whatever it is, are

1    guns something that are, are frequently found in the

2    possession of people who deal drugs?  Yes.  Why is that?  And

3    go into the reasons why.  But --

4           THE COURT:  Well, first of all, he's got to be able

5    to say -- lay the foundation.

6           MR. HEALY:  Oh, certainly.

7           THE COURT:  I've investigated 50,000 cases, and in

8    45,000 of them there was a gun present, and the gun was

9    present always on the pillow of the bed or on the nightstand

10   or within 15 feet or 20 feet or whatever distance from the

11   gun, and it was always this kind of gun, it wasn't that kind

12   of gun typically.  He has to have some basis.

13          MR. HEALY:  Well, sure, Judge.  I mean, if I, if I

14   put the agent on the stand and we went through all this and

15   offered him as an expert and there was an objection and you

16   said sustained, I couldn't ask him the questions.

17          THE COURT:  Right.

18          MR. HEALY:  I mean, there's no question about it.  If

19   the Court wants to do that now, we can do it now, or we can do

20   it during the trial.  It's --

21          THE COURT:  Well, why don't we do it this way then.

22   We'll just sustain the motion in limine, and when you're ready

23   to do that, that gives a signal to everybody that you are

24   going to be laying that foundation, and before he expresses

25   those opinions we'll hear the objection again.

1          MR. HEALY:  Opinions.  So would that include that

2     during the thousands of investigations he's done into drug

3     traffickers it's very common for them to carry pistols as

4     opposed to hunting rifles?

5          THE COURT:  Well, I don't know what, what the opinion

6     is.

7          MR. HEALY:  Okay.

8          THE COURT:  I've seen everything.  You know, I've

9     seen -- I've seen a .22 rifle behind the refrigerator.

10         MR. HEALY:  Well, and a .30-30 has been used to

11    commit drug offenses.  So -- well, we'll do that then, Your

12    Honor, and we'll proceed that way.  The Court's ruled, and the

13    Government respects it.

14         THE COURT:  Yeah.  I just wonder because that

15    instruction is so -- offers exactly the things that the law

16    enforcement officer testifies by way of an opinion rather than

17    this is what we found in this case.  And maybe they're gonna

18    say, well, we know the Judge is going to instruct on this

19    instruction, this pattern instruction, so we realize there's

20    certain things that are not there, and so we've got to explain

21    them away somehow.

22         MR. HEALY:  Well, I, I don't -- do you mean that we

23    would try to explain them away by saying, oh, there's -- that

24    these weren't found --

25         THE COURT:  It's unimportant in this case.


Julie H. Thomas, RMR, CRR                    (307)778-0078

1          MR. HEALY:  Never even crossed my mind, Your Honor,

2     but, um, and I'm not, I'm not sure what the Court's basis for

3     that might be.  But the Court --

4          THE COURT:  Well, my -- all I'm saying is do we

5     really need the expert to talk about the tools of the trade

6     when it appears to me that every TV program about drugs that

7     you see, some guy's out there shooting a gun off or stealing

8     drugs at gunpoint from somebody or shooting at a cop or -- you

9     know, if the jury -- if it hasn't somehow seeped into the

10    jury's mind that there is a high risk of violence in

11    connection with drug trafficking --

12         MR. HEALY:  Well, there's no question, Judge, that in

13    all of these TV shows that happens all the time and all the,

14    you know, gangsta rap and all of that and everything else, but

15    I guess what I go back to is that when, when I can't find a

16    single case, and apparently Mr. Jubin can't either, that says

17    that testimony about tools of the trade from an experienced

18    law enforcement officer is not allowed and there's multiple

19    cases, multiple cases all over the country that say it is, I'm

20    not sure why we would rely on the jury's exposure to

21    television rather than a witness.

22         THE COURT:  Well, and I have some concern about you

23    looking at Mr. Molina and saying his tool of the trade is a

24    pistol unless you've got some pretty strong evidence that he's

25    carrying this out when he delivers drugs and so forth.

1          MR. HEALY:  I can understand that, Your Honor.  I can

2     understand that.

3          THE COURT:  I mean, it's -- I don't know.  It's kind

4     of stereotyping.

5          MR. HEALY:  Well, I guess that's what, what an expert

6     does in some, some sense.  I mean, when, when there are tools

7     of the trade that are present and around, paraphernalia and

8     baggies or scales or whatever there might happen to be, when

9     people can testify that this is the room where they kept their

10    guns, this is the room where they kept their dope, this is the

11    room --

12         THE COURT:  Well, that's your argument, though.  It

13    seems to me that's a legitimate argument you can say.

14         MR. HEALY:  And I agree with you, Your Honor, and

15    I'll make the argument.  I am just, I am just adding that in

16    terms of precedent there's never been anything wrong with this

17    in courts that I can find, and I could be wrong.  Mr. Jubin

18    didn't find it, and I know the kind of researcher he is.  So

19    with that, we'll proceed.

20         THE COURT:  Good.  Well, let's just clear the deck.

21    You are going to let me know when you are going to be going

22    into this evidence --

23         MR. HEALY:  Yes.

24         THE COURT:  -- and prepared to lay the foundation in

25    terms of training, experience, et cetera.  And then after

1    you've qualified him as an expert and asked him do you have an

2    opinion as to this subject, he would stand and make his

3    objection at that point and say no foundation or improper

4    evidence.  Okay?

5            MR. JUBIN:  Thank you.

6            MR. HEALY:  Thank you, Your Honor.

7            MR. JUBIN:  The next issue before the Court is the

8    voluntariness hearing.  I know the Court had the opportunity

9    to review the videotape.  With the Court's permission, I'd

10   hand you a transcript of a pretty highly relevant portion

11   thereof.  And it starts on the bottom of page 3.  The last

12   person to speak is Agent Chris.  And I don't know if we're

13   going a little bit out of order here.  I think it's the

14   Government's burden to show that it's voluntary, but I'll at

15   least let you know what the issue is here before we do that.

16           Essentially a statement made by a defendant to be

17   admissible has to be voluntary, free of coercion and improper

18   inducements.  I've cited the law in both my motion in limine

19   and the memorandum that I filed yesterday in support or in

20   supplement of that motion in limine.

21           What happened here is the agent knew that Mr. Molina

22   was in custody, wanted to question him, pretty clearly wanted

23   to question him badly, and told him he had the right to remain

24   silent, anything you can and will be -- and will be used

25   against you in a court of law.  He said that at such a speed,

1   you might have noticed that on the tape, that he stumbled over

2   his words.  And then he wanted to know if having those rights

3   in mind Mr. Molina wanted to talk.  And Mr. Molina kind of

4   gave, gave a curt nod and then looked at the agent and said,

5   "So you will not help me on any of this?"  And the agent's

6   response to that was, "Well, that's, that's -- no, I think we

7   can, we can do something.  I'm just saying I can't say -- I

8   can't take those charges away right now."  And then there was

9   a long pause after which the agent said, "Would you mind

10  answering a few questions for me or talk for a while longer?"

11          And during that long pause obviously Mr. Molina's

12  contemplating what the agent just said to him.  On one hand,

13  he gave him a Miranda warning that said everything you can --

14  you say can and will be used against you.  Mr. Molina says you

15  mean you're not going to help me on any of this, and he says,

16  yeah, we can do something, we can't take these charges away

17  right now.  And the implicit promise is what you say is going

18  to help you with your charges, directly contrary to what

19  Miranda says is if you say it it's going to be used against

20  you.  So which is he supposed to believe?  The officer just

21  contradicted the Miranda warnings in order to induce

22  Mr. Molina to make the statement.  And then he did.

23          So that's the introduction.  I think that the

24  Government has to prove to the Court that it's a voluntary

25  statement before it's admissible.  And I know the Court had

1  the benefit of reviewing that entire statement.  There are a

2  couple things that I could, I could give the Court by way of

3  proffer, or I could call Mr. Molina to the stand.  The

4  evidence would be that before the interview Mr. Molina smoked

5  methamphetamine that morning.  I think he was arrested around

6  9 o'clock.  As I recall, the interview was a few hours later.

7  At the time of the interview Mr. Molina was worried about his

8  kids and couldn't believe, as you probably saw, couldn't

9  believe they still had his kids.  He thought it was six days

10  later.  He doesn't recall how much methamphetamine he smoked

11  that morning, but he typically used a lot, and he does not

12  remember the interview other than having had the opportunity

13  with me to review it on video.

14      MR. HEALY:  Your Honor, the Government calls Agent

15  Chris McDonald.

16      THE COURT:  Very well.  He has been previously sworn.

17      Please be seated.  Agent McDonald, you were sworn

18  earlier today?

19      THE WITNESS:  Yes, Your Honor.

20      THE COURT:  And you understand you are still subject

21  to that oath?

22      THE WITNESS:  I do, Your Honor.

23    CHRIS McDONALD, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

24  Q.  (BY MR. HEALY)  Agent McDonald, just please give a brief

25  background of your law enforcement experience and in

1  particular the number of noncustodial and custodial interviews

2  you've participated in approximately.

3  A.  I have approximately 12 years total law enforcement

4  experience.  That includes two years as a detention officer in

5  Campbell County and in Johnson County, Wyoming, two years as a

6  deputy sheriff at the Campbell County Sheriff's Office in

7  Gillette, one year as a task force officer for the northeast

8  enforcement team for the Division of Criminal Investigation in

9  Gillette, and I am currently in my seventh year as a full-time

10  agent in Gillette for Wyoming DCI, the northeast enforcement

11  team.

12          During that time --

13  Q.  One moment, please.

14          Sorry.  During that time?

15  A.  I have conducted hundreds, if not thousands, of

16  noncustodial and custodial interviews.

17  Q.  During those interviews have you had opportunities to

18  interview people that have been drunk?

19  A.  Yes.

20  Q.  Did you ever determine that -- did you ever make a

21  determination about whether they could speak to you based upon

22  how drunk they were?

23  A.  Yes.

24  Q.  Were there times that you thought it would be better not

25  to speak to someone because of their intoxication level?

 1  A.  Yes.

 2  Q.  Can the same be said about the use of controlled

 3  substances?

 4  A.  Yes.

 5  Q.  Give an example.  Not necessarily a specific example, but

 6  explain to the Court, if you will, the kind of things you look

 7  for that help you determine whether somebody is, um, able to

 8  speak with you intelligent -- intelligently.

 9  A.  When I begin an interview, Your Honor, or if it pleases

10  the Court, I speak with the subject in the interview for

11  several minutes.  I try to initially see -- many times you can

12  tell if they appear to be cooperative, their stance, are they

13  closed in their nature, are they open, things of that nature.

14  But I also try to observe their behaviors for any signs of use

15  of a controlled substance.  Some of these can include if

16  they're very sweaty, fidgeting, slurring their words, they

17  show signs of bruxism.  In addition to those, also I try to

18  make sure or I try to ascertain whether or not they can answer

19  direct questions intelligently, can they ask questions of

20  themselves appropriately.

21  Q.  Were you part -- were you -- did you conduct an interview

22  with the defendant Sigi Molina on January 16th, 2013?

23  A.  Yes, sir.

24  Q.  Will you set the scene for the Court?  We have a -- well,

25  first let me ask you this.  Was, was that interview videoed?

 1 | A.  Yes, sir, it was.

 2 | Q.  Was that video provided to the United States Attorney's

 3 | Office in preparation for this case?

 4 | A.  Yes, sir.

 5 |       MR. HEALY:  Without objection, we do have

 6 | Government's Exhibit 4 [sic] that is the video.  I know the

 7 | Court has watched it.  I'm just wondering -- when I say

 8 | without objection, it's a question.  Is there an objection?

 9 |       MR. JUBIN:  For purpose of the record here?

10 |       MR. HEALY:  Yes.

11 |       MR. JUBIN:  No objection.

12 |       MR. HEALY:  Just for purposes of the record, Your

13 | Honor.

14 |       THE COURT:  It will be received.

15 |   (Government's Exhibit 49 received.)

16 | Q.  (BY MR. HEALY)  I don't want to go into the entire

17 | interview, Agent McDonald, but set the scene for the Court.

18 | Tell the Court where you were, how things -- well, first of

19 | all, tell the Court where you were.

20 | A.  The interview was conducted in an interview room at the

21 | Campbell County Sheriff's Office.

22 | Q.  What did the interview room look like?

23 | A.  It's a -- well, it's a smaller room with a, with a table

24 | in it, three -- I can't remember if there were three or four

25 | chairs, and just the table.

1  Q.  Was Mr. Molina handcuffed?

2  A.  No, sir.

3  Q.  Were you wearing a weapon?

4  A.  Yes, I was.

5  Q.  Was it visible to Mr. Molina?

6  A.  No, sir.

7  Q.  Why wasn't it visible?

8  A.  I typically carry my duty weapon concealed, or I always

9  carry it concealed.  I'm sorry.

10 Q.  Was there any other officer in the room with you at any

11 time or agent?

12 A.  Yes, sir.

13 Q.  Who else was in the room with you?

14 A.  Special Agent Budd.

15 Q.  Did he display a firearm at any time?

16 A.  Yes, he did.

17 Q.  When was that?

18 A.  When we were discussing Mr. Molina's possession of

19 firearms, we asked about a certain type of firearm, whether it

20 was a revolver or a semiautomatic.  Agent -- and I don't

21 remember the time inside the interview that this happened, but

22 Agent Budd picked up his shirt and showed Mr. Molina the

23 automatic that he carries to confirm it was an automatic that

24 Mr. Molina was speaking of.

25 Q.  Was that display prior to or subsequent to the reading of

1  Miranda to the defendant, Mr. Molina?

2  A.  Subsequent to.

3  Q.  Was it prior to or subsequent to the time that Mr. Molina

4  indicated that he would continue talking and signed his

5  Miranda waiver?

6  A.  Subsequent to.

7         THE COURT:  It was almost three-quarters of the way

8  through the interview that occurred, and I don't think

9  Agent Budd removed the weapon.  I think he just turned and

10 lifted his shirt, and --

11        THE WITNESS:  Yes, Your Honor.

12        THE COURT:  -- Mr. Molina looked, looked and said yes

13 or nodded.

14 Q.  (BY MR. HEALY)  Did the defendant respond intelligently to

15 the questions you asked?

16 A.  Yes.

17 Q.  Did he ask independent questions of you?

18 A.  Yes.

19 Q.  Do you know if the defendant had ever been previously

20 arrested for a crime?

21 A.  Yes.

22 Q.  Did you know prior to your interview with him?

23 A.  I did.

24 Q.  Do you have a copy of the defendant's NCIC in front of

25 you?

1    A.  I do.

2    Q.  If you need to refer to it, let me know, but otherwise

3    what arrest record do you remember the defendant having prior

4    to your interview with him?

5    A.  I remember a 1998 DUI arrest out of Kansas.  I remember a

6    1995 arrest, felony arrest for aggravated assault on a

7    nonfamily member, and a weapons offense.  I believe those are

8    both out of Grand Island, Nebraska.  I believe they're out of

9    Grand Island, Nebraska.

10   Q.  Would it refresh your recollection to look at the NCIC

11   report?

12   A.  May I?

13   Q.  Yes.

14   A.  Yes, it's a 1995 arrest for aggravated assault and use of

15   a firearm from Grand Island.  There is a, uh, theft

16   by -- theft of services and theft by unlawful taking from

17   Grand Island as well.  And I believe -- and a failure to

18   appear in 1997 from Dodge City, Kansas.

19   Q.  Thank you.  How did the defendant appear to you?  Other

20   than the fact that he responded accordingly and appropriately

21   to your questions, how did he appear to you?

22   A.  He appeared quiet and, uh, contemplative, I guess.  He

23   responded with each question, asked questions of his own.  He

24   was concerned for his children.

25   Q.  Did you talk to him about that issue?

1    A.  I did.

2    Q.  What did you tell him about that issue?

3    A.  He initially asked the question of -- well, when I spoke

4    to him about it, he was concerned where his children were.  I

5    told him that we would -- we had contacted DFS or the

6    Department of Family Services and they were in their custody

7    or would be, 'cause they had -- the children were at school.

8    Mr. Molina's question was whether or not they could go to a

9    family member.  I told Mr. Molina that I believe they could, I

10   would contact or we would contact the caseworker and provide

11   those names to the caseworker so that they could go with -- I

12   believe it was David.  And at that point I actually asked

13   Agent Budd to step out and contact -- the DFS worker's name is

14   Karen -- to step out and call her so we could get that taken

15   care of.  I asked Mr. Molina the phone number and address for

16   David as well as -- he wasn't quite sure on that, but he did

17   give me more information where I could get that as well as

18   where his sister and her husband lived.

19   Q.  Agent McDonald, how long, if you can recall, into the

20   interview did you read Miranda to the defendant?

21   A.  I believe it was around 12 minutes 50 seconds, 12 minutes

22   48, approximately.

23   Q.  Did you ever raise your voice to Mr. Molina in any kind of

24   threatening way?

25   A.  No, sir.

1    Q.  Did Agent Budd ever raise his voice in any threatening

2    way?

3    A.  No, sir.

4    Q.  Were there any threats of violence against Mr. Molina or

5    against his family?

6    A.  No, sir.

7    Q.  Now, did you hear Mr. Jubin read this portion of the

8    transcript that he read to the Court just now?

9    A.  I did.

10   Q.  Was there a point prior to this time, which was

11   approximately 12, 13 minutes into the interview, that you

12   discussed the defendant's charges with him?

13   A.  I did.

14   Q.  Please describe that to the Court.

15   A.  If I remember correctly, it was approximately 8 minutes

16   45 seconds into the interview.  I told Mr. Molina what he was

17   charged with, uh, the fact that we had executed a search

18   warrant at his residence, that the charges that were pending

19   that we had arrested him for were felonies, and I told him --

20   I can't remember my exact words now, but I told him there's --

21   I can -- those, those charges cannot go away, there's nothing

22   I can do about that right now or now.  I think I just said

23   now.

24   Q.  And you don't dispute the characterization that Mr. Jubin

25   made and that the Court has already reviewed that later you

1   reminded him again that there was nothing that, before

2   Miranda, that there was nothing you could do about the charges

3   right now?

4   A.  I'm sorry.  Before Miranda?

5   Q.  Excuse me.  Right after Miranda when he was asking you if

6   there was anything you could do for him.

7   A.  I don't dispute -- I'm sorry.  I apologize.

8   Q.  Let me ask the question again because that was very

9   confusing.

10          After you read him Miranda was there any indication

11  from Mr. Molina that he didn't understand what you read to

12  him?

13  A.  No.

14  Q.  What indication did he give you that he did understand it?

15  A.  He asked a clarifying question in that there's nothing you

16  can do for this -- on -- there's nothing you can do for me on

17  this right now, or words to that effect.

18  Q.  At any time prior to you reading Miranda to him did he ask

19  for an attorney?

20  A.  No.

21  Q.  At any time prior did he say he didn't want to talk to

22  you?

23  A.  No.

24  Q.  Was there ever any indication at any time from Mr. Molina

25  that he didn't want to talk to you?

1    A.  No, sir.

2    Q.  After you read him Miranda and asked him if he understood

3    what you read to him, did he indicate in any way, either

4    verbally or by some nonverbal movement, that he understood?

5    A.  Yes.

6    Q.  What was that?

7    A.  He nodded.  Mr. Molina nodded.  Pardon me.

8    Q.  After he nodded, what did you do?

9    A.  I -- I can't remember if that's when he asked the

10   question, but after I -- I gave him the written rights form

11   that I read the rights from, asked him, asked him if he could

12   read English.  He stated that he could.  Asked him to read the

13   form, ensure that it was what I just read to him and then, if

14   he agreed, sign it.

15   Q.  Did he sign it?

16   A.  Yes.

17   Q.  Did he review it?

18   A.  Yes.

19   Q.  Did it appear to you that he reviewed it?

20   A.  To some degree.  I don't believe he read every word, if

21   that . . .

22   Q.  And the --

23        MR. HEALY:  Your Honor, may I approach with

24   Government's Exhibit 40?

25        THE COURT:  You may.

1    Q.   (BY MR. HEALY)  Do you recognize this document?

2    A.   Yes.

3    Q.   Is it a -- what is it?

4    A.   It appears to be a copy of the rights form.

5    Q.   How do you recognize it?

6    A.   Because I've seen the original.  I recognize the

7    signatures on, on the form.

8    Q.   And the signatures are from?

9    A.   Trevor Budd, Sigi Molina, with a date and time.

10         MR. HEALY:  Government offers for purposes of the

11   record Government's Exhibit 40.

12         MR. JUBIN:  No objection.

13         THE COURT:  40 is received.

14   (Government's Exhibit 40 received.)

15   Q.   (BY MR. HEALY)  Now, Agent McDonald, the discussion -- the

16   signature on the Miranda waiver, we talked about this a

17   little, did that come before or after he asked you if, um, so

18   you will not help me on any of this question?

19   A.   After.

20   Q.   Did you ever make any promises to Mr. Molina about what

21   you would do for him if he talked to you?

22   A.   No.

23         MR. HEALY:  One moment, Your Honor.

24   Q.   (BY MR. HEALY)  Do you know approximately how old

25   Mr. Molina is?

 1   A.  I think he's three years older than me, 43.

 2   Q.  Was there any indication to you that he didn't understand

 3   English?

 4   A.  No.

 5   Q.  Why?

 6   A.  'Cause we conversed for over two hours in English.

 7   Q.  What was the tone of that conversation?

 8   A.  Very relaxed.

 9        MR. HEALY:  At this time I have nothing further, Your

10   Honor.  But we do ask the Court to consider, to consider

11   Government's Exhibit 4.  Thank you.  Or -- yeah, 4.  Thanks.

12                        CROSS-EXAMINATION

13   Q.  (BY MR. JUBIN)  Good evening, Agent McDonald.

14   A.  Good evening, sir.

15   Q.  When you told Mr. Molina, "I think we can, we can do

16   something," was it your intent to give him hope that you could

17   do just that?

18   A.  No.

19   Q.  What was your intent?

20   A.  To answer his question.  There's -- can I -- I'm sorry.

21   Can I continue or --

22   Q.  Sure.  His question was, "So you will not help me on any

23   of this?"

24   A.  Mm-hmm.

25   Q.  Okay.  And you answered that question.

1   A.   Mm-hmm.

2   Q.   And you said, "I think we can, we can do something."

3   Right?

4   A.   Yes.

5   Q.   Is it your testimony that, to this Judge, that you don't

6   think that would give him some hope that by talking to you you

7   could do something for him?

8   A.   I guess are you asking what he thought or what I was

9   trying to tell him?

10  Q.   Well, let's take both of those.  First of all, what do you

11  think -- what kind of, um, what kind of a mental state do you

12  think that would induce in someone when you tell them, "I

13  think we can, we can do something"?  Do you think that would

14  give the person hope?

15  A.   It could, yes.

16  Q.   And what was your intent in doing that?

17  A.   To let him know that if he's cooperative, there is, I

18  guess, there is things that can be done.

19  Q.   There is hope?

20  A.   There's hope.

21  Q.   And, in fact, you got more specific about what could be

22  done; right?

23  A.   No.

24  Q.   Well, you said, "I can't take those charges away right

25  now."  Correct?

1    A.  Correct.

2    Q.  When could you take those charges away?

3    A.  I can't.

4    Q.  Then why did you tell him you couldn't take them away

5    right now?  Why didn't you tell him there was nothing you

6    could do about those charges?

7    A.  I was trying to reiterate what I told him previous.

8    Q.  "I can't take those charges away right now."  Do you think

9    maybe somebody would have the expectation with those words

10   that at some future point you could?

11   A.  That was -- no.  I -- that's not what I was implying or

12   trying to imply.

13   Q.  This was a federal indictment; right?

14   A.  Correct.

15   Q.  You have no authority to take that indictment and make it

16   go away; right?

17   A.  Absolutely not.

18   Q.  This is not as if it's a traffic ticket where you can give

19   somebody a warning and release them; right?

20   A.  Correct.

21   Q.  So we're clear here, Mr. Healy asked you if he had any

22   questions, and I think you said no, and then you testified,

23   well, he asked a clarifying question.  So he did have

24   questions, because he asked you one.  Correct?

25   A.  Correct.

1  Q.  And his question involved exactly whether or not you would

2  be willing to help him; correct?

3  A.  Correct.

4  Q.  And by saying you could do something, "I think we can, we

5  can do something," you implied to him that by talking to

6  you -- directly told him by talking to you it would be helpful

7  to him; correct?

8  A.  Did I say that then?  Is that what you are asking me?  I'm

9  sorry.

10  Q.  I'm asking you if by saying, "I think we can, we can do

11  something," in response to his question, "So you will not help

12  me on any of this," you were telling him that by talking to

13  you it would help him; correct?

14  A.  Correct.

15  Q.  And it was only after you made that statement, that

16  response that you could do something, that Mr. Molina actually

17  signed that Miranda waiver that's been introduced as

18  Exhibit 40 in this hearing; correct?

19  A.  Correct.

20  Q.  You testified that you've done hundreds, if not thousands,

21  of custodial or noncustodial interviews; correct?

22  A.  Yes, sir.

23  Q.  How many of those were custodial?

24  A.  I couldn't give you a number, sir, but maybe roughly half,

25  a third.  I couldn't give you a number.

1   Q.  Can you get any closer than hundreds or thousands on the

2   number of interviews?

3   A.  Not off the top of my head, no.

4   Q.  Okay.  In how many of the custodial interviews that you

5   did did you contradict the Miranda warnings you gave the

6   suspect, as you did in this case?

7   A.  I don't believe I ever contradicted the Miranda warnings.

8            MR. JUBIN:  Okay.  I'll let the evidence speak for

9   itself.  Thank you.

10            THE WITNESS:  Thank you.

11            MR. HEALY:  No further questions, Your Honor.

12            THE COURT:  You may step down.

13            THE WITNESS:  Thank you, Your Honor.

14            MR. HEALY:  Nothing further from the Government, Your

15   Honor.

16            THE COURT:  Thank you.  Anything further, Mr. Jubin?

17            MR. JUBIN:  I'll call Sigi Molina.

18            THE COURT:  Very well.

19            COURTROOM DEPUTY:  Sir, would you please raise your

20   right hand.

21       (The witness was sworn.)

22            COURTROOM DEPUTY:  Please be seated, sir.  For the

23   record, would you please state and spell your name, sir.

24            THE WITNESS:  Sigifredo Molina, S-i-g-i-f-r-e-d-o,

25   M-o-l-i-n-a.

1          MR. JUBIN:  Your Honor, I'd like to make it clear

2    that this is a preliminary matter and that Mr. Molina's

3    statements made to adjudicate this preliminary matter are not

4    to be admitted in trial against him.

5        SIGIFREDO MOLINA, DEFENDANT HEREIN, DIRECT EXAMINATION

6    Q.  (BY MR. JUBIN) Mr. Molina, you've been present in the

7    courtroom; correct?

8    A.  Yes.

9    Q.  Before -- do you remember the interview with Agent

10   McDonald?

11   A.  No.

12   Q.  Do you know if you smoked methamphetamine before that

13   interview?

14   A.  Before we got arrested that's what, that's what I was

15   doing, smoking meth.

16   Q.  Do you know how much you smoked?

17   A.  I always smoke a lot, so -- and I still -- it was a lot,

18   and I smoke until I always get high.

19   Q.  At the time of your interview do you know how much time

20   had passed from the time when you were arrested?

21   A.  I, I thought it was like six days after I got arrested.

22   Q.  Do you really remember this interview?

23   A.  No, I don't.

24          MR. JUBIN:  I have nothing further.

25   ///

1                          CROSS-EXAMINATION

2    Q.  (BY MR. HEALY)  Mr. Molina, do you remember giving the --

3    in response to the agent's questions do you remember what your

4    wife's phone number is, and you gave your wife's phone number?

5    A.  No, I don't.

6    Q.  Do you remember in response to the agent's questions about

7    your Social Security number, you gave your Social Security

8    number?

9    A.  No, I don't remember.

10   Q.  Do you remember having concern for your children?  Because

11   your attorney today said that you had concern for your

12   children.

13   A.  I, I don't remember none of the, uh, of the interview.

14   I've always been concerned about my children, so . . .

15   Q.  Well, I need to make sure that this is straight, because

16   in representations to the Court your attorney said that you

17   were concerned about your children during this interview.  Do

18   you remember being concerned about your children?

19   A.  No, I don't remember.

20   Q.  You don't recall how much methamphetamine you used before

21   the agents searched your home?

22   A.  No, I don't recall.

23   Q.  But you recall using methamphetamine before they searched

24   your home?

25   A.  Yes, that's what I was doing right when they knocked at

1  the door, when they were hitting the door.

2  Q.  So wasn't it true that that was pretty early in the

3  morning?

4  A.  The kids were already in school, so it was after 8:30.

5  Q.  Okay.  So you remember that the kids were in school, that

6  the search warrant was after 8:30, you remember smoking a lot

7  of methamphetamine --

8  A.  Mm-hmm.

9  Q.  -- but you're telling the Court that you don't remember

10  anything about the interview?

11  A.  Yes, sir.

12          MR. HEALY:  I don't have any further questions for

13  this witness, Your Honor.  Thank you.

14          MR. JUBIN:  Nothing further.

15          THE COURT:  Thank you.  Is there anything further we

16  need to do this evening?

17          MR. HEALY:  No, Your Honor.

18          MR. JUBIN:  Not that I'm aware of.

19          MR. FLEENER:  No, sir.

20          THE COURT:  Very well.  I'll take this matter under

21  advisement and give you an answer tomorrow morning.

22      (Proceedings recessed 6:46 p.m.,

23      May 7, 2013.)

24

25

1                    C E R T I F I C A T E

2

3

4           I, JULIE H. THOMAS, Official Court Reporter for the

5    United States District Court for the District of Wyoming, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein on the aforementioned subject on

9    the date herein set forth, and that the foregoing pages

10   constitute a full, true and correct transcript.

11           Dated this 13th day of October, 2013.

12

13

14

15                    ____/s/ Julie H. Thomas____

16                         JULIE H. THOMAS
                          Official Court Reporter
17                       Registered Merit Reporter
                         Certified Realtime Reporter
18                         CA CSR No. 9162

19

20

21

22

23

24

25