IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

----------------------------------------------------------------

UNITED STATES OF AMERICA,          Case No. 13-CR-00004-J

     Plaintiff,                      Volume II of V
                                   (Pages 254 through 423)
     vs.                             Cheyenne, Wyoming
                                   May 8, 2013
JACQUELINE M. GARCIA, SIGIFREDO     9:21 a.m.
MOLINA VARELA, aka SIGI,

     Defendants.                     **CERTIFIED COPY**

----------------------------------------------------------------


TRANSCRIPT OF TRIAL PROCEEDINGS

**(EXCLUDING JURY INSTRUCTIONS)**

BEFORE THE HONORABLE ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE
and a jury of twelve and two alternates

APPEARANCES:

For the Plaintiff:          MR. STUART S. HEALY III
                            Assistant United States Attorney
                            UNITED STATES ATTORNEY'S OFFICE
                            P.O. Box 668
                            Cheyenne, WY 82003-0668

For the Defendant           MR. THOMAS A. FLEENER
Garcia:                     Attorney at Law
                            FLEENER & VANG LLC
                            P.O. Box 913
                            Laramie, WY 82073-0913




OFFICIAL COURT REPORTER - (307)778-0078

Proceedings recorded by mechanical stenography,
transcript produced by computer.

1   APPEARANCES:  (Cont.)

2

    For the Defendant        MR. THOMAS B. JUBIN
3   Molina Varela:           Attorney at Law
                             JUBIN & ZERGA, LLC
4                            2614 Pioneer Avenue
                             P.O. Box 943
5                            Cheyenne, WY 82003-0943

6   Court Reporter:          JULIE H. THOMAS, RMR, CRR
                             2120 Capitol Avenue, Room 2228
7                            Cheyenne, WY 82001
                             (307)778-0078   CA CSR No. 9162
8

9                    *     *     *     *     *

10
                              I N D E X
11

12   OPENING STATEMENTS                                    PAGE

13   Mr. Healy                                             268
     Mr. Fleener                                           279
14   Mr. Jubin                                             283

15


16   GOVERNMENT'S WITNESSES                                PAGE

17   TROY HIPSAG
         Direct - Mr. Healy                                287
18       Cross - Mr. Fleener                               311
         Voir Dire - Mr. Healy                             325
19       Cross (Resumed) - Mr. Fleener                     327
         Cross - Mr. Jubin                                 332
20       Redirect - Mr. Healy                              333
         Recross - Mr. Jubin                               334
21   ROBERT PROFFITT
         Direct - Mr. Healy                                336
22       Voir Dire - Mr. Jubin                             340
         Cross - Mr. Fleener                               341
23   JASON RUBY
         Direct - Mr. Healy                                342
24   CHRIS MCDONALD
         Direct - Mr. Healy                                354
25

I N D E X (Cont.)

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 1 | 311 |
| 2 | 297 |
| 3 | 297 |
| 4b | 310 |
| 6 | 340 |
| 7 | 339 |
| 10 | 408 |
| 10a | 408 |
| 10b | 408 |
| 11 | 410 |
| 11a | 420 |
| 11B | 410 |
| 12 | 419 |
| 13 | 421 |
| 25 | 305 |
| 25b | 409 |
| 25c | 409 |
| 53  (Demonstrative) | 377 |
| 53a (Demonstrative) | 379 |

1                        I N D E X (Cont.)

2

MOTIONS                                              PAGE

3
Defendant Molina's Motion in Limine to Prohibit
4 Introduction of Statements by the Defendant
       Ruling of the Court                           260
5
Defendants' Motion for a Mistrial
6      Mr. Jubin                                     302
       Mr. Healy                                     303
7      Mr. Fleener                                   303
       Ruling of the Court                           303
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings resumed 9:21 a.m.,

2       May 8, 2013, outside the presence of the jury.)

3                THE COURT:  Thank you.  Please be seated.

4                Revisiting the issue of expert testimony, I think

5    I'll persist in the Court's ruling in this matter that prior

6    to the time that expert testimony is offered that

7    there -- that the Government approach in that regard.  There

8    are certainly cases out there, as the Government has pointed

9    out, where experts have been used.  The Tenth Circuit at this

10   point has stated that the expert testimony that drug dealers

11   typically possess guns does not -- standing alone, is not

12   sufficient to establish in furtherance, and I think an

13   instruction can be created that puts all of that in proper

14   perspective.

15               Actually, the pattern instruction that we have from

16   the Tenth Circuit is one that is really a very bare-bones

17   instruction and may need to be expanded somewhat.  I'd

18   recommend people look at it and decide.

19               MR. HEALY:  Your Honor.

20               THE COURT:  Yes.

21               MR. HEALY:  I just want to put the Court at ease.

22   I've already put defense attorneys at ease about this.  We're

23   not going to ask Agent McDonald to opine about the presence of

24   firearms with drug dealers and that means that they're guilty

25   and stuff like that, but I do want -- and I'll still approach

1    if the Court would like me to.  I just thought we might save

2    time by doing this.  I'm still going to try to lay foundation

3    to qualify Agent McDonald as an expert at least in his area

4    about prices, quantities, those kind of things.  So I just

5    want the Court to know that we don't need to worry about that,

6    but we are going to be fashioning jury instructions, we have

7    thought of that already, and I appreciate it, Your Honor.

8    Thank you.

9           THE COURT:  Good.  Thank you.

10          MR. JUBIN:  I am aware that the Tenth Circuit has

11   approved instructions concerning the prices and things like

12   that but nothing with respect to guns.

13          THE COURT:  Well, we found some Tenth Circuit cases

14   where at least you'll find language like -- let me give you

15   one, and this is one that was not selected for publication.

16   "A firearm is possessed in furtherance of a drug trafficking

17   crime if it assists, promotes, or aids in accomplishing,

18   advancing or achieving the goal or objective of the underlying

19   offense," U.S. versus Rockey.  "The mere presence of a firearm

20   at the scene of a drug trafficking crime is not sufficient to

21   establish 'in furtherance' element of 924(c)(2).  In addition,

22   expert testimony that drug traffickers generally use firearms

23   to further their drug crimes, standing alone" -- standing

24   alone -- "is not sufficient to establish the in-furtherance-of

25   element."  Citing U.S. versus Rios and also the House Report

1    and Bailey, "was to state that standing on its own, expert

2    testimony that drug dealers typically possess guns may be

3    insufficient to meet the 'in furtherance of' test."

4         So the language is played -- you know, they've played

5    all around that language, it seems to me.  In any event, at

6    the bottom, the in-furtherance element requires the jury to

7    find a nexus between the defendant's possession of the firearm

8    and the drug offense.

9         Let me read one more because this one will really get

10   you, especially in view of the language you see from the

11   National Rifle Association that it's not guns that cause

12   problems, it's people that cause problems.  This statement,

13   and this is a quote from U.S. versus Sherman, a First Circuit

14   case, "A sufficient nexus exists where the firearm protects

15   drug stockpiles or the defendant's territory, enforces payment

16   of the drugs, or guards the sales proceeds."  Where the

17   firearm.  Kind of a funny sentence.

18        The remaining matter for consideration was the issue

19   of the statements made by the defendant and whether or not

20   they are admissible at trial, the voluntariness portion of

21   this.  The Court has reviewed all that was presented to it,

22   which is the tape, which is approximately two hours and 20

23   minutes in length.  As argued, really the first portion of the

24   tape is the one that we look to, I think.  However, viewing

25   the entire tape is helpful to the Court.  Throughout a viewing

1  of that tape I saw absolutely nothing that would indicate to

2  me or support the defendant's contention that he was

3  dysphoric, unconscious of where he was, unable to respond

4  appropriately.  He responded directly to questioning

5  throughout a two-and-a-half period -- approximately

6  two-and-a-half-hour period, appeared to be alert yet relaxed,

7  was guarded somewhat even in terms of his body language.  A

8  good bit of the time his arms were folded as he sat in the

9  chair and at times drank coffee that had been provided to him

10  by the -- by Agent McDonald and Agent Budd.  Actually the

11  agents appeared to be more nervous than the defendant was.

12  Defendant spoke clearly in the English language, but very

13  soft-spoken throughout the time, did express concerns about

14  his children and his primo, David, picking up the children and

15  those arrangements, which were primarily handled by Agent Budd

16  during the conversation, who would periodically leave

17  ostensibly to communicate with child services -- Family

18  Services as to, as to the children.

19          The viewpoint of the tape, the camera, the tape was

20  looking down on the three individuals in the interrogation

21  room, so other than general gestures and posture, the Court

22  was unable, from the camera view, to look at the size of the

23  pupils or whether there was a nystagmus or whether there was

24  bruxism, which was mentioned yesterday.  Certainly could not

25  tell anything obvious that would signify that somehow the

1    defendant had lost six days as a result of his, his drug use.

2         I would find certainly taking a piece of this might,

3    as the defendant has done, might raise some concerns, but

4    there was certainly substantial evidence, in my view, that the

5    statement that was made was made voluntarily and is -- that

6    the voluntariness issue should be resolved in favor of

7    receiving the statement.

8         Do you have any questions?

9         MR. JUBIN:  I would just like to make sure the record

10   is clear that the objection to that statement along the lines

11   of voluntariness includes the Miranda issue that was briefed.

12        THE COURT:  That is correct.  You have furnished to

13   this Court the portion, and it is a relatively small portion

14   that has been, I find, cherry-picked largely, but from that

15   much longer statement and from the -- and does not include the

16   period where the defendant signed the waiver of rights form in

17   this matter, which has been received into evidence.

18        MR. FLEENER:  Judge, I would join Mr. Jubin's

19   objection, and I would like to I guess ask the Court for some

20   guidance.  Do you want us both to object at the same time if

21   we are objecting to the United States, or can my objections

22   be -- or if Mr. -- for the time being when Mr. Jubin objects

23   can I join his objections unless I opt out, or unless you want

24   us all jumping around?

25        THE COURT:  Well, between the two of you if there

1    could be some, some understanding.

2            MR. FLEENER:  Okay.

3            MR. JUBIN:  I anticipate the need to get up just

4    because I don't want the risk that the Tenth Circuit will say

5    by failing to object I have waived it.  So I anticipate I'd

6    better get up if I have an objection.

7            THE COURT:  Well, that would be my guess.

8            MR. FLEENER:  Then I'll get up as well.

9            THE COURT:  All right.

10           MR. FLEENER:  Thank you.

11           MR. HEALY:  Your Honor, one other thing that came up

12    this morning.  We provided a transcript of the relevant

13    portions of Government's Exhibit 2 and 3 that were given to

14    the Court yesterday, which is the telephone calls

15    and -- actually 2, 3, and 4.  The telephone calls, we have not

16    transcribed those, but with the wire we did transcribe it.  We

17    are -- what the Government plans to do is offer, pursuant to

18    U.S. v Watson, 594 F.2d 1330, and that's a Tenth Circuit case,

19    and U.S. V Mayes, 917 F.2d 457, transcripts to assist the jury

20    in listening to the relevant portions of the wire that we are

21    going to play.

22           I also want to put defense counsel on notice.  I

23    don't intend to play the entire wire.  There's an hour and a

24    half of wire, and most of it is not relevant, I don't believe,

25    for the case.  If they would like to play it, they certainly

1  will have that opportunity.  But this transcript was prepared

2  between Agent Chris McDonald and the paralegal, Mikala Dawson.

3  Agent McDonald reviewed the transcript as he -- in conjunction

4  with his multiple, multiple, multiple reviews of the wire, and

5  he initialed this.  I am offering it to the Court as

6  Government's Exhibit 4a so the Court isn't thinking about this

7  in a vacuum.

8           THE COURT:  Thank you.  Have counsel received this as

9  well?

10          MR. FLEENER:  Yes, Your Honor, we have.  I'm going to

11 object to it, but I'd like -- you haven't formally offered it

12 yet; correct?

13          MR. HEALY:  Well, I have offered this for the Court's

14 review.  It's going to be formally offered through Agent

15 McDonald.

16          MR. FLEENER:  I'm sure I'll formally object at the

17 appropriate time.  I'll research it.  Thank you, Judge.

18          THE COURT:  All right.

19          MR. JUBIN:  Your Honor, one other thing.  I think

20 we're straight on this, but Mr. Healy indicated to me earlier

21 that he does not intend to play the tape of Mr. Molina.  As

22 the Court is aware, it contains some opinion statements of

23 agents which would be inadmissible.  And I think Mr. Fleener

24 also had an objection on the basis of his client's Bruton

25 issues.  And so I think we're going to be -- the Government

1    will restrict itself to admission of statements through the

2    agent's testimony, if I'm not mistaken.

3              MR. HEALY:  That is correct.  And this is a good

4    time, Your Honor, to just remind defense counsel of a couple

5    of things that I said and let the Court know that I said this

6    and put it on the record.

7              Mr. Fleener talked initially, I don't know if he

8    still plans -- or Mr. Jubin talked initially about just

9    playing the portion of the videotape that includes the part

10   where Agent McDonald says something to the effect of we can't

11   do anything about the charges right now.  I advised Mr. Jubin

12   that if he did that, I would be asking the Court -- in fact,

13   that puts the Government in a trick bag because it doesn't

14   allow the Government to show the entire recording and the

15   relationship that was developed between the parties during

16   this conversation slash interrogation, but I can't ask the

17   Court to admit the whole thing and let the jury hear it

18   because of the references to Mr. Garcia -- or Miss Garcia.  So

19   I would just ask the Court not to allow Mr. Jubin to do that,

20   and I'll make this a formal motion in that regard.

21             The second thing is we don't intend to play that

22   audio or video because we don't want any problems for the

23   record, but I did tell Mr. Fleener that it's a dangerous

24   territory to start talking about whether there's, there's this

25   video evidence of Mr. Molina that includes nothing about

1  Miss Garcia because then we have a problem with opening the

2  door to that videotape coming in and the statement about

3  Miss Garcia's role in the conspiracy.  I just want to put both

4  those things on the record, Your Honor.  Thank you.

5          MR. JUBIN:  With respect to playing that brief

6  portion of the tape, I reserve my right to do that if -- and I

7  may decide to do that.  On the other hand, I may decide that

8  if the agent's testimony under cross-examination is candid and

9  revealing in that regard, I may not find it necessary to do

10 so.  But I think I'll make that decision based upon how things

11 go.

12         THE COURT:  Very well.  I would note that there are

13 portions in that tape, to maybe try to drill down to the more

14 specific, where the agent is accusing Mr. Molina of protecting

15 Ms. Garcia, and actually throughout that tape there is some

16 discussion concerning her conduct, but not a lot.  But I think

17 you'd want to review it thoroughly, both -- everybody, if you

18 can stand to watch two and a half hours of not much going on

19 over a long period of time.

20         All right.  Is everybody clear on what the intentions

21 are of each of the parties as they move back and forth?  And I

22 will, I will certainly rule as circumstances require.

23         Why don't I, before the jury comes in, let you look

24 at the just initial instructions, make sure that we're not

25 forgetting something that we should have.

1          John, would you bring the jury in?

2          COURTROOM DEPUTY:  Yes, sir.

3      (Jury in at 9:43 a.m.)

4          THE COURT:  Good morning, ladies and gentlemen.

5  Please be seated.

6          I note that all of the jurors and alternate jurors

7  are present today following their selection yesterday.

8          Trials, criminal trials, are started with a general

9  set of instructions that are given to the jury that really

10  talk about your general duties.  All of the instructions that

11  will be given in this case will be in this notebook and will

12  go with you to the jury room when you go to deliberate at the

13  end of the case.

14      (Jury instructions not transcribed.)

15              *     *     *     *     *

16          THE COURT:  Again, you will receive all of these

17  instructions at the end of the case and take them into the

18  jury room when you go to deliberate.

19          Mr. Healy.

20          MR. HEALY:  Thank you, Your Honor.  Just a brief

21  moment to make sure all the technology is in order.

22          THE COURT:  Ladies and gentlemen, you will see these

23  television screens in front of you, CRTs.  If you need to

24  improve your view, you can raise them somewhat or even turn

25  them a little bit.  And if you have any problem with that,

 1   just raise your hand, let us know, and John can help you.

 2         MR. HEALY:  In case it wasn't obvious, Your Honor, I

 3   did not let the clerk know ahead of time that I would need

 4   that television.  And we may not use it.

 5         John, we can make it work.

 6         COURTROOM DEPUTY:  Are you sure?

 7         MR. HEALY:  Thank you.

 8         THE COURT:  Is the picture coming up on the screens

 9   for the jurors?  All right.

10         MR. HEALY:  May it please the Court.

11         THE COURT:  Mr. Healy.

12         MR. HEALY:  Counsel, defendants.

13         Ladies and gentlemen of the jury, good morning.  Over

14   the next several days you are going to hear about a conspiracy

15   case, a drug case, involving Mr. Molina and Miss Garcia.  What

16   you are going to hear specifically is that an opportunity was

17   presented to these two people, and that opportunity included

18   an ability to make a lot of money.  You're going to hear

19   testimony about how the drug trade is really no different than

20   basic economics.  It's all about supply and demand.  If supply

21   is small and demand is great, prices go up.  If demand is low

22   and supply is great, prices go down.  Or if supply is great,

23   like in Casper, greater, or Denver for that matter or

24   somewhere in Nebraska, for instance, if supply is greater in

25   those areas, it's cheaper to buy methamphetamine there, and

1   you can make a lot of money selling it in a place like

2   Gillette, Wyoming, where demand is high.  You'll hear about

3   that.  You'll hear that these defendants had an opportunity,

4   and they seized it.

5          That opportunity came to them in the persons of Kyle

6   Carothers and Heidi Blankenship in particular.  There were

7   others, but those are two of the witnesses you are going to

8   hear from.  And make no mistake about it, ladies and

9   gentlemen, Kyle Carothers and Heidi Blankenship are addicts,

10  and they have had their troubles, and they have struggled, and

11  they have sold methamphetamine.  In fact, Kyle Carothers and

12  Heidi Blankenship have sold methamphetamine to Mr. Molina and

13  Miss Garcia.  And I won't be the one telling you about that.

14  Agent McDonald, Agent Budd, they won't tell you about it.

15  Kyle Carothers and Heidi Blankenship will take the stand, and

16  you will judge their credibility, and they will tell you about

17  it.  And they'll tell you other things.  They'll tell you

18  about deals that they struck with the United States.  They'll

19  tell you about statements that they made to agents.  They'll

20  tell you about times that they may have lied before.  They'll

21  say all of those things right there, and you will decide what

22  they're telling you is true or what they're telling you is

23  false.

24         But one of the things you are going to hear them say

25  is that both of them from a very early age, or at least in

1   Mr. Carothers' circumstance, were tight with Mr. Molina and

2   Miss Garcia.  Miss Blankenship was a little older, but you

3   will know when she testifies that she had a very close

4   relationship with Miss Garcia in particular, in fact,

5   considered her a best friend.

6           Now, Mr. Carothers, his girlfriend was Whitney Rose,

7   and you see her pictured there second in from the left.  She

8   was -- she has been around in Gillette a long time.  You'll

9   hear her tell her story about how from the time she was 15

10  years old she was delivering controlled substances for older

11  gentlemen in Gillette, Wyoming, more -- usually, at least at

12  the beginning, she was delivering cocaine more than

13  methamphetamine, but she worked into methamphetamine, and she

14  started using it at 21 very heavily, so she became addicted.

15  But the key thing about Miss Rose is that she knew a lot of

16  other addicts because she'd been doing it a long time.  And

17  when Miss Rose came together with Mr. Carothers, the light

18  bulbs went off for both of them and for the defendants,

19  Mr. Molina and Miss Garcia.  They recognized an opportunity.

20  Let's make some money.  We have the sources.  You have the

21  addicts.  Let's make some money.

22          On the far right is Robert Brodie.  You will hear

23  from Robert Brodie, too.  These are the four people that the

24  Government will call that were eyewitnesses to what went on

25  during this period of time from March 2011 until really even

 1  into January 2013.  Mr. Brodie will tell you about his

 2  relationship with Heidi Blankenship.  He began his

 3  relationship with her just driving her around to sell

 4  methamphetamine to people.  He knew that she was getting her

 5  methamphetamine from her best friend, Jackie Garcia, and from

 6  her common-law husband, Mr. Molina.  He knew that because for

 7  a long time he would have to wait in the car when he took

 8  Miss Blankenship to the home on -- in the Antelope Valley area

 9  that you will hear about where Miss Molina -- or Miss Garcia

10  and Mr. Molina lived.  He would have to wait out in the car.

11  Miss Blankenship wouldn't have any drugs.  She'd go into the

12  house; she'd have drugs.  Eventually, however, and it was

13  really when Miss Blankenship was arrested for, I believe, an

14  aggravated assault and taking methamphetamine into a jail,

15  which by the way she will testify came from, directly from

16  Miss Garcia, it was then when Mr. Brodie had to step up.  He

17  had to start getting the methamphetamine from Mr. Molina and

18  Miss Garcia.  And during that time he was raising money for

19  Miss Blankenship, and you'll hear about that.

20          So let's talk a little bit more specifically about a

21  couple of these key players.  First, let's talk about

22  Miss Garcia.  You will hear during the testimony of Special

23  Agent Troy Hipsag, or he's actually a sheriff's -- Campbell

24  County Sheriff's Office detective right now, but at one time

25  he was a special agent in March of 2011 with the task force.

1    And during that period of time he ran into a person by the

2    name of Jimmy Hernandez.  And Jimmy Hernandez said that he

3    could buy methamphetamine from Miss Garcia.  So they set up a

4    purchase of methamphetamine from her in March of 2011.  And

5    you'll hear the audio, and you'll decide for yourself what

6    happens in that audio.  But the audio is about -- first about

7    setting up the deal.  For $400 she was gonna get

8    methamphetamine for Jimmy Hernandez.  Later a wire is put on

9    Mr. Hernandez, and Agent McDonald is listening to everything

10   that happens, along with Agent Hipsag, and over a period of a

11   fairly long time one night on this same date, March 23rd,

12   2011, Jimmy Hernandez enters the home that Miss Garcia is in

13   and buys 2 grams, well, about 1.8 grams of methamphetamine

14   from Miss Garcia.  So you're gonna hear about that.

15       You're going to hear Mr. Carothers tell you that he

16   dated Miss Garcia's daughter when he was 13, and he got close

17   to the family, and he got close enough to the family that when

18   he was 15 he began using methamphetamine with Mr. Molina and

19   Miss Garcia.  He's 21 now.  And he'll tell you all about that.

20       Again, Miss Blankenship will tell you about her

21   friendship.  Now, Miss Blankenship, there's gonna be no

22   question to you because Miss Blankenship is gonna tell you

23   about her past.  She's been using drugs for a long time.  She

24   has her favorites.  She sometimes uses methamphetamine.  She

25   prefers opiates, pills.  But what's interesting about her is

1    that she knew that she could start making money selling drugs

2    in Gillette, Wyoming, and she knew that the best place to go

3    was Mr. Molina and Miss Garcia because they knew the people

4    that could get the methamphetamine cheaper, and so, therefore,

5    when she sold it she could make more money and, therefore,

6    give more money to Mr. Molina and Miss Garcia.

7          Mr. Molina.  You're gonna hear about Mr. Molina.

8    You're gonna hear that he was the guy that had the source.

9    And what's interesting, and we'll talk about this a little bit

10   more in just a couple minutes, is that Mr. Molina admitted

11   that he was the guy with the source.

12         So Kyle Carothers and Whitney Rose, their home was

13   searched on May 23rd, 2011, and that's kind of when -- even

14   though that controlled buy took place in March, this, uh,

15   this, this case really started up in May of -- May 23rd, 2011

16   when Mr. Carothers and Miss Rose's home was searched.  At that

17   time law enforcement found 35 and a half ounces of -- or 35

18   and a half grams of methamphetamine.  That's a typo.  It was

19   35 and a half grams, not ounces.  And that's what remained of

20   2 ounces of methamphetamine that you will hear Whitney Rose

21   and Kyle Carothers tell you they had just purchased from

22   Mr. Molina and Miss Garcia.  There were also guns found.  And

23   this is, this is gonna come out in direct examination, too.

24   You're going to hear that though those guns were found and

25   though they were found in close proximity to drugs and though

1    there was evidence that some of those guns may have been

2    traded for methamphetamine, these defendants were promised

3    that they wouldn't be charged with a drug -- a gun count if

4    they cooperated early and truthfully.  You will hear that.

5    You will hear that from them.

6              You will also hear Mr. Carothers explain to you about

7    how he had the sources, Mr. Molina, Miss Garcia, and Miss Rose

8    had the customer base.  And she had a big customer base, such

9    a customer base, in fact, that Mr. Carothers will tell you,

10   and Mr. Molina will confirm in his confession, that he was

11   purchasing multiple ounces weekly to sell in Gillette from

12   Mr. Molina and Miss Garcia.

13             This is a photograph that you will -- that will be

14   offered into evidence or asked to be offered into evidence of

15   the methamphetamine that was seized from the home of Rose and

16   Carothers, the 35 and a half grams of methamphetamine.

17             Now, you'll hear from Heidi Blankenship and Robert

18   Brodie, as I told you.  Miss Blankenship was very close to

19   Jackie Garcia in particular.  She lived with them for a period

20   of time.  She observed a lot of things when she lived with

21   them.  She will tell you that until about the spring of 2011

22   she sold methamphetamine to Mr. Molina and Miss Garcia when

23   they didn't have it.  But what happened in 2011 to change that

24   arrangement is that Miss Blankenship wanted to make more

25   money, and so did Mr. Molina and Miss Garcia.  So she

1    approached them about sourcing her for more -- with more, and

2    they did, about a quarter ounce every other week.  You'll hear

3    Mr. Brodie say the same thing.

4          So on January 16, 2013, months after the search of

5    Whitney Rose's and Kyle Carothers' home, as you'll hear,

6    months after -- remember, that was in May of 2012 -- law

7    enforcement received a search warrant to search the home of

8    Mr. Molina and Miss Garcia.  While they were in that home they

9    found a small amount of methamphetamine.  And all of this was

10   in an upstairs bedroom that you will hear each of the

11   witnesses describe to you as the place where Mr. Molina and

12   Miss Garcia did their business.  One -- sometimes these

13   witnesses have referred to it as the business room.  That's

14   where the methamphetamine was stored, the money was kept, and

15   the, the methamphetamine was often weighed out and handed over

16   to people.

17         You will also hear that in that same room agents

18   found this firearm.  It was in a safe, an open safe.  It was

19   wrapped in plastic.  It's a .22 semiautomatic pistol.  Now,

20   this information becomes significant because you will hear

21   from some of these witnesses and you will hear in Mr. Molina's

22   confession that it, that it was something that he had done

23   before, that he had traded methamphetamine for firearms.  And

24   you'll hear that from the witnesses, and these firearms will

25   be discussed by Mr. Molina in particular in his confession.

1            Now, importantly, when agents got into the house --

2    and you'll hear about how that went.  There was a delay

3    getting in because the, the front door of the Garcia and

4    Molina residence was double reinforced and difficult to get

5    into.  But when they did get in, they, they in the same

6    bedroom upstairs, the business room, and in the same safe that

7    was open they found this firearm.  This is a .40 caliber.  The

8    reason why this firearm is significant is that you can see, in

9    the area where the ammunition goes, a bullet that was pushed

10   in but not inside the chamber all the way.  The only person in

11   that room when law enforcement went into the house, they found

12   Jackie Garcia in that room with that firearm in an open safe.

13   Mr. Molina in his confession says that the last he knew that

14   firearm was wrapped up.

15           Now, the garage was also searched.  This is

16   significant because Kyle Carothers will tell you that this is

17   another place that he, he bought methamphetamine from

18   Mr. Molina, and he'll tell you that these bottle jacks

19   that -- I wish I had a little pointer on this.  I guess I do.

20   These bottle jacks that are shown here where the blue marks

21   are (indicating), these were significant because Mr. Carothers

22   stated in his statement to law enforcement and, well, he'll

23   tell you that Mr. Molina taught him to hide methamphetamine

24   when he was transporting it inside these jacks.  He'll tell

25   you that jacks just like this were what he hid his

1    methamphetamine in, and he learned that from Mr. Molina.  And

2    Mr. Molina in his confession says I taught Kyle Carothers to

3    hide methamphetamine inside those bottle jacks.

4             Now, on January 16, 2013 Agent McDonald interviewed

5    Mr. Molina, and he will discuss that on the stand, and he'll

6    tell you all about it.  Some of the things that Mr. Molina

7    said to him are listed in front of you, and they are as

8    follows.

9             Mr. Molina's source was a person named Raul.  He

10   started working with this source in late 2009 or 2010.  That's

11   when he started getting methamphetamine from Raul.  Raul --

12   not only did Mr. Molina tell them about Raul, but he said the

13   person's, my source's phone numbers in Mexico are written on a

14   piece of paper in my wallet.  And sure enough when

15   Mr. Molina's wallet was searched, agents found phone numbers

16   from Mexico that had -- that were associated with Mr. -- with

17   Raul, or at least according to Mr. Molina they were.  He

18   stated that he paid $10,000 per 5 ounces of methamphetamine or

19   $2,000 per ounce.  And, again, you're going to hear about how

20   all these numbers work out and why it's such a profitable

21   business in Gillette.  He will tell you over the course of the

22   next several years he received 10 to 20 shipments of

23   methamphetamine.  Three were 10 ounces; the rest were 5

24   ounces.

25            He will tell you that that methamphetamine --

1          COURTROOM DEPUTY:  Excuse me.  I'll get you some

2    water.

3          JUROR NO. 19:  Please.

4          MR. HEALY:  He will tell you that that

5    methamphetamine was distributed to Carothers and Rose, to

6    Blankenship and Brodie, and to a person named Mike Kain.

7          COURTROOM DEPUTY:  Excuse me.

8          MR. HEALY:  That's fine.  Are you okay, sir?

9          JUROR NO. 19:  Yes, yes, sir.

10          MR. HEALY:  The name Mike Kain is important because

11    during the search of the home belonging to Mr. Molina and

12    Miss Garcia there were documents found that had Mike Kain's

13    name and number written on them.  He also will tell you that

14    he traded methamphetamine for guns, and he'll talk about the

15    guns that he had and some of the guns that he received in

16    exchange for methamphetamine which he no longer had.

17          So that is some of the evidence, ladies and

18    gentlemen, that you will hear during the course of this trial.

19    It's by no means all of the evidence.  But when you hear this

20    evidence and you think about it and you consider the

21    credibility of the witnesses, all of their reasons for

22    testifying, everything that comes in before you to consider,

23    when you consider that evidence, I'm confident that at the end

24    of this week, maybe early next week, I'll stand before you

25    again and ask you to convict both Mr. Molina and Miss Garcia

1   of conspiring to possess with intent to distribute

2   methamphetamine over 500 grams and possessing firearms in

3   furtherance of that conspiracy.  Thank you.

4          MR. FLEENER:  May it please the Court.

5          THE COURT:  Mr. Fleener.

6          MR. FLEENER:  Mr. Healy.

7          Ladies and gentlemen, I present this opening

8   statement on behalf of Jackie Garcia.  We don't know what the

9   witnesses are going to say.  Unlike the United States, we

10  haven't had access to the various witnesses in this case.

11  They've been squirrelled away in county jails and other places

12  throughout the state.  We'll find out what they're going to

13  say this week.  But because we don't know what they're going

14  to say, my opening statement is going to be a lot shorter than

15  Mr. Healy's is.  We're going to ask for a couple things, and

16  I'm gonna explain a couple principles that I'd ask that you

17  keep first and foremost in your minds as you're listening to

18  the evidence in this case.

19         The first principle is the truth and what the truth

20  is.  And if you hear it one time, you're gonna hear it -- I

21  expect that you'll hear it 30 times from the various witnesses

22  in this case, that all they're being told to do is tell the

23  truth, and if they tell the truth then they'll receive

24  benefits from the United States for telling the truth.  And,

25  unfortunately, the real question is going to be what is the

1  truth, and that's why I want to talk about it for a few

2  minutes right now.

3          When you're sitting in your home and the United

4  States, through its agents and federal prosecutors, come to

5  your home and start asking you questions because they're

6  investigating Jackie Garcia or Sigi Molina and they believe

7  that Jackie Garcia and Sigi Molina are drug traffickers and

8  you're told that you are going to receive some sort of benefit

9  for telling the truth, it doesn't take a rocket scientist to

10 figure out what the truth means to the United States.  And it

11 certainly doesn't take a rocket scientist if you are a felon,

12 methamphetamine addicts with history of unreliability, it

13 doesn't take any sense at all to figure out that what they

14 need to say is that Mr. Garcia and Ms. Molina or, excuse me,

15 Ms. Garcia and Mr. Molina are whatever the United States wants

16 them to say.  That becomes the truth.  And even through their

17 testimony in the next few days what we expect you are going to

18 hear is that they are going to talk about possible benefits

19 they're receiving for telling the truth, and it's gonna

20 sound -- Mr. Healy is a fine attorney, and he's a good friend.

21 The witnesses are going to make it sound as if there's this

22 great arbiter in the sky or that the federal judge is the

23 person who decides what the truth is, and then assuming that

24 this great arbiter in the sky or the federal judge decides

25 that they're telling the truth, they receive a benefit from

1   the federal government by reduced sentences, dismissed

2   charges, drug treatment, whatever the, whatever the benefit

3   that they are, that they are receiving, that it comes from

4   this arbiter in the sky.

5          The truth is that the reductions in place come from

6   the United States and solely from the United States, and

7   you'll hear evidence about that.  One or two of the witnesses

8   will finally give it up after cross-examination, or maybe it

9   will come from the agents that this concept of truth, when

10  you're reducing somebody's sentence and you're receiving

11  benefit for your testimony, the truth is decided by one person

12  and one person only.  It's the United States by Mr. Healy.

13  Because without him filing a motion to reduce your sentence,

14  it doesn't matter what your testimony is, whether it's

15  truthful or not truthful, if Mr. Healy doesn't believe it,

16  then the motion isn't filed, and your sentence isn't reduced.

17         So the concept of the truth is important to remember

18  because the truth isn't as defined as you and I and common

19  ordinary people would think the truth is.  In this case when

20  they're talking to you about the truth, until you folks go

21  back and deliberate and actually find the truth, the truth is,

22  at least as far as these witnesses are concerned, the truth is

23  how -- or the facts as Mr. Healy perceives them to be.

24         The second concept, the second principle I want to

25  talk about and I want you to keep in your mind is this concept

1   of credibility.  And one thing that Mr. Healy said in his

2   opening statement, which is correct, is that you folks are

3   gonna have the ability to examine each and every witness and

4   determine whether they're credible or not.  And what you are

5   going to be doing is you're gonna -- and I ask that you do

6   this.  I'm sure that Mr. Jubin would ask that you do this as

7   well.  I can't speak for Mr. Jubin, he has his own client, so

8   I guess I won't.  So what I would ask is that you look each

9   and every individual witness in the eye, look them in the

10  eyes, and find out whether they're telling you the truth.

11  Find out whether they're being given promises or benefits from

12  the United States which would sway your ability to tell the

13  truth.  Tell them -- look them in the eye and figure out

14  whether or not they're using drugs or were using drugs during

15  a period of time that would render their ability to recall

16  events correctly correctly.  Look them in the eyes and

17  determine whether or not, um, they have histories of being

18  criminals, quite frankly, and have been in trouble with the

19  law over and over again, um, which may affect their ability to

20  be credible.  Look them in the eye and find out whether, um,

21  they have histories of being untruthful, whether they have,

22  have lied to folks over and over and over again.  These are

23  things that -- one of the good things about practicing law in

24  Wyoming is we have jurors full of common sense, and we would

25  expect that you and we would ask that you look each and every

1    witness in the eye and determine is this person telling me the

2    truth or does this person have an incentive to testify in a

3    particular way to satisfy one party or the other.  And as we

4    stand here today, the party that the incentive will be to

5    testify in a particular way will be an incentive to testify to

6    please Mr. Healy and the United States.  Keep credibility in

7    mind.

8          Ms. Garcia asks for one thing today, which is a fair

9    trial.  And we believe that at the close of all the evidence,

10   recognizing that there may be evidence that is more relevant

11   towards Mr. Garcia -- or Ms. Garcia or more relevant to

12   Mr. Molina, that you folks are able to separate when

13   appropriate and keep in your mind these concepts of truth and

14   credibility and deliver a fair and just verdict.

15         One other thing.  The scientists -- remember the

16   concept of confirmation bias and how that affects people when

17   they test -- or how that affects not only lab results when

18   they're -- when things are being examined, but also how it

19   affects regular decision-making in our every day and how it

20   affects prosecution theories of the case and police

21   investigations.  Confirmation bias is important.

22         Thank you.

23         MR. JUBIN:  Good morning, ladies and gentlemen.

24         May it please the Court.

25         THE COURT:  Mr. Jubin.

1          MR. JUBIN:  Mr. Healy.

2          MR. HEALY:  Tom.

3          MR. JUBIN:  Mr. Fleener.  Mr. Molina.

4     All the Government's main witnesses here are going to

5  be horrible drug users, high at the time, strung out on drugs,

6  not able to form credible memory, not able to form credible

7  understanding of the events in which they're involved.  And

8  the Government's gonna parade these folks in front of you and

9  ask you to believe them as if they were reliable, as if their

10 testimony could ever establish facts beyond a reasonable

11 doubt, but the evidence will be that they are unreliable.  And

12 you will be asked to look at their motives.  You'll be asked

13 to look at their motives and the unbelievable incentives that

14 Mr. Fleener has touched on that gives them the kind of

15 motivation to give you information that's not reliable.

16        Whitney Rose, longtime drug dealer.  She had

17 connections in the drug world long before she ever knew there

18 was a Jackie Garcia or a Sigi Molina.  And what is she gonna

19 get out of this?  These cases involve -- this case and her

20 case in particular involve mandatory minimum terms of

21 imprisonment, 10 years or more.

22        MR. HEALY:  Your Honor, I'd ask the Court to strike

23 that.  This is outside the province of the jury.

24        THE COURT:  Sustained.  The jury will disregard the

25 comment.

1          MR. JUBIN:  You're gonna find out that Whitney Rose

2    got a deal whereby she could avoid having five years extra put

3    onto her sentence simply to come in here and testify involving

4    guns.

5          Kyle Carothers, what are you going to find out about

6    him?  He had his sources for drugs, sure he did, but where

7    were those sources?  His father, in Casper, in Denver.  And

8    you'll find statements from him that show him to make

9    statements here in court that are demonstrably false.

10          Heidi Blankenship, heroin addict.  Her favorite drug,

11    as you heard, is opiates.  Unreliable.  Brought drugs into a

12    jail.  Convicted of aggravated assault.  Huge, huge incentive

13    for her to come in here and tell whatever the Government wants

14    to hear to get that motion that only the Government can give

15    her to make her sentence one that's palatable.

16          And you'll learn, as Mr. Fleener alluded to, that it

17    is solely the Government's discretion which determines whether

18    these people who they are going to parade in front of you get

19    the benefit of those reduced sentences or not.

20          You'll find out that for Heidi Blankenship there are

21    witnesses who say, hey, a gun came from you.  You'll find out

22    that Heidi Blankenship may well admit that, and yet her Plea

23    Agreement is gonna say, oh, yeah, we all agree -- the Plea

24    Agreement with the Government says we all agree she did not

25    possess a gun.  The kind of things that make you wonder about

1   reliability and credibility.

2        You'll hear from Mr. Brodie, somebody who's a driver

3   for Ms. Blankenship apparently as she's selling

4   methamphetamine long before any connection to Molina or

5   Garcia.

6        You know, the evidence is going to be that Sigi

7   Molina is not a perfect human being.  None of us are.  He's

8   had maybe more problems than others in terms of his, his

9   issues with drugs, but he's a human being.  He's an addicted

10  person, but he's held jobs, he's worked, got a paycheck.  And

11  the evidence may show that he may have had some level of

12  involvement with methamphetamine, as just about every addict

13  does, but not in the conspiracy that the Government has

14  charged in this case.  And those guns, they weren't possessed

15  in furtherance of drug trafficking.  The evidence will show

16  that when -- I don't know if you'll see the photo or not, but

17  the evidence will show that there was no clip in that gun.

18  That gun that was wrapped up, didn't have a clip.  There were

19  no bullets in them.  Maybe there was a bullet in the one, and

20  if there was Mr. Molina was certainly surprised by that.  That

21  furthering trafficking is a question you'll be asked to

22  answer.

23       You saw a slide in the Government's opening, it said

24  that there was a search of Carothers, Kyle Carothers' and

25  Whitney Rose's home on May 23rd, 2011.  The evidence isn't

1 gonna show that. The evidence is gonna show that they didn't

2 even really get together until August of 2011, months after in

3 the Government's slideshow supposedly their home was searched.

4 They weren't living together then. You saw on that slide

5 there, there were 35.5 ounces taken from their home. That's

6 not right. The evidence isn't gonna show that.

7          So at the end of the day, ladies and gentlemen, I ask

8 that you listen carefully to the evidence, that you give the

9 weight to the witnesses that the law requires you to, that you

10 use your judgment, you use your healthy skepticism, and I will

11 ask you at the end of this trial to find that Sigi Molina is

12 not guilty of the conspiracy that's charged in this case nor

13 of possessing a firearm to further any drug trafficking.

14 Thank you.

15          THE COURT: You may call your first witness.

16          MR. HEALY: The Government calls Deputy Troy Hipsag.

17     (The witness was sworn.)

18          COURTROOM DEPUTY: Please take the stand, sir.

19          Sir, for the record would you please state and spell

20 your name.

21          THE WITNESS: My name's Troy Hipsag, T-r-o-y,

22 H-i-p-s-a-g.

23     TROY HIPSAG, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

24 Q.  (BY MR. HEALY)  What do you do?

25 A.  I'm currently an investigator with the Campbell County

 1  Sheriff's Office.  During the investigation of Miss Garcia, I

 2  was a task force officer with the Wyoming Division of Criminal

 3  Investigation.

 4  Q.  Okay.  Slow down just a little bit, Agent Hipsag, or

 5  Deputy Hipsag.  First of all, let's back up.  What do you do

 6  specifically for -- as a detective or investigator for the

 7  Campbell County Sheriff's Office?

 8  A.  I'm a narcotics investigator.

 9  Q.  What are your daily duties?

10  A.  My daily duties are to investigate possessions of drugs,

11  delivery of drugs, and just general cases surrounding drugs.

12  Q.  You mentioned that you were a task force officer for DCI.

13  Just briefly, what is that?

14  A.  What that is is every two years or thereabouts we from the

15  Sheriff's Office go on a rotation or a two-year assignment, if

16  you will, to the Wyoming Division of Criminal Investigation.

17  When we're there, we investigate primarily drug trafficking or

18  delivery of narcotics and also possession of narcotics cases.

19  In rare circumstances we'll assist with homicides or other

20  general cases.

21  Q.  Will you give a little bit of background about your

22  education and training prior to becoming a law enforcement

23  officer?

24  A.  I attended college at South Dakota State University.  I

25  got a four-year degree, a bachelor's degree, in sociology with

1    a minor in criminal justice.

2    Q.  Did you go immediately into the Campbell County SO?

3    A.  I did not.  Probably -- I graduated in 1993 from college,

4    and it was in 2006 that I, that I started my career in law

5    enforcement.

6    Q.  Have you had any specialized training, besides your

7    on-the-job training every day, in narcotics and narcotics

8    trafficking?

9    A.  Yes.  When I went to the Wyoming Law Enforcement Academy,

10   we had brief training in narcotics.  Then I went to the task

11   force in 2009.  Obviously I have on-the-job training there and

12   also went to the 80-hour Drug Enforcement Administration basic

13   class.

14   Q.  During your drug-related investigations, either with the

15   SO or with -- as a task force officer, have you ever had

16   occasion to use a confidential informant to make recorded

17   calls to a suspected drug distributor?

18   A.  Yes, many times.

19   Q.  Many times.  Approximately how many?

20   A.  When I was on the task force, I had 21 cases of my own

21   where I used informants.  So I would say of those cases

22   usually on more than one occasion we did a controlled

23   purchase, so I would guesstimate roughly 40 or more times.

24   Q.  During your drug investigations, did you ever have

25   occasion to use a confidential informant to make a controlled

1    buy as opposed to a recorded call?

2    A.   Yes.

3    Q.   What is a controlled buy?

4    A.   A controlled purchase is we have the informant make

5    contact with a subject or suspect.  They arrange for the

6    purchase of an illegal narcotic.  It's a controlled setting.

7    Obviously we want to control the circumstances where it's at

8    so that we, as agents, can observe the controlled purchase and

9    control it the best that we can.  And it's controlled to

10   ensure that the safety obviously of the informant, the person

11   selling the drugs, and our safety as well.

12   Q.   What do you do in preparation for a controlled buy?

13   A.   Once an informant has been established, we'll have them

14   make contact with the subject or the suspect to arrange for

15   the purchase of in this case methamphetamine, to set up the

16   deal -- not set up -- to arrange for the purchase.  Prior to

17   coming to the office they are obviously instructed not to buy

18   any narcotics or be around it prior to arranging for the deal.

19   Q.   When they come to your office, do you meet with them

20   before the controlled purchase?

21   A.   We do.  We interview them to see what the arrangement is

22   they have made prior to coming to our office.

23   Q.   How do you prepare them, these confidential informants,

24   for a controlled buy?

25   A.   Prior to the buy we try and make recorded phone calls.

1   Um, after the recorded phone calls we search the informant,

2   his vehicle, fit him with a concealed transmitter or a wire.

3   And then we follow the informant from the inception

4   until -- from the time he leaves our office until the time he

5   returns to our office and then leaves the office after the

6   interview after the buy.

7   Q.  Do you make your controlled -- or your confidential

8   informants use their own money?

9   A.  No.

10  Q.  How do you arrange for the purchase?

11  A.  We provide them with, with buy funds which we prerecord

12  prior to the buy.

13  Q.  Why do you take care to search both the confidential

14  informant and the car that the confidential informant is

15  driving?

16  A.  We want to ensure that when the informant leaves our

17  office or prior to leaving our office he or she didn't arrive

18  with any illegal substances or other contraband either on

19  their person or in the car that they're gonna drive.

20  Q.  Is it true that oftentimes, probably in a -- well, I'll

21  ask the question.  Is it true that oftentimes these

22  confidential informants are working for you because they're

23  hoping to get something?

24  A.  Many times that is true.

25  Q.  Explain that.  Explain what a confidential informant might

1    hope to get from law enforcement if he or she works for you.

2    A.   Obviously the world of narcotics is tough to get into if

3    you look like I do or some of the other agents.  It's hard for

4    us to do undercover purchases or buy drugs ourselves.  So what

5    we do is we use these informants, and oftentimes they are

6    people who have been charged with either possession of

7    narcotics or been charged with the delivery of narcotics.  And

8    in return for consideration to lessen their -- the charges

9    against them, they agree to buy narcotics for us.

10   Q.   Have you personally approached prosecutors before asking

11   them to consider leniency if a confidential informant has

12   worked for you and been honest with you?

13   A.   I have.

14   Q.   On March 23rd, 2011 did you use a confidential informant

15   to attempt a purchase of methamphetamine from Jackie Garcia?

16   A.   Yes, I did.

17   Q.   What was the name of the confidential informant?

18   A.   His name was James Hernandez.

19   Q.   When was the last time you had contact with James

20   Hernandez?

21   A.   The last time I physically saw him was March 25th.  For

22   several days after that I tried to contact his telephone

23   number.  It went to voice mail.  And then in the weeks after

24   that I called it, and eventually it was disconnected.  I tried

25   to drive by his house -- or I did drive by his house, and his

 1  van wasn't there either.

 2  Q.  When you say March 25th you had contact with him, of what

 3  year was that?

 4  A.  2011.

 5  Q.  Why was he, why was he being a CI?  What incentive did he

 6  have to be a CI?

 7  A.  He started as a confidential informant for the Gillette

 8  Police Department.  They had purchased methamphetamine from

 9  him.  I believe it was two occasions.  After he worked for

10  them or was an informant for them, I learned from Detective

11  Alger that Mr. Hernandez was familiar with Miss Garcia and was

12  able to purchase methamphetamine from Miss Garcia.  So I in

13  turn contacted Mr. Hernandez.  He said he could indeed

14  purchase methamphetamine from Miss Garcia, and he became a

15  confidential informant for me.

16  Q.  Did he hope to work off any kind of charge that may have

17  resulted from that?  And, of course, that's a term of art,

18  "work off," but did he hope that the charges that he may have

19  been facing for the, the previous deliveries that you

20  discussed, did he hope that those charges would be mitigated

21  by his work for you?

22          MR. FLEENER:  Objection.  This is hearsay and

23  speculation.

24          MR. JUBIN:  Join.

25          THE COURT:  Sustained.

1    Q.  (BY MR. HEALY)  Had you -- were you familiar with Jackie

2    Garcia's voice prior to March 23rd, 2011?

3    A.  Yes, I was.

4    Q.  Had you had personal contact with her in order to

5    familiarize yourself with her voice?

6    A.  Yes, in 2008.

7    Q.  So on March 23rd, 2011 what happened?

8    A.  March 23rd, 2011 I was contacted by the confidential

9    informant.  He had arranged for the purchase of $400 worth of

10   methamphetamine from Miss Garcia.  The informant --

11          MR. FLEENER:  Objection.  That's hearsay as well,

12   Judge.

13          MR. HEALY:  Your Honor, that is not hearsay.  It is

14   not offered for the truth of the matter asserted but offered

15   to demonstrate why this particular transaction occurred on

16   March 23rd, 2011.

17          MR. FLEENER:  It's offered to show that he was

18   setting up a controlled buy with Jackie Garcia.  That's why

19   they're offering it, Judge, which is hearsay.  It's the truth

20   of the matter asserted.

21          MR. JUBIN:  I join the objection.

22          THE COURT:  The objection is overruled.

23          Ladies and gentlemen, you are instructed that this

24   officer is not vouching for the truth of the -- of

25   Mr. Hernandez and his report to Miss -- about Miss Garcia.  So

1   it's received for the sole purpose of just explaining what

2   follows now.

3   Q.  (BY MR. HEALY)  So what did you do on March 23rd, 2011?

4   A.  On March 23rd, 2011 the confidential informant came to our

5   office.  Again, he said that he had arranged for the purchase

6   of $400 or 2 grams of methamphetamine from Miss Garcia.

7   Q.  Okay.  Agent Hipsag, I'm just going to ask you again, try

8   to slow down just a little bit.  I can see the court reporter

9   furiously typing over there.

10          THE WITNESS:  Sorry.

11  Q.  (BY MR. HEALY)  Were you present when those calls were

12  made?

13  A.  Yeah.  Once we confirmed that he had arranged that for the

14  purchase, we began to make recorded phone calls to

15  Miss Garcia.

16  Q.  Did -- do you remember the number that was used?

17  A.  670-0610.  Or I believe maybe 0601.  I'm sorry.

18  Q.  So what do you believe the number was?

19  A.  670-0601.

20  Q.  I'm approaching you with what's been previously marked as

21  Government's Exhibit 2, Government's Exhibit 2 and 3.  I want

22  to --

23          MR. HEALY:  May I approach, Your Honor?

24          THE COURT:  You may.

25  Q.  (BY MR. HEALY)  Will you look at those and tell me if you

1  recognize them?

2  A.  Yes.

3  Q.  How do you recognize them?

4  A.  They are the calls I listened to, and I put my initials on

5  the CDs.

6  Q.  Those are your initials on the CDs?

7  A.  They are.

8  Q.  Are those calls, the calls that you recorded, made from

9  the confidential informant to the person you believe was

10 Jackie Garcia?

11 A.  Yes.

12 Q.  Have you listened to them?

13 A.  I have.

14 Q.  When those calls were made, could you tell me how they

15 were preserved?

16 A.  They were digitally recorded and then downloaded to a

17 computer and then ultimately put on these CDs.

18 Q.  When you listened to those calls, are they true and

19 accurate depictions of what you recall happening when you were

20 listening to the calls on March 23rd, 2011?

21 A.  Yes, they are.

22       MR. HEALY:  Your Honor, the Government offers

23 Government's Exhibit 2 and 3.

24       THE COURT:  Where were the calls made from?

25       THE WITNESS:  They were made from our office, the DCI

1    office in Gillette.

2            MR. FLEENER:  We would object to hearsay and also

3    confrontation, Judge.

4            MR. JUBIN:  I'd join those objections.

5            THE COURT:  Overruled.  They will be received.

6        (Government's Exhibits 2, 3 received.)

7            MR. HEALY:  May we publish, Your Honor?

8            THE COURT:  Please publish.

9        (Audio recording played.)

10   Q.  (BY MR. HEALY)  Agent -- I'm so used to calling you agent.

11   Deputy Hipsag, what was happening in that call?

12   A.  During that first call we just wanted to make sure that

13   Miss Garcia --

14           MR. FLEENER:  Objection.  The evidence speaks for

15   itself.  They have a recording.  The jury is free to interpret

16   what happened during the call.  It's not proper for the agent

17   to speculate or offer his opinion as to what happened during

18   the phone call.

19           MR. JUBIN:  I'd join that objection and augment it

20   with confrontation.

21           THE COURT:  Overruled.

22           What was your purpose in having the call made?

23           THE WITNESS:  The reason for the call was to arrange

24   for the informant to purchase the methamphetamine from

25   Miss Garcia.

1    Q.  (BY MR. HEALY)  What were the next series of calls that

2    happened, just so the jury knows what's coming?

3    A.  The next series of calls -- we wanted to go to

4    Miss Garcia's house to purchase the methamphetamine, not have

5    her deliver the methamphetamine to the informant's house.  So

6    at 5:12 p.m. --

7              MR. FLEENER:  Objection.  That was nonresponsive.

8    A.  5 -- sorry.

9              THE COURT:  Overruled.

10   A.  At 5:12 p.m. the informant made another recorded phone

11   call to Miss Garcia.  The call went to voice mail.  He left a

12   message, said, I'm gonna call you back, answer your phone.

13             At 5:33 I had the informant make two more calls to

14   Miss Garcia.  The reason we made two is because the first one

15   went to voice mail.  The second call as well went to voice

16   mail.  He didn't leave a message on those.

17             At 5:43 the informant again called Miss Garcia, and

18   she answered her phone.  During that call the informant said

19   he had to run to Antelope Valley, which is where Miss Garcia

20   lived --

21             MR. FLEENER:  Objection.  Again, the phone call,

22   whatever is said in the phone call can speak for itself.  His

23   interpretation of what's being said in the phone call is

24   improper, it's hearsay, and would violate confrontation,

25   Judge.

1          MR. JUBIN:  I join.

2          THE COURT:  Sustained.  Just play the call.

3    Q.  (BY MR. HEALY)  So there were -- well, let me ask this

4    then, Deputy Hipsag.  There's going to be, according to your

5    testimony, two calls that, that were not picked up, one call

6    that was left a voice message, and then the fourth call will

7    be the call where there's contact made with Miss Garcia?

8    A.  That's correct.  And then there's an additional fifth call

9    where we also made contact with Miss Garcia.

10          MR. HEALY:  Thank you.  We will publish, Your Honor.

11          THE COURT:  Proceed.

12    (Audio recording played.)

13    Q.  (BY MR. HEALY)  Deputy Hipsag, the woman's voice that you

14    hear in the recordings, do you recognize that voice?

15    A.  Yes, I do.

16    Q.  Whose voice is it?

17    A.  Um, Miss Garcia.

18    Q.  Do you recognize Jackie Garcia in the courtroom?

19    A.  I do.

20    Q.  Would you point her out, please.

21    A.  Sitting at the defense table in the pink-colored shirt.

22    Q.  Do you recognize Mr. Molina?

23    A.  I do.

24    Q.  Have you had prior contact with Mr. Molina?

25    A.  Yes, I have.

1    Q.  Will you point out Mr. Molina, please.

2    A.  At the defense table in the green shirt.

3    Q.  Are all -- are those all of the calls that were recorded

4    with James Hernandez?

5    A.  On March 23rd, yes.

6    Q.  Were, um, were any other calls made to Miss Garcia on

7    March 23rd that were not recorded?

8    A.  No.

9    Q.  Do you know what it means -- in your experience as a

10   narcotics officer, have you heard the term "papers" used

11   before?

12   A.  Yes.  Oftentimes drug buyers or drug sellers, dealers,

13   will use the term "paper" on the phone in reference bring the

14   paper, which means --

15         MR. FLEENER:  Objection --

16   A.  -- bring the money --

17         MR. FLEENER:  -- this is hearsay.  He's speculating.

18   There's also confrontation issues, Judge.

19         THE COURT:  Overruled.  You may answer.

20   Q.  (BY MR. HEALY)  Please finish.

21   A.  We've heard that on other recorded phone calls and other

22   wires, do you have the paper or bring the paper.

23   Q.  How much -- when -- and this is in the second call.  When

24   it's heard that Jimmy Hernandez responds cuatro, what does

25   that mean to you?

1    A.  It means four.

2    Q.  And why is that significant?

3    A.  Significant because the arrangement was to purchase $400

4    worth of methamphetamine.

5    Q.  Okay.  Please describe in detail for the jury how you

6    prepared for this particular controlled purchase.

7    A.  After the recorded phone calls we determined that we'd

8    drive to Miss Garcia's house.  Even though she said it would

9    be an hour, informant said he'd be there in a half hour.  So

10   the informant was searched.  The informant's car was searched.

11   No illegal items or contraband were found either on the

12   informant or in his car.  The informant was then fitted with

13   the concealed transmitter or the wire.  The informant then

14   left our office.  He was followed to 2790 Whitetail,

15   Apartment A, Miss Garcia's residence in Antelope Valley, by

16   myself and Agent McDonald.

17        When the informant arrived at 2790 Whitetail, he got

18   out of his van and walked into the house.  When he got into

19   the house, we could hear him talking to a male.  That male is

20   later identified as Shane Draper, who also I've known from

21   prior contacts.

22   Q.  Let me stop you right there --

23   A.  Sure.

24   Q.  -- Deputy Hipsag.  First of all, were any arrangements

25   made with the confidential informant, with Mr. Hernandez, to

1   somehow signal you if there was any danger?

2   A.  Yeah.  We always have, um, a code word, if you will, if

3   something goes wrong or the informant is in danger or anyone

4   is in danger to use that word and use it loud enough over the

5   wire so that we, as agents, can hear it and we can take action

6   if that word is heard.

7   Q.  During the time period that you listened to this activity

8   of Mr. Hernandez at the Molina Garcia home, was that code word

9   ever used?

10  A.  It was not.

11        MR. HEALY:  Your Honor, may I approach?

12        THE COURT:  Yes, you may.

13  Q.  (BY MR. HEALY)  I'm handing --

14        THE COURT:  This would be a good time.  The jurors

15  have been seated there for almost two hours.  I think it's

16  about time for them to get a break.  Let's stand in recess for

17  15 minutes.

18     (Proceedings recessed 10:59 a.m. to 11:14 a.m.,

19        resuming outside the presence of the jury.)

20        MR. JUBIN:  Your Honor, I noticed during the

21  presentation of the evidence so far that whenever there was a

22  tape that needed to be played or a new disc was put in, before

23  the jury and presented to the jury was a screen that indicated

24  all the various files that were contained on the paralegal's

25  computer relevant to this investigation.  My concern is that

1   suggested to the jury that there is a whole host of evidence

2   contained on a Government computer against these defendants,

3   and that's not the evidence.  It's not the exhibit.  And the

4   exhibit was pulled out of one of those multiple files.  And

5   because of the potential for prejudice in that regard, I'd

6   move for a mistrial.  I think we have it remedied for the

7   future if the Court denies the motion for mistrial, but --

8           THE COURT:  It will.

9           MR. HEALY:  Your Honor, in response I just think

10  that's a leap of supposition that isn't necessary under the

11  circumstances.

12          MR. FLEENER:  I join Mr. Jubin for the record, Judge.

13          THE COURT:  All right.  I agree that it is a leap.

14  It was a brief exposure to a desktop with the list of files

15  that really would be very difficult -- at least I couldn't

16  draw any substance from, from that list in terms of anything.

17  And hopefully that has been remedied until you say to display

18  the screen.  And it wasn't necessary even to put it on the

19  screen I don't think because we were listening to a sound

20  recording.

21          Thank you, Mr. Jubin, for bringing it to our

22  attention, though.

23          MR. JUBIN:  Thank you.

24          COURTROOM DEPUTY:  Ready for the jury?

25          THE COURT:  We're ready.

1        (Jury in at 11:16 a.m.)

2              THE COURT:  Thank you.  Please be seated, ladies and

3    gentlemen.

4              Please continue with the direct examination of Deputy

5    Hipsag.

6              MR. HEALY:  Thank you, Your Honor.  May I approach

7    the witness?

8              THE COURT:  You may.

9    Q.  (BY MR. HEALY)  Deputy Hipsag, I have handed you what's

10   been marked as Government's Exhibit 25.  Is that correct?

11   A.  Yes.

12   Q.  Do you recognize that photograph?

13   A.  Yes.  That's the home of Jackie Garcia.

14   Q.  Do you know who else she lives with at that home?

15   A.  Uh, Mr. Molina.

16   Q.  Is that a true and accurate depiction of their home at

17   least -- well, I'll back up.  Is that the home they lived in

18   on March 23rd, 2011?

19   A.  Yes, it is.

20   Q.  You testified you followed the confidential informant,

21   James Hernandez, to that home.

22   A.  That's correct.

23   Q.  Is that a true and accurate depiction of the home that you

24   saw on March 23rd, 2011?

25   A.  Yes, it is.

1    Q.  What is the address?

2    A.  It's 2790 Whitetail, Apartment A.

3             MR. HEALY:  Government offers Exhibit 25.

4             MR. FLEENER:  No objections, Judge.

5             MR. JUBIN:  No objection.

6             THE COURT:  The exhibit is received.

7        (Government's Exhibit 25 received.)

8             MR. HEALY:  May I publish, Your Honor?

9             THE COURT:  You may.

10   Q.  (BY MR. HEALY)  Deputy Hipsag, will you point to the front

11   door of the residence that Mr. Molina and Miss Garcia lived

12   in?

13   A.  It's the one on the left, the open door.

14   Q.  Would you touch the screen?

15   A.  Sorry.  (Indicating).

16   Q.  Thank you.

17            Okay.  You testified that a person that is known to

18   you as Shawn Draper answered the door; is that correct?

19   A.  Shane Draper.

20   Q.  Shane Draper, I'm sorry.  Who was with you -- where were

21   you set up and observing this?

22   A.  Directly across the road.  As we look at the house in the

23   photograph, if we were behind the photograph or where the

24   photograph was taken, we were right in that position.

25   Q.  Could you see clearly the front of the house?

1    A.  Yes.

2    Q.  Who was with you?

3    A.  Agent McDonald.

4    Q.  Was he with you during the entire course of the wire?

5    A.  Yes, he was.

6    Q.  How was the listening set up in your vehicle?

7    A.  We were able to hear the wire.  We couldn't hear all the

8    conversations on the wire, but we were able to hear portions

9    of the wire.

10   Q.  Were you both able to hear it at the same time?

11   A.  Yes.

12   Q.  What were some of the problems that you encountered in

13   hearing everything?

14   A.  Sometimes with wires, obviously, because they are

15   concealed, um, and in this case Mr. Hernandez had a big jacket

16   on, sometimes they will ruffle the microphone on the wire.

17   It's a very small microphone.  So sometimes it gets muffled or

18   covered.  Or if someone moves, sometimes the audio isn't

19   picked up entirely.

20   Q.  At any point during your surveillance of this home did you

21   observe anyone else arrive at the home?

22   A.  Yes.  Our informant got there approximately 6:15.  At

23   roughly 6:55 a dark-colored SUV showed up at the house and

24   parked in the garage which is assigned to Apartment A.

25              THE COURT:  Was it 6:55 when the --

1   A.  As far as our surveillance notes go, it was 6:55 p.m.

2   I'm not sure of the time on the wire.

3           Two people got out of that SUV, Miss Garcia and

4   Mr. Molina, and they walked into the door of 2790 Whitetail.

5   Q.  (BY MR. HEALY)  Now that you bring it up, what time did

6   the, what time did the wire start?

7   A.  I believe it was 6:03 when we turned it on.

8   Q.  When they arrived, when Mr. Molina and Miss Garcia arrived

9   at the home, were you able to see them well enough to identify

10  them?

11  A.  Yes, we were.

12  Q.  What happened after their arrival?

13  A.  They walked into the -- and maybe I should back up just a

14  bit.  6:03 was when we left the office, so the wire was turned

15  on sometime right before that.  When they arrived at the

16  house, they went inside.  I could hear Miss Garcia's voice

17  visiting with Mr. Hernandez.  At I believe it was one hour and

18  one minute into the wire Mr. Hernandez says, Am I supposed to

19  go downstairs?  Then he and Miss Garcia's voices can be heard,

20  and they're laughing.  As the wire goes on, you can hear them

21  communicating.  At 1:07 Miss Garcia mentions 2 grams, which

22  was the arranged purchase of methamphetamine.  And then she

23  says words to the effect that he would owe -- Mr. Hernandez

24  would owe her for the favor that she was doing.  And then she

25  indicated at one point it was a quarter short.

1    Q.  What does a quarter short mean to you, in your training

2    and experience?

3    A.  A quarter short means since we ordered 2 grams that it was

4    a quarter short or half a gram short of what it was, the

5    original purchase was supposed to be.

6    Q.  A half a gram short of the original, what the original

7    purchase was supposed to be?  Is that what you said?

8    A.  And that was consistent.  Um, when we weighed it later, it

9    was 1.8 grams with packaging.  And then when it was sent to

10   the lab it was actually a little bit more than a quarter.  I

11   believe it was 1.353 grams, so roughly a half gram less than

12   we ordered.

13   Q.  So that takes into account the packaging?

14   A.  The 1.8 grams did, yes.

15   Q.  Was there a point during your surveillance that Jimmy

16   Hernandez left the Garcia Molina home?

17   A.  He did.  I believe it was -- I can't remember the time

18   exactly, but it was shortly after those conversations he left

19   the house, um, briefly visited with Mr. Molina and Mr. Draper

20   who were -- had left the house earlier and were working on a

21   car out in the driveway.  Mr. Hernandez got in his van and was

22   followed back to the DCI office.

23   Q.  I want to back up just a moment.  You talked about this

24   meeting in the basement with Miss Garcia and the confidential

25   informant.  Was there ever any point during that period of

1  time that you just described about the, the methamphetamine

2  purchase that you heard Mr. Molina's voice?

3  A.  No, not at that time.

4  Q.  Did you follow the CI, Mr. Hernandez, back to your office?

5  A.  Yes, we did.

6  Q.  What happened then?

7  A.  Once we got back to the office he handed me the

8  methamphetamine purchased from Miss Garcia, and I searched the

9  CI.  His car was also searched, again, to ensure that no

10  illegal items or contraband were left in the car.  Again,

11  there was nothing found.

12          MR. HEALY:  May I approach, Your Honor?

13          THE COURT:  Yes.

14  Q.  (BY MR. HEALY)  Handing you what's been marked as

15  Government's Exhibit 46 [sic].  Do you recognize that?

16  A.  I do.

17  Q.  What is it?

18  A.  It's the recording, the wire, from the buy on March 23rd,

19  2011.

20  Q.  How do you know that is the recording of the wire?

21  A.  It's the CD that I initialed and listened to.

22          MR. HEALY:  Government offers Government's Exhibit

23  46, Your Honor.  And -- or excuse me.  It's 4b, Your Honor.

24  This is sort of following the opening statement typo.  It's

25  4b.

 1              MR. FLEENER:  Objection:  confrontation and hearsay

 2    and foundation.

 3              MR. JUBIN:  I'd join.

 4              THE COURT:  The objection is overruled.  The exhibit

 5    is received.

 6         (Government's Exhibit 4b received.)

 7    Q.  (BY MR. HEALY)  Now, you just testified, Agent Hipsag,

 8    that the confidential informant handed you methamphetamine.

 9    A.  That's correct.

10              MR. HEALY:  May I approach, Your Honor?

11              THE COURT:  You may.

12    Q.  (BY MR. HEALY)  Handing you what's been marked as

13    Government's Exhibit 1, do you recognize that item?

14    A.  Yes, I do.

15    Q.  How do you recognize it?

16    A.  When I seal my evidence, I always use clear tape or in

17    most cases use clear tape and put my initials.  This has my

18    initials, and the evidence tag is the one I put on there.  I

19    recognize that from my handwriting which isn't so neat.

20    Q.  Is there a date on Government's Exhibit 1?

21    A.  The date's -- the date of the offense is 3/23/2011.

22              MR. HEALY:  The Government offers Government

23    Exhibit 1.

24              MR. JUBIN:  Objection:  Rule 401.

25              THE COURT:  Overruled.  It is received.

1        (Government's Exhibit 1 received.)

2   Q.  (BY MR. HEALY)  What is contained within Government's

3   Exhibit 1?

4   A.  Methamphetamine.

5   Q.  Is that the methamphetamine you took from James Hernandez?

6   A.  It is.

7   Q.  Deputy Hipsag, what do you -- what did you do with this

8   methamphetamine once it was received by you and you had placed

9   it in evidence?

10  A.  It was then transported to the Wyoming Crime Laboratory

11  for testing.

12          MR. HEALY:  No further questions at this time, Your

13  Honor.  Thank you.

14                      CROSS-EXAMINATION

15  Q.  (BY MR. FLEENER)  Agent Lipsig [sic]  -- I'm sorry.  Do

16  you go by deputy or detective?

17  A.  Deputy would be fine.

18  Q.  And your last name is spelled?

19  A.  H-i-p-s-a-g.

20  Q.  Deputy, what do you know about Jimmy Hernandez, who was

21  the alleged confidential informant or did the controlled buy

22  with you guys?

23  A.  I know that he was -- had sold methamphetamine to the

24  police department.  In return for consideration of charges,

25  agreed to work as an informant for them and then --

1    Q.  You mean --

2    A.  -- agreed to work as an informant for me.

3    Q.  You say he did what to the police department with respect

4    to methamphetamine?

5    A.  I'm sorry.  He sold methamphetamine to the police

6    department when they used a confidential informant.

7    Q.  Okay.  So when -- I can't see.  When, when -- the reason

8    you guys got ahold of him is because you guys had done a

9    controlled buy on him?

10   A.  I had not, no.

11   Q.  Your department had?

12   A.  No, the police department had.

13   Q.  Okay.  You're with the sheriff's office?

14   A.  That's correct.

15   Q.  All right.  So the Gillette -- in Campbell County?

16   A.  That's correct.

17   Q.  The Gillette Police Department, another law enforcement

18   agency in Campbell County, had conducted a controlled buy

19   apparently from Jimmy Hernandez?

20   A.  That's correct.

21   Q.  That's what you understand?

22   A.  Yes, that's what I understand.

23   Q.  And the Jimmy Hernandez -- or the confidential informant

24   in Gillette had apparently bought drugs from the confidential

25   informant that you used, Mr. Hernandez.

1  A.  The -- I guess rephrase that, if you will.

2  Q.  Sure.  The confidential informant -- the Gillette PD used

3  a confidential informant against Jimmy Hernandez?

4  A.  That's correct.

5  Q.  When?

6  A.  I'm unsure of the dates of when they did that.  Prior to

7  me, obviously, coming in contact with him.

8  Q.  How many controlled buys with Jimmy Hernandez did they use

9  him for?

10  A.  I'm not sure how many.

11  Q.  Or I mean, sorry, how many controlled buys of Jimmy

12  Hernandez took place in Gillette with Gillette PD?

13  A.  I know of one.  I'm not sure of how many.

14  Q.  Did he have pending charges in -- with either the Gillette

15  Police Department or Gillette city court or with Campbell

16  County circuit court or felony court with -- because of these

17  methamphetamine transactions he was involved in?

18  A.  Yes, he did.  And just like I testified earlier, the

19  agreement was with the police department, Detective Alger, and

20  then I visited with Detective Alger also, and in agreement for

21  Mr. Hernandez working for me as a confidential informant he

22  was allowed to still continue to work off those charges.

23  Q.  Did -- how close in time from when he was selling

24  methamphetamine for -- in the city of Gillette and got

25  apparently hemmed up was he working for you as a CI and

1  allegedly buying methamphetamine from Miss Garcia?

2  A.  Again, I'm unsure of the exact dates of when they

3  purchased methamphetamine from him, but it was, uh --

4  Q.  Are we talking years?

5  A.  No, it was not years.

6  Q.  Months?

7  A.  I would say months.  That's fair.

8  Q.  Okay.  But prior to Mr. Garcia -- excuse me --

9  Mr. Hernandez working as a control -- or excuse me.  And what

10 did you call him, a confidential informant, a confidential

11 source?  What was --

12 A.  Confidential informant.

13 Q.  Okay.  He was a CI?

14 A.  Correct.

15 Q.  You also have confidential sources?

16 A.  We do.

17 Q.  What's the difference between the two, because that's

18 going to come up in trial?

19 A.  An informant is someone who actively purchases narcotics

20 for us.  They fill out paperwork.  There's rules, if you will,

21 they have to follow, and it's an actual, an actual agreement.

22       A confidential source is someone who is not willing

23 to do that but, however, provides us information.

24 Q.  Okay.  And I appreciate that because I think that probably

25 is important for all of us to know for the next week.

1           And Mr., Mr. Hernandez was a confidential informant.

2   He had taken apparently the additional step of attempting to

3   purchase drugs.

4   A.   That's a fair assessment, yes.

5   Q.   And he -- do you know what happened to his charges that he

6   was working off?

7   A.   I do not.  I left that up to the police department.  I

8   told them, um, what Mr. Hernandez had done for us, and the

9   charges were originally from the police department, so I left,

10  um, the consideration up to the police department and

11  obviously the county attorney's office.

12  Q.   Do you have any idea -- I mean, now that you have been

13  involved -- or this is two years ago.  Do you have any idea

14  what happened to these charges?

15  A.   I do not.

16  Q.   Where is Mr. Hernandez?

17  A.   I do not know that.

18  Q.   Your last contact with him was March, March 25th of 2011?

19  A.   Yeah, actually seeing him.  I talked to him on the phone,

20  again, a couple times in the days pre -- or following that and

21  then roughly the week after those dates.  And I'm sorry for

22  not knowing exactly when the week ended and started, but

23  that's when I lost contact with him in 2011.

24  Q.   All right.  So you only had contact with this man for

25  about a week?

1   A.  I had contact with him, obviously, prior to March 23rd.  I

2   would say roughly two to three weeks.

3   Q.  Which is still a fairly short amount of time with a

4   confidential informant.

5   A.  It is.

6   Q.  And did he have a contract with you?  I mean, you said

7   that they have to sign CI agreements.

8   A.  Mm-hmm.

9   Q.  Did he have a CI agreement with you?

10  A.  He did.

11  Q.  Do you have a copy of that with you?

12  A.  I do not.

13  Q.  What was his criminal history like other -- we know that

14  he had some apparent drug charges with -- stemming from the

15  Gillette Police Department; correct?

16  A.  That's correct.

17  Q.  Did he -- are you aware of whether he had any other

18  criminal conduct at all?

19  A.  I can't say exactly, but I do remember we ran a criminal

20  history on Mr. Hernandez, and it was very minimal, no serious

21  offenses.

22  Q.  He was a, he was a drug addict, I assume.

23  A.  I'm sorry?

24  Q.  A drug addict, I assume.

25  A.  He was a drug user.

1    Q.   Okay.

2    A.   Absolutely.

3    Q.   I mean, because you didn't -- and the reason why -- I

4    mean, he's not here to testify today; correct?

5    A.   That's correct.

6    Q.   And no one is here to gauge his credibility.  I mean,

7    we're talking to you.  You were the only one who actually had

8    any dealings, you and Agent McDonald, with this Jimmy

9    Hernandez as far as law enforcement goes.

10   A.   Right.  I guess I could vouch for his credibility.  There

11   was --

12        MR. HEALY:  Hold on.  May -- I'd like to have

13   this -- could we approach, Your Honor?

14        (At side bar.)

15        MR. HEALY:  I think the problem here is pretty

16   obvious.  I don't want the witness, in response to

17   Mr. Fleener's questions, saying that he is vouching for the

18   credibility of the CI, even though the CI isn't here to

19   testify and is not technically a witness in this case.  It

20   seems improper to me.  I don't know how to object to my own

21   witness other than to say, um, uh, unresponsive and foundation

22   and improper.

23        MR. FLEENER:  I -- well, I mean, I understand the

24   dangers in asking that question.  The CI is not here.  I want

25   to know what this agent -- I mean, I assume he's going to say

1    that he can vouch for him, and I am going to say how, and we

2    are going to explore the fact that he really doesn't know the

3    man at all, and that was my intent in asking that question.

4         MR. HEALY:  That's fine, as long as it's not -- I'd

5    just like the Court maybe to instruct the jury that the

6    witness cannot vouch for the credibility of --

7         MR. FLEENER:  I understand the words he used were --

8         MR. HEALY:  Yeah.

9         MR. FLEENER:  -- were cause -- the words that he used

10   caused an alarm.

11        MR. HEALY:  Yeah.

12      (End of side bar.)

13        THE COURT:  Ladies and gentlemen of the jury, this

14   witness cannot vouch for the credibility of someone who's not

15   here, Mr. Hernandez.  He can state what his experience has

16   been with him or what knowledge he has about him.

17   Q.  (BY MR. FLEENER)  Rather than vouching for someone's

18   credibility, what experience do you have with -- what

19   experiences do you have with, with Jimmy Hernandez that,

20   um -- well, let me ask you first.  Was there anything in his

21   agreement which caused you to be hesitant to use him as a

22   confidential informant?

23   A.  No.  The information he had given me was reliable and,

24   obviously, with the controlled buys turned out to be a

25   reliable controlled buy.  As far as his reliability, on the

1    first controlled buy, and you can hear it on the wire, he says

2    at the end of it, $500 tomorrow, um.  We actually arranged for

3    the controlled purchase of 3 and a half grams of

4    methamphetamine on March 24th, 2011.  Um, Mr. Hernandez

5    traveled to Miss Garcia's house on that occasion, actually

6    fronted her $500 which were prerecorded.  The same steps were

7    taken prior to the buy.  On that night Miss Garcia had to

8    leave the house and go look for the methamphetamine is what

9    she told Mr. Hernandez.  She never ended up delivering the

10   methamphetamine.  So Mr. Hernandez went home on that evening.

11   The following morning, March 25th, Mr. Hernandez called me and

12   said Miss Garcia had returned the $500 he had given her the

13   day before.

14          MR. FLEENER:  Objection.  That's hearsay and

15   nonresponsive.

16          THE COURT:  Okay.

17   A.  I guess in terms of his reliability --

18          THE COURT:  It's hearsay.

19   Q.  (BY MR. FLEENER)  The -- I want to -- I appreciate that

20   you recognize -- that you believe he did a good job during

21   this two-or-three-day period that you had an involvement with

22   Mr. Hernandez.  Correct?  You --

23   A.  Say again?  I'm sorry.

24   Q.  You believe -- you had a good experience with

25   Mr. Hernandez during your two-or-three-day involvement with

1    him?

2    A.  His information was, was --

3    Q.  Helpful?

4    A.  -- checked out, for lack of better term.

5    Q.  And I'm talking about -- well, if he was so helpful, where

6    did he go?

7    A.  You know, I can't answer that.

8    Q.  You would agree that one of your agreement -- one of the

9    terms of your confidential informant agreement is to keep law

10   enforcement apprised of your whereabouts?

11   A.  It is.

12   Q.  And he didn't do that?

13   A.  He did not.

14   Q.  That's not very trustworthy.  He disobeyed one of the

15   terms of his agreement.  You'd agree with that?

16   A.  Again, at that point our agreement was terminated.

17   Q.  But this is only two days or three days after he was

18   apparently cooperative.  You believed him on the 23rd

19   and 25th, and now apparently you terminated him on the 27th,

20   correct, or sometime around there?

21   A.  It was roughly a week after the 25th.

22   Q.  Well, all this happened the latter part of March.  You'd

23   give me that much.  Middle to the end of March is your entire

24   involvement with this particular confidential informant, Jimmy

25   Hernandez.

1   A.  I would say from the beginning till, yeah, the end.

2   Q.  Okay.  30 days worth of involvement with Mr. Hernandez

3   and, and your office.

4   A.  Sure.

5   Q.  Okay.  And during that time his actual involvement took

6   place during about a week-long window --

7   A.  That's correct.

8   Q.  -- where he was actively involved?

9   A.  Yes.

10  Q.  And during that window -- I mean, one of the terms that

11  he -- one of the things that he has to do is keep your office

12  informed of his whereabouts?

13  A.  Right.

14  Q.  And he didn't do it?

15  A.  Not after the controlled purchases, no.

16  Q.  Right.  He skedaddled and ran away.

17  A.  Sure.

18  Q.  And whether his charges were dismissed or taken care of or

19  he pled to them, we don't have any idea because you don't know

20  where he is.

21  A.  I guess the charges probably wouldn't pertain to his

22  whereabouts.  I'm sure that was worked out, um, based on the

23  information I gave Detective Alger with the county attorney's

24  based on the information or the, the, the buys that

25  Mr. Hernandez did.

1   Q.  And you say the buys.  He did one buy.  An attempted buy

2   and a buy.

3   A.  For me, but he also purchased methamphetamine for the

4   police department.

5   Q.  I thought they purchased from him.

6   A.  Yeah, and then in turn he agreed to be an informant for

7   them, and he purchased methamphetamine for them, and then went

8   to work as an informant for me.

9   Q.  Okay.  When -- and I'm sure one of the agreements in

10  your -- one of the standard clauses in your CI agreement he's

11  not to commit violations of laws outside the supervision of

12  the confidential informant program, something like that.

13  A.  I don't know if that's accurate.  They obviously aren't to

14  break any laws.  Minor traffic offenses obviously don't fit in

15  there, but not to violate laws, obviously not to use.

16  Q.  Well, but they're violating the law in theory by

17  conducting a controlled buy.  They are possessing controlled

18  substances.  Right?

19  A.  It's not a violation of the law.  They're acting --

20  Q.  Right, because they're doing it at your behest.

21  A.  Correct.

22  Q.  So one of the terms in the agreement is you are not

23  supposed to violate the law other than -- he wasn't supposed

24  to possess drugs absent the possession of drugs under your

25  supervision.

1   A.  That's correct.

2   Q.  All right.  And do you know whether he actually did

3   possess or use drugs during that time?

4   A.  When he was around me, he did not possess drugs.

5   Q.  Well, I would hope not in the DCI office.  I'm talking

6   about the other 27 days that he was around.  Do you have any

7   evidence that he either possessed or used drugs during that

8   time?

9   A.  I have no evidence that he did.

10  Q.  The -- you said that the purported methamphetamine that he

11  purchased from Ms. Garcia was -- it turned out being light a

12  half a gram or something?

13  A.  Roughly.

14  Q.  Assuming he actually purchased from Ms. Garcia, couldn't

15  he have also used methamphetamine that day with Ms. Garcia,

16  which would probably not be the right thing to do if you're a

17  CI?

18  A.  That's not the right thing to do.  Again, we listen to the

19  wire, and we hear what we can on the wire, and then the

20  information -- at the end of the controlled purchase we

21  interview the informant for the details that took place on the

22  wire.  And again not all, all the things are heard on the

23  wire.  Um, to my knowledge he did not use any methamphetamine

24  on that day.

25  Q.  He -- during this time period that you knew him he

1   obviously had access to methamphetamine because he was -- he'd

2   done controlled buys with the city, and the city had done

3   controlled buys from him.  Correct?

4   A.  Yes.

5   Q.  When, when he showed up at your office to do the actual

6   controlled buy, um, what kind of car was he driving?  You said

7   it was a van?

8   A.  It was a van, minivan.

9   Q.  Do you know what kind of van?

10  A.  I believe it was a Ford Windstar.

11  Q.  How did you inspect that van to determine that it -- that

12  there weren't drugs there?

13  A.  It was searched by hand, actually looked through the van,

14  underneath floor mats, all crevices that we can access.

15  Q.  Okay.  You didn't bring a dog in at all?

16  A.  No.

17  Q.  Why?

18  A.  That's standard -- normally we do not use dogs to search

19  our informant's cars.

20         MR. FLEENER:  May I approach, Judge?

21         THE COURT:  Yes, you may.

22         MR. FLEENER:  I'm going to retrieve 1.

23         THE WITNESS:  Yes.

24         MR. FLEENER:  Thank you.

25  Q.  (BY MR. FLEENER)  Can you please unseal the, the exhibit

1  and show the smaller bag?

2  A.  Sure.

3       MR. FLEENER:  And the record should reflect that the

4  witness is unsealing the main evidence bag, so that there's

5  not issues with chain of custody.

6       MR. HEALY:  Your Honor, um, so, Mr. Fleener -- may I

7  ask Mr. Fleener -- there's -- may I voir dire the witness?

8       THE COURT:  Yes.

9                    VOIR DIRE EXAMINATION

10 Q.  (BY MR. HEALY)  Agent Hipsag, is there any danger to

11 anybody in this room or to yourself to handle that bag, um,

12 that Mr. Fleener has asked you to take out of there?

13 A.  Yes.  There could be methamphetamine residue on the

14 outside.

15      MR. HEALY:  I do not believe that that bag should be

16 opened.  If Mr. Fleener can give a good reason why it needs to

17 be opened, then maybe we could listen to it, but it seems to

18 me that it would be -- I don't think that this witness should

19 be handling that bag.

20      MR. FLEENER:  I want the witness to handle the bag to

21 demonstrate how small this bag is and how easy it would be to

22 hide this bag of purported methamphetamine in a minivan and

23 without a dog sniffing the minivan how that could have been

24 hidden in a million different places that he wasn't able to

25 check by hand.

1          THE COURT:  Why don't you let me see the whole

2    exhibit and --

3          MR. HEALY:  Before you do that, Your Honor, may we

4    put a plastic bag -- do we have a plastic bag that we can

5    repackage it in?  It's in a clear plastic bag now, but -- oh,

6    may the witness reseal it before the Court --

7          THE COURT:  Sure.

8          MR. HEALY:  Thank you.

9          THE COURT:  Just as long as I can see the -- what's

10   inside of it.

11         MR. HEALY:  Make sure it's -- for the record, I've

12   instructed the -- one moment, Your Honor.

13         For the record, I instructed the witness to try to

14   make sure that he shook the clear baggie that the baggie of

15   methamphetamine is placed in so that when the tape is placed

16   back in to reseal this evidence the Court can see it.

17         THE COURT:  I would rule that the jury can see,

18   through the plastic -- through the clear plastic outer bag,

19   the smaller inner container without having to open the clear

20   outer container.

21         MR. FLEENER:  Your Honor, may I publish the exhibit

22   to the jury so they can see it for the next line of

23   questioning?

24         THE COURT:  Any objection?

25         MR. HEALY:  No, Your Honor.

1          MR. FLEENER:  Thank you.

2          I'll go ahead and retrieve the bag when you're done,

3    ma'am.  Thank you.

4                    CROSS-EXAMINATION (Resumed)

5    Q.  (BY MR. FLEENER)  When you, when you originally -- well,

6    you search -- you searched Mr. Hernandez; correct?

7    A.  That's correct.

8    Q.  And how did you do that?

9    A.  That's a comprehensive search.  Obviously search from his

10   head down to his toes, shoes and socks come off, thorough

11   search of his whole body.

12   Q.  Did you conduct it yourself?

13   A.  I did.

14   Q.  And did he keep his clothes on?

15   A.  He did, aside from his socks.

16   Q.  How do you know he didn't have that bag in his clothes

17   somewhere?

18   A.  I was confident with my search, and I searched, um, for

19   lack of better terms, um, not deep enough but actually

20   physically searched his groin area, parts where it would be

21   possible to conceal methamphetamine, and there was none there.

22   Q.  Did you search his body, his body cavity?

23   A.  We don't do body cavity searches.

24   Q.  Why?

25   A.  First of all, I believe we have to have a search warrant

1   to do those.

2   Q.  Not if it's voluntary.

3   A.  Sure.

4   Q.  He's coming to see you.  So why don't you do that?

5   A.  We do not do that.  That's not a standard practice for

6   searches prior to buying narcotics.

7   Q.  Well, certainly people stick methamphetamine in their

8   bodies.

9   A.  That's true.

10  Q.  Um, as a way to conceal methamphetamine from law

11  enforcement and to move from place to place.

12  A.  Right.  It's been my experience with informants that --

13  Q.  That was a yes-or-no question.

14  A.  Yes, that's true.

15  Q.  And you could have searched his body for these drugs.  I

16  mean, you could have done a body cavity search had you wanted

17  to.

18  A.  Had he agreed.

19  Q.  Had you asked.

20  A.  Sure, and had he agreed, yes.

21  Q.  Had you -- you didn't ask?

22  A.  Correct.

23  Q.  So he never agreed or disagreed?

24  A.  Sure.

25  Q.  But you could have asked?

1   A.  I could have, yeah.

2   Q.  You chose not to?

3   A.  Yes.

4   Q.  And you know that methamphetamine is sometimes secured in

5   body cavities.

6   A.  That's true.

7   Q.  In fact, Heidi Blankenship, one of the witnesses the

8   Government has -- gonna be bringing up here sometime in the

9   next few days, had methamphetamine in her vagina.  It was

10  found in the jail.  Correct?

11  A.  Correct.

12  Q.  And you would agree that that bag is rather small?

13  A.  It is.

14  Q.  In fact, a gram of methamphetamine, you folks compare it

15  to what's in a Sweet 'N Low or an Equal packet?

16  A.  Oftentimes, yeah, that's a comparison.

17  Q.  So this would be the equivalent -- if it's a gram and a

18  half, it would be the equivalent of one and a half packets of

19  Sweet 'N Low?

20  A.  That's fair, yes.

21  Q.  And, um, he had access to methamphetamine because, well,

22  one, he was a methamphetamine user; correct?

23  A.  Correct.

24  Q.  And he had done controlled buys for the city before.

25  A.  That's correct.

1   Q.  And the city had done controlled buys for him -- from him.

2   A.  Also correct.

3   Q.  Where he was selling methamphetamine to others.

4   A.  Yes.

5   Q.  And the quantity of, of methamphetamine, this -- well, let

6   me strike that.

7           What did you do to attempt to find Mr. Hernandez so

8   that he could be present and this jury could determine his

9   credibility today?

10  A.  Aside from calling his phone after the controlled

11  purchases on March -- and meeting with him physically on

12  March 25th, 2011, I called his phone several times.  Went to

13  voice mail.  No answer.  The following week I called his

14  phone.  The numbers were disconnected.  I then drove by his

15  house, and his van was gone.  Aside from those attempts, none.

16  Q.  What have you done in the last two years to find him?

17  A.  September 11th -- September -- I'm sorry.  September of

18  2011 I had to go back to the sheriff's office, so I returned

19  to patrol prior to becoming an investigator.

20  Q.  All right.  So as far as you know, at least your

21  involvement in the case, you've done nothing since end of

22  March of 2011 to find this Jimmy Hernandez?

23  A.  That's correct.

24  Q.  I assume you didn't check Social Security records or IRS

25  records or anything else that may give some sort of indication

1   as to where Jimmy Hernandez was prior to 2011.

2   A.  No, I did not.

3   Q.  Why?

4   A.  I just did not.  I, uh, I learned that I was going to

5   testify recently, and the attempt to contact Mr. Hernandez --

6   I just never, never attempted to find him.

7           MR. FLEENER:  No further questions, Judge.  Thank

8   you.

9           THE COURT:  It's the noon hour, ladies and gentlemen.

10  We'll stand in recess until 1:30 o'clock this afternoon,

11  1:30 o'clock.  Let me give you some additional instruction.

12          Remember the instruction not to discuss this case

13  with anyone or attempt to learn about this case from sources

14  outside of the courtroom.  You must not communicate with or

15  provide any information by any means about this case.  You may

16  not use any electronic devices or media, such as telephone,

17  cell phone, smart phone, iPhone, Blackberry, or computer, the

18  Internet, any Internet search engine, any Internet service,

19  any text or messaging service, any Internet chat room, blog,

20  or website, such as Facebook, MySpace, LinkedIn, YouTube, or

21  Twitter, to communicate with anyone any information about this

22  case or conduct any research about this case until I accept

23  your verdict.  If anyone attempts to contact you, let us know

24  so that we can do something about it.

25          We'll stand in recess until 1:30 o'clock.

 1          (Proceedings recessed 11:57 a.m. to 1:40 p.m.)

 2              THE COURT:  Thank you.  Please be seated.

 3              Mr. Jubin.

 4              MR. JUBIN:  Thank you, Your Honor.

 5                        CROSS-EXAMINATION

 6   Q.  (BY MR. JUBIN)  Deputy Hipsag, my name is Tom Jubin.  I

 7   represent Sigi Molina seated over here.  We haven't met

 8   before, have we?

 9   A.  No, we have not.

10   Q.  You were testifying that Jimmy Hernandez, this

11   confidential informant, was allowed to work off his charges.

12   Do you recall your testimony in that regard?

13   A.  I do.

14   Q.  So is it your understanding he was told by officers that

15   they would make his charges go away by doing what they said?

16   A.  I don't know exactly what they told him.  I typically

17   never say that.  It's not up to us.  It's inevitably up to the

18   county attorneys if they want to follow through with the

19   prosecution.  So I couldn't say that they told him that, if

20   they did or did not.

21   Q.  But you are aware that he was allowed to work off those

22   charges --

23   A.  That's correct.

24   Q.  -- with the officers themselves?

25   A.  Correct.

 1  Q.  Okay.  You also testified that this confidential

 2  informant, Jimmy Hernandez, made some purchases for the

 3  Gillette Police Department that were unrelated to his

 4  assistance to you; correct?

 5  A.  That's correct.

 6  Q.  And I don't want to leave this jury speculating.  There's

 7  no information that those -- that work that Jimmy Hernandez

 8  did for the Gillette Police Department has anything to do with

 9  Sigi Molina or Jackie Garcia; correct?

10  A.  Not that I'm aware of.

11         MR. JUBIN:  I don't have any further questions.

12  Thank you.

13                    REDIRECT EXAMINATION

14  Q.  (BY MR. HEALY)  Deputy Hipsag, you were speaking with

15  Mr. Fleener about Mr. Hernandez and discussing what he, he did

16  for you that, um, the following day.  You were discussing

17  this -- that you had tried to set up another buy from

18  Miss Garcia.  Is that correct?

19  A.  That's correct.

20  Q.  And you were about to talk about something that happened

21  that made you put some faith in Mr. Hernandez.  What was that?

22  A.  Well, that buy didn't come to fruition, and the next

23  morning Mr. Hernandez called me and said that Miss Garcia had

24  returned the $500 to him, and he returned that $500 to me.

25  Q.  You were also asked in fairly great detail about, about

1  searches and body cavity searches and things like that.  Do

2  you recall?

3  A.  Yes.

4  Q.  Did anything that Jackie Garcia said during the wire that

5  you monitored indicate to you that the CI had meth on him

6  prior or subsequent to meeting with Jackie Garcia?

7  A.  No.

8  Q.  Mr. Jubin asked you about working off charges.  Have you

9  ever -- when you have dealt with CIs before, is it common

10 practice among narcotics detectives or task force officers or

11 law enforcement officers in general to say that if someone

12 cooperates with you you'll try to help them?

13 A.  Yes, it is.  Excuse me.

14           MR. HEALY:  Nothing further, Your Honor.  Thank you.

15                    RECROSS-EXAMINATION

16 Q.  (BY MR. JUBIN)  You recall your answer to Mr. Healy's last

17 question here?

18 A.  Is it common to tell them that you'll work with them?

19 Q.  Right, is it common.

20 A.  Yes.

21 Q.  You indicated that it's not your role to tell someone that

22 you'll make the charges go away; is that right?

23 A.  Correct.  I never say I'll make your charges go away.

24 Q.  Because that would be improper; correct?

25 A.  Ultimately we converse with the county attorneys --

1   Q.  That's a yes-or-no question.  It would be improper for you

2   to tell them that?

3   A.  Yes.

4          MR. JUBIN:  Okay.  Thank you.

5          MR. HEALY:  No further questions, Your Honor.

6          THE COURT:  You may step down.

7          THE WITNESS:  Thank you.

8          THE COURT:  Do you wish this witness to be excused?

9          MR. HEALY:  We would like Deputy Hipsag to be excused

10  from his subpoena.

11         MR. FLEENER:  No objection.

12         MR. JUBIN:  No objection.

13         THE COURT:  You are so excused.

14         THE WITNESS:  Thank you.

15         MR. HEALY:  Since he is excused from his subpoena, if

16  Deputy Hipsag would like to stay for a while, Your Honor, may

17  he sit in the courtroom and --

18         THE COURT:  He may do -- I assume there's a

19  sequestration agreement in this matter.

20         MR. JUBIN:  We haven't specifically discussed it, but

21  we do typically have sequestration in these matters.  And if

22  he's not coming back as a witness, I have no objection to him,

23  as any member of the public, watching the proceedings.

24         MR. FLEENER:  Agreed, Judge.

25         THE COURT:  I would just instruct him he shouldn't be

1    talking to other witnesses in the case.

2              MR. JUBIN:  Absolutely.  Thank you.

3              MR. HEALY:  Thank you.  Your Honor, the Government

4    calls Special Agent Bobby Proffitt.

5        (The witness was sworn.)

6              COURTROOM DEPUTY:  Please take the stand, sir.

7              Sir, for the record will you please state and spell

8    your name.

9              THE WITNESS:  It's Robert Proffitt, R-o-b-e-r-t,

10   P-r-o-f-f-i-t-t.

11     ROBERT PROFFITT, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

12   Q.  (BY MR. HEALY)  What do you do?

13   A.  I'm a special agent with the Wyoming Division of Criminal

14   Investigation.

15   Q.  Special Agent Proffitt, how long have you been with DCI?

16   A.  I've been a full-time agent since September of 2010.

17   Q.  What were you doing prior to that?

18   A.  I was a deputy sheriff for the Campbell County Sheriff's

19   Office.

20   Q.  How long had you been a deputy sheriff?

21   A.  Since 2003.

22   Q.  Any law enforcement experience prior to 2003?

23   A.  I spent almost three years working in the detention

24   center.

25   Q.  Prior to being in the detention center, do you have any

1    other law enforcement or military experience for that matter?

2    A.   Four and a half years in the Marine Corps.

3    Q.   What are your duties as a special agent with DCI?

4    A.   To mainly work narcotic investigations.

5    Q.   What kind of things do you do when you investigate

6    narcotics crimes?

7    A.   Interview, um, individuals that may be involved with

8    narcotics crimes and, uh, surveillance, kind of watch

9    individuals.

10   Q.   Do you, do you help with search warrants?

11   A.   Yes, I do.

12   Q.   Have you ever been a -- an evidence custodian during a

13   search warrant?

14   A.   Yes, I have.

15   Q.   What is that?

16   A.   Um, that's the person that's gonna be in charge of all the

17   evidence that's located where a search warrant is being

18   executed.

19   Q.   What, what do you -- walk the jury through what typically

20   happens during a search warrant and how the evidence custodian

21   handles evidence that's seized during a search warrant.

22   A.   Typically during a search warrant the evidence

23   technician -- once the residence has been photographed, the

24   evidence is located, the agent or officer will bring that to

25   the evidence technician, at which time they will put a item

1   number to that and also complete a evidence property sheet.

2   Q.  Are you -- so do you -- is it actually the proper word or

3   phrase for it or title for it, evidence technician?

4   A.  I don't know if that's the proper term, but that's just

5   what we've called it, yes.

6   Q.  Okay.  Were you an evidence technician on May 23rd, 2012

7   during the search of 1074 Country Club Road, Number 705, in

8   the Thunder Rock apartments?

9   A.  Yes, I was.

10  Q.  Describe for the jury what happened on that date.

11  A.  Agent McDonald had received a search warrant for the

12  residence at which time we went to the residence, secured the

13  residence, which anybody involved -- any individuals in the

14  residence were secured to make it safe.  Once they were

15  secured, um, some of them may have been taken to jail, some of

16  them released, and then we at that time began searching the

17  residence looking for any evidence.

18          MR. HEALY:  May I approach the witness, Your Honor?

19          THE COURT:  You may.

20  Q.  (BY MR. HEALY)  I am approaching you with what's been

21  marked as Government's Exhibit 7.  I'd like you to look at it

22  and tell me if you recognize this photograph.

23  A.  Yes, I do.

24  Q.  How do you recognize it?

25  A.  That was item KC1000 that was located in the residence.

 1    Q.  Is that a true and accurate depiction of what you located

 2    in the residence as item KC1000?

 3    A.  Yes, it was.

 4           MR. HEALY:  Your Honor, the Government offers

 5    Government's Exhibit 7 and requests to publish.

 6           MR. JUBIN:  No objection.

 7           MR. FLEENER:  No objection, sir.

 8           THE COURT:  Exhibit 7 is received, and you may

 9    publish it.

10       (Government's Exhibit 7 received.)

11    Q.  (BY MR. HEALY)  Special Agent Proffitt, what is the jury

12    seeing in this photograph?

13    A.  They're seeing the methamphetamine that was located

14    originally on the couch underneath where Kyle Carothers was

15    sitting.

16    Q.  I'm approaching you with what's been marked as

17    Government's Exhibit 6.  Please look at Government's Exhibit 6

18    and tell me if you recognize that item.

19    A.  Yes.

20    Q.  How do you recognize it?

21    A.  That is the item that was located, um, on the couch.

22    Q.  When you say the item, do you mean the suspected

23    methamphetamine?

24    A.  Yes.

25    Q.  How do you know that that is the same item?

 1  A.  Because that is my -- the way I packaged the item once it

 2  was taken back to the DCI office.

 3  Q.  Does it have the case number on, on Government's

 4  Exhibit 6?

 5  A.  Yes, it does.

 6  Q.  Does it have the name of the case?

 7  A.  Yes, it does.

 8          MR. HEALY:  Government offers Government's Exhibit 6.

 9          MR. JUBIN:  May I voir dire, Your Honor?

10          THE COURT:  Yes.

11                    VOIR DIRE EXAMINATION

12  Q.  (BY MR. JUBIN)  Agent Proffitt, the search that you are

13  talking about where this Exhibit 7 or 6 was taken from, whose

14  residence is that?

15  A.  It was Whitney Rose and Kyle Carothers.

16  Q.  So it wasn't Jackie Garcia or Sigi Molina?

17  A.  No, it was not.

18          MR. JUBIN:  Thank you.

19          MR. HEALY:  The Government has offered Government's

20  Exhibit 6.

21          MR. JUBIN:  No objection.

22          MR. FLEENER:  No objection, sir.

23          THE COURT:  6 is received.

24      (Government's Exhibit 6 received.)

25          MR. HEALY:  No further questions at this time.  Thank

1  you, Your Honor.

2                    CROSS-EXAMINATION

3  Q.  (BY MR. FLEENER)  You're -- are you -- you're agent;

4  correct?

5  A.  Yes, I am.

6  Q.  Agent, I'm Tom Fleener representing Sigi or, excuse me,

7  Jackie Garcia.  Were you actually conducting the search, or

8  were you just keeping track of the evidence?

9  A.  I kept track of the evidence.

10  Q.  Okay.  You weren't there when the house was searched?

11  A.  I was there.  As the evidence was searched, I was at the

12  kitchen table.

13  Q.  Where did all the guns go that Kyle Carothers and Whitney

14  Rose have?

15  A.  They got logged and taken to Cheyenne.

16  Q.  Okay.  But when you were searching the house, you also

17  found several -- well, tell me what weapons you found at their

18  house.

19  A.  There was, um -- I know there was at least two pistols

20  located, two .45 caliber pistols.  I want to say one was a

21  Grizzly.  Um, I think the other one may have been a Hi-Point,

22  but I can't say for sure.

23             MR. FLEENER:  Okay.  Thank you.

24             MR. JUBIN:  No questions.

25             MR. HEALY:  Nothing further, Your Honor.  I'm not

1    going to excuse Agent Proffitt at this time, so I would ask

2    that Agent Proffitt leave the courtroom.

3              THE COURT:  Please remain available.

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  Do not discuss your testimony with any

6    other witness.

7              THE WITNESS:  Yes, Your Honor.

8              MR. HEALY:  The Government calls Special Agent Ruby.

9         (The witness was sworn.)

10             COURTROOM DEPUTY:  Please take the stand, sir.

11             Sir, for the record would you please state and spell

12   your name.

13             THE WITNESS:  Jason Ruby, J-a-s-o-n, R-u-b-y.

14        JASON RUBY, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

15   Q.  (BY MR. HEALY)  Where are you employed?

16   A.  The Sheridan County Sheriff's Office, currently assigned

17   to the Division of Criminal Investigation Northeast

18   Enforcement Team.

19   Q.  How long have you been with the sheriff's office?

20   A.  Since 2005.

21   Q.  What do you do for the sheriff's office?

22   A.  A deputy.

23   Q.  What are your duties as a deputy?

24   A.  Uh, patrol, um, just basic street patrol.

25   Q.  Do you have any other prior law enforcement or applicable

1   experience prior to your time as a sheriff's deputy?

2   A.  I do not.

3   Q.  Did you go through the law enforcement academy?

4   A.  I did.

5   Q.  Have you had any other sort of special training during

6   your time as a sheriff's deputy?

7   A.  Yes.  I've been through several schools while being

8   employed at the Sheridan County Sheriff's Office.

9   Q.  What kind of schools?

10  A.  Narcotics schools, firearms schools, DUI schools.

11  Q.  You also said you're a task force officer?

12  A.  That is correct.

13  Q.  Will you explain to the jury what a task force officer is?

14  A.  A task force officer is a person from a local law

15  enforcement agency that's assigned to the Division of Criminal

16  Investigation, whichever team they're located in, to get

17  experience in narcotics investigations.

18  Q.  What do you do then for -- as a task force officer with

19  DCI?

20  A.  Work mainly on narcotics investigations.

21  Q.  In your work in narcotics investigations, have you had the

22  opportunity to be an evidence technician?

23  A.  Yes, I have.

24  Q.  What is an evidence technician?

25  A.  An evidence technician is a person that would take all the

1  evidence in a search warrant, they would apply item numbers to

2  it as well as do a detailed evidence receipt for those items.

3  Q.  As part of your duties as an evidence technician -- how

4  often have you been an evidence technician?

5  A.  Four or five times.

6  Q.  As part of your duties as an evidence technician, do you

7  make sure that all the items are properly sealed and stored?

8  A.  Yes.

9  Q.  Were you involved in Gillette, Wyoming, on January 16,

10  2013 in the search of 2790 Whitetail, Apartment A?

11  A.  Yes, I was.

12  Q.  Do you know to whom that particular apartment belonged?

13  A.  Jacqueline Garcia and Sigifredo Molina.

14  Q.  Were you the evidence technician in that particular

15  search?

16  A.  I was.

17         MR. HEALY:  Your Honor, I discussed this with the

18  defense attorneys briefly, and I think for efficiency reasons

19  and time what I'm going to ask, with the Court's permission,

20  Special Agent Ruby to do is take the portable microphone and

21  come down to this table that has the evidence that was taken

22  out of the home, or at least the evidence the Government

23  intends to offer.  He is going to go through each of these

24  items.  I'll ask him if he recognizes these items and how he

25  recognizes them.  He'll go through them, discuss them briefly

1   for foundation purposes.  And then after he's gone through

2   these, I will ask the Court to -- I will offer the evidence to

3   the Court.

4          THE COURT:  Any objection to him stepping down and

5   approaching the table?

6          MR. JUBIN:  No, I have no objection to doing that for

7   efficiency.

8          MR. FLEENER:  No, sir.

9          THE COURT:  You may step down.  Deputy, you'll need

10  to speak -- hold the microphone up to your mouth and speak

11  directly into it.

12         THE WITNESS:  Okay.

13  Q.  (BY MR. HEALY)   Okay.  Special Agent Ruby, will you

14  please go through these items by number and identify where

15  they were seized and how you are familiar with them.

16  A.  Yes.  The first item is marked Government's Exhibit

17  No. 10.  It's a wallet containing an ID card in the last name

18  of Molina as well as miscellaneous cards and pieces of paper.

19  It was found in the upstairs bedroom and -- at 2790 Whitetail,

20  Unit A.

21  Q.  Thank you.

22  A.  Keep going?

23  Q.  Yes.

24  A.  The next one is marked state's [sic] Exhibit 11.  It's

25  miscellaneous paperwork to include two notebooks, passwords,

1    pay/owe sheets, a 2 gigabyte media card, and a black wallet

2    with paperwork in the name of Molina inside which was also

3    located in the upstairs bedroom.

4    Q.  How do you recognize -- and I should go back to Exhibit 10

5    as well.  How do you recognize Exhibit 10 and Exhibit 11?

6    A.  I recognize them 'cause I'm the one who put the evidence

7    ID cards -- or tags on them as well as signed the seal.

8    Q.  Please move to the next.

9    A.  Government Exhibit No. 12, legal documents in the name of

10   Heidi Blankenship which was located in the upstairs bedroom.

11   Again, I affixed the evidence item tag as well as sealed the

12   seal.

13   Q.  How do you know that it's upstairs bedroom?

14   A.  With the moniker UB.

15   Q.  UB?

16   A.  I gave all the stuff that was in the upstairs bedroom UB.

17   The other bedroom that stuff was taken from was MB for master

18   bedroom.

19   Q.  Move to the next, please.

20   A.  The next is Government Exhibit No. 13.  It's a photocopy

21   of item number 400C, which is a pay stub in the name of

22   Sigfreid -- Sigifredo Molina, which was also located in the

23   upstairs bedroom.

24          The next one is Government Exhibit 14.  It's a

25   wirebound notebook containing suspected pay/owe sheets and

1    phone numbers which was located in the upstairs bedroom.

2    Again, it has my signature on the seal, as well as I affixed

3    the evidence label, too.

4          Next, Government Exhibit No. 15, 13 wirebound

5    notebooks with suspected pay/owe sheets inside, again located

6    in the upstairs bedroom.  I affixed the evidence label as well

7    as signed the seal.

8    Q.  One quick interruption here, Special Agent Ruby.  When,

9    when you write on those tags suspected pay/owe sheet, that

10   doesn't mean that those have been confirmed as pay/owe sheets,

11   does it?

12   A.  No, it does not.

13   Q.  Just what you think at the first instance?

14   A.  That is correct.

15   Q.  Okay.  Please move to the next exhibit.

16   A.  Government Exhibit 16, which is miscellaneous paperwork.

17   It was located in the upstairs master bedroom.  It was labeled

18   MB100.  Again, I affixed the evidence label as well as signed

19   the seal.

20         Government Exhibit 17, which is miscellaneous

21   paperwork and letters that was located in the upstairs

22   bedroom, and 17a, which is a receipt in the name of Heidi

23   Blankenship.  Again, that was located in the upstairs bedroom.

24   I affixed the evidence tags as well as signed the seal.

25         Evidence label 500, UB500, which is Government

1   Exhibit No. 18, which is a silver canister with a white powder
2   substance, that was also located in the upstairs bedroom.  I
3   affixed the evidence seal, but I did not sign the, the seal to
4   seal the package.
5   Q.  Who signed that seal?
6   A.  Special Agent Robert Proffitt.
7          Evidence -- Government Exhibit No. 19, which is a
8   glass vial with a white powder res -- substance which was
9   located in the upstairs bedroom.  Again, I affixed the
10  evidence tag but did not sign the seal.
11  Q.  Who did?
12  A.  Special Agent Robert Proffitt.
13         I don't see an Exhibit 20, but Government Exhibit
14  No. 21, which is a Hi-Point .40 caliber handgun and a black
15  nylon holster which was located in the upstairs bedroom.
16  Again, I affixed the evidence tag as well as signed the seals
17  on the box.
18         Government Exhibit No. 22, which is a
19  Jennings .22 caliber handgun.  Again, I affixed the evidence
20  tag, but I did not sign the seal.  That was located in the
21  upstairs bedroom.
22  Q.  Thank you, Special Agent Ruby.  Could you take your -- oh,
23  sorry.
24  A.  There's one more.  Government Exhibit No. 24, which is:
25  seven full boxes of federal .40 caliber ammunition; one full

1    box of American Eagle .40 caliber ammunition -- excuse me --

2    one box of .40 caliber, Eagle .40 caliber ammunition with 10

3    live rounds; one box of Winchester .25 auto; one box of

4    Magtech .380 with 35 rounds; one box of CCI .22 ammunition

5    with 90 rounds; a plastic Ziploc baggie with six .380 rounds

6    and two 9 millimeter rounds.  Again, I affixed the evidence

7    label as well as signed the seal.

8    Q.  Agent Ruby --

9    A.  Excuse me.  I got out of order.  Government Exhibit

10   No. 23, which is a box of Winchester .25 auto ammunition that

11   was located in the upstairs bedroom.  Again, I affixed the

12   evidence label and signed the seal.

13   Q.  Is that everything that you see on the table?

14   A.  It is.

15   Q.  Would you please take the witness stand again?

16   A.  I will.

17   Q.  And hand the microphone back to the clerk.  Thank you.

18          You explained that a couple of these items, in

19   particular items Exhibit 18 and Exhibit 19 that had the

20   crystalline substance within it, the white crystalline

21   substance, that those were actually sealed by Special Agent

22   Proffitt, from whom the jury has heard.

23   A.  That is correct.

24   Q.  How does that happen?

25   A.  Oftentimes when you're -- have a lot of evidence that was

1   recovered from a search warrant, several agents get together

2   to help package and seal those items.  In that case the person

3   who actually seals the item puts their initials on the seal.

4   Q.  And those initials, from your experience with Special

5   Agent Proffitt, are -- belong to Robert Proffitt?

6   A.  That is correct.

7   Q.  Do you remember him being with you when you were taking

8   custody of this evidence?

9   A.  Yes, he was.

10  Q.  What did you do with this evidence after you took custody

11  of it and marked it?

12  A.  The evidence was transported to the Gillette DCI office.

13  It was packaged, sealed, and then stored in a secure location

14  pending transport to the Wyoming crime lab in Cheyenne,

15  Wyoming.

16  Q.  Do you know if it was transported to the Wyoming crime

17  lab?

18  A.  Yes, I do.

19  Q.  Who transported it?

20  A.  Special Agent Robert Proffitt.

21          MR. HEALY:  Your Honor, the Government offers

22  Government's Exhibit 10, 11, 12, 13, 14, 15, 16, 17, 17a, 18,

23  19, 21, 22, 23, and 24.

24          MR. JUBIN:  Objection on the basis of Rule 402, Your

25  Honor.

1          MR. FLEENER:  I'll join Mr. Jubin's objection.

2          THE COURT:  Want to approach?

3      (At side bar.)

4          THE COURT:  Show us the purpose of the offer.

5          MR. HEALY:  Your Honor, the reason why I chose to go

6    the order that I did is that Special Agent McDonald is going

7    to take the stand and talk about these items that he's looked

8    at and the significance of them to him.  What would have

9    happened if I put him on first to demonstrate the relevance of

10   each of these items is that we would have had or we could have

11   had an objection to foundation, which then meant we would have

12   to admit them conditionally, and then Special Agent Ruby would

13   have to get up and ask to -- if they were admitted at all, he

14   would have to then come up and lay foundation for them.  As a

15   matter of efficiency and time, I thought it might be more

16   productive to have the evidence custodian here, because there

17   were no chain of custody stipulations or anything of that

18   sort, and go through those matters so that Agent McDonald

19   could look at these and just discuss them because they would

20   be entered into evidence.

21          MR. JUBIN:  I think that may be the procedure that

22   the Government is wanting to use.  I think I just needed to

23   make the objection because at this point it's premature to

24   admit them.

25          MR. HEALY:  Well, then we have at least laid chain of

1    custody foundation.  We'll put Agent McDonald on.  He'll

2    discuss them and talk about their relevance to the case.

3              THE COURT:  I think that's a thing that you can do.

4              MR. HEALY:  Thank you, Your Honor.

5              MR. JUBIN:  Thank you.

6              THE COURT:  I would --

7              MR. JUBIN:  Tom.  Tom.

8              MR. FLEENER:  Oh.

9              THE COURT:  The reason you see any hesitancy on my

10   part is I don't know if you are going to be bringing somebody

11   in from the crime lab who's going to -- if there is a chain of

12   custody issue concerning these items.

13             MR. HEALY:  There will be people from the crime lab.

14   I haven't heard of any chain of custody issues.  I just know

15   that there wasn't a stipulation on chain of custody.

16             Also, the other reason why it becomes a practical

17   issue, Judge, is when Agent McDonald is talking about these

18   and talking about their relevance to his investigation, it's

19   going to be difficult for him to talk about the relevance to

20   his investigation to the jury if these items aren't admitted.

21             So, again, I'm going to offer these items and ask the

22   Court to accept them conditionally based on the testimony that

23   I believe Agent McDonald will provide to the Court and the

24   jury about their significance to his investigation.

25             THE COURT:  Thank you.  I will grant your motion.

1        (End of side bar.)

2            THE COURT:  The items just mentioned will be received

3    conditionally.

4        (Government's Exhibits 10, 11, 12, 13, 14, 15,

5        16, 17, 17a, 18, 19, 21, 22, 23, 24 received

6        conditionally.)

7            MR. HEALY:  Your Honor, I have no further questions

8    for this witness.  Thank you.

9            MR. FLEENER:  I have no questions.

10            MR. JUBIN:  No questions.

11            MR. HEALY:  May the witness be excused?

12            MR. FLEENER:  No objections.

13            MR. JUBIN:  No objection.

14            THE COURT:  You are excused and released from the

15    process that brought you here.  Please do not discuss your

16    testimony with other witnesses.

17            MR. HEALY:  May Agent Proffitt also be excused, Your

18    Honor?

19            MR. JUBIN:  No objection.

20            MR. FLEENER:  No objection, sir.

21            THE COURT:  He may be excused.  Please instruct him.

22            MR. HEALY:  The Government calls Special Agent Chris

23    McDonald.

24        (The witness was sworn.)

25            COURTROOM DEPUTY:  Please take the stand, sir.

1            Sir, for the record would you please state and spell

2    your name.

3            THE WITNESS:  My name is Chris McDonald, C-h-r-i-s,

4    M-c-D-o-n-a-l-d.

5      CHRIS McDONALD, GOVERNMENT'S WITNESS, DIRECT EXAMINATION

6    Q.  (BY MR. HEALY)  Where do you work?

7    A.  I work for the Wyoming Division of Criminal Investigation,

8    Northeast Enforcement Team, stationed in Gillette, Wyoming.

9    Q.  What are your duties?

10   A.  I'm currently assigned as a supervising agent at the

11   Gillette office.  I supervise two full-time agents and three

12   task force officers.  In addition to that, I have

13   investigative responsibilities for narcotics investigations as

14   well as general investigations by request of other

15   agencies -- agencies.  Pardon me.

16   Q.  What do you mean by general investigations?

17   A.  The Wyoming Division of Criminal Investigation has

18   original jurisdiction in all drug crimes in the state of

19   Wyoming.  We have concurrent jurisdiction in all other crimes,

20   which means we can investigate other crimes, what we call

21   general crimes, everything from embezzlement to homicide, by

22   request of another agency.  That typically includes small,

23   smaller agencies that have major crimes.  Those agencies that

24   don't have the manpower, the resources to, uh, complete an

25   investigation into a general crime, they, they request our

1   assistance.

2   Q.  How long have you been with the Division of Criminal

3   Investigation?

4   A.  I am completing my seventh year as a full-time special

5   agent.

6   Q.  What did you do prior to your time as a special agent?

7   A.  Previous to my employment as a special agent I worked as a

8   deputy sheriff at the Campbell County Sheriff's Office.  That

9   also included a year as a task force officer in the Gillette

10  office of Wyoming DCI.

11  Q.  How long were you with the Campbell County SO?

12  A.  From 2003 to 2006.

13  Q.  What experience did you have prior to that time?

14  A.  Prior to that I had worked actually at the Campbell County

15  Sheriff's Office previous to that, years previous to that, as

16  a detention officer.  I also worked as a detention officer at

17  the Johnson County Sheriff's Office in Buffalo.  Prior to that

18  I was a sergeant in the Marine Corps, ironic as it sounds, in

19  military intelligence, I guess.

20  Q.  What, what did you do in military intelligence, if you

21  can --

22  A.  I began --

23  Q.  -- say?

24  A.  Pardon me?

25  Q.  If you can say.

1    A.  I began as a Morse code intercept operator actually,

2    became an analyst, and then I went on to some other work.

3    Q.  What's your total law enforcement experience?

4    A.  Approximately 12 years.

5    Q.  You mentioned the general crimes and the narcotics crimes

6    that DCI has some jurisdiction over.  Approximately what

7    percentage of each do you do each year?

8    A.  The vast majority of the cases I investigate are drug

9    crimes.  I would say over 95 percent.

10   Q.  How many drug cases does your office, just your office,

11   the office in Gillette, Wyoming, open on average each year?

12   A.  For the year of 2012 we, in the Gillette office, we opened

13   50 cases.

14   Q.  What are involved in those cases?  What are the things

15   that you do when you open a case?

16   A.  Depending upon the type of case, even upon the type of

17   narcotics case, there are various things that you do inside an

18   investigation, but they almost always include things such as

19   interviews, many times surveillance, many times controlled

20   purchases, things of this nature.

21   Q.  Through interviews do you learn about the, sort of the

22   world of drug trading in Gillette, Wyoming?

23   A.  Yes.

24   Q.  And over the course of your time at DCI have you become

25   familiar with the, the way that drug trafficking and

1  drug-trafficking organizations generally work in Gillette,

2  Wyoming?

3  A.  Generally, yes.

4  Q.  And when you used -- when you do recorded calls or

5  controlled buys, does that also contribute to your

6  understanding and knowledge of the drug world in Gillette,

7  Wyoming?

8  A.  Yes.

9  Q.  I want to talk to you a little bit about your specialized

10  training in narcotics trafficking.  How many hours of training

11  do you have?  And if you could, please, divide it into state

12  and federal training.

13  A.  Okay.  I have approximately 1500 hours of training, local,

14  state, and federal.  That includes the basic academy, both

15  detention officer basic and peace officer basic, federal

16  training, and I attended the 80-hour DEA basic course.  I

17  attended a 40-hour clandestine laboratory course with -- we

18  had to do 8-hour updates every year for that.  I've attended

19  survival Spanish courses or a course, pardon me.  I've

20  attended a confidential informant management course.  Some of

21  the local and state training I've attended include SWAT basic,

22  blood spatter analysis.  I've attended several conferences,

23  both homicide conferences and general law enforcement

24  conferences.  I've attended a leadership course for -- I'm

25  sorry, leadership courses.

 1   Q.  Agent McDonald, approximately how many, if you can give an

 2   approximate number, drug-related investigations have you been

 3   involved in with your time at DCI and, for that matter, in the

 4   sheriff's office?

 5   A.  Since October of 2005 -- pardon me -- September of 2005

 6   when I became a task force officer I personally have opened 80

 7   cases.  Now, approximately five of those have

 8   been -- have -- are completely nondrug.  The rest have

 9   all -- are all either delivery cases, interdiction cases, or

10   other types of narcotics cases.

11   Q.  Do those include conspiracy cases?

12   A.  They do.

13   Q.  Have you ever instructed other agents and law enforcement

14   officers in any area that pertains to narcotics?

15   A.  I have.

16   Q.  Please tell the jury about your experience as an

17   instructor.

18   A.  I have taught for the past three sessions anyway at the

19   DCI basic agent's course held -- we try to hold it every

20   summer.  The last couple times I've taught, uh, CI management

21   and surveillance as well as help with the undercover portions

22   of the course.  I also do most -- or I assist other cadre with

23   most of the practical exercises.

24   Q.  Any other presentations you've made to law enforcement

25   agents?

1   A.   Yes.  Um, I have done presentations on Title III wiretaps.

2   Q.   To whom did you give that presentation?

3   A.   To the South Dakota state drug investigators conference.

4   Q.   Just so the jury understands, what's the difference

5   between the wires that they have heard about during the course

6   of their time here in the courtroom and a Title III wire

7   investigation, just briefly?

8   A.   I think previous to the -- the references to a wire

9   previous in previous testimony is a colloquial term we use for

10  a body.  It's a concealed transmitter and recorder.  It's a

11  radio.  It not only transmits out, but it's got an in,

12  in-house recorder as well.  That's what we call a wire or a

13  body wire.

14          When I mention a Title III wiretap, it is a

15  completely different animal.  That involves listening to other

16  people's phones after a lengthy process of going through the

17  court system and getting all those things approved.  So not

18  really the same thing.

19  Q.   Thank you.  Now, during these, these multiple, well,

20  numerous cases I guess -- you said you've opened approximately

21  85 that have -- or 80 that have had to do with narcotics?

22  A.   Well, I've -- those are just the cases that I'm the case

23  agent on, but I've been on hundreds more.

24  Q.   Well, let me ask you about that.  You've done 80 that you

25  have personally opened?

1   A.  Correct.

2   Q.  But there are others that you have worked?

3   A.  Absolutely.

4   Q.  Please describe that to the jury.

5   A.  Well, since 2005 approximately 320 cases have been opened

6   in Campbell, Crook, and Weston County.  That's my area at the

7   Northeast Enforcement Team.  I certainly have not been

8   involved in every single one of those, and not every one of

9   those have been narcotics, but I've been involved in the vast

10  majority of them.  In addition to that, in the same time

11  period there's been over 500 cases opened in the northeast

12  enforcement area, which not only includes Campbell, Weston,

13  and Crook but also Johnson and Sheridan County.  I work less

14  frequently in Johnson and Sheridan Counties, but I have spent

15  many, many days working conspiracy cases.  I've worked

16  undercover extensively in Johnson and Sheridan Counties.  I've

17  worked Title III wiretaps out of Johnson -- or out of Sheridan

18  County.  In addition to that, I have also been on several

19  cases outside the Northeast Enforcement Team helping the

20  Southeast Enforcement Team, the Southwest Enforcement Team,

21  the Central Enforcement Team, and the Northwest Enforcement

22  Team.

23  Q.  During those cases are you frequently called upon to

24  interview witnesses?

25  A.  Frequently, yes.

1   Q.  What kind of witnesses?

2   A.  The witnesses really run the spectrum.  Everyone from a

3   mere eyewitness to an event, I guess what I would call a

4   standard person that just happens to be in, be in the area, to

5   suspects to cooperators to arrestees.  Almost anyone we

6   contact in the course of our job is subject -- any time we

7   talk to someone, pardon me, is really an interview.

8   Q.  Approximately how many interviews have you done during

9   your time with just DCI?

10  A.  Sir, I'm, I'm sorry, but I don't know that I can put a

11  number on it.  But what I can tell you is this.  In 2012 I

12  opened 13 cases.  In this case alone there were 30 interviews

13  done, 25, approximately 25 of which I was involved with.

14  Cases range.  They can be more than 30.  I've done cases that

15  were significantly more than 30.  I've done cases where

16  there's two interviews.  But it just -- it's a really critical

17  portion of -- or it's a really common portion of our job.

18  Q.  I want to talk to you about some of the different methods

19  that you have employed in your investigations.  What are they,

20  just briefly?

21  A.  There are several methods of narcotics investigation.

22  They can go from, uh, what we call interdiction where, say,

23  someone is stopped with a -- a vehicle stop is made, there's

24  drugs discovered in the vehicle, those -- the people that

25  stopped may call us to further investigate the crime.

1          We can use confidential informants to make controlled

2     purchases, similar to what has been described earlier.

3          We do -- we try to but it's very difficult to

4     actually do undercover operations where we send an officer

5     undercover to work.

6     Q.   Why is that very difficult?

7     A.   In -- although Gillette is one of the larger cities in

8     Wyoming, it's a -- it's still a small town, and the groups or

9     the, the -- I, I don't want to call them cells, but the small

10    groups of people that distribute methamphetamine to each other

11    and to others are very tight knit and secretive.  I personally

12    have a hard time going, no matter what I look like, can go in

13    and infiltrate that group.  It's very difficult.  Pardon me.

14    Q.   So because that's difficult for an agent like you to do,

15    is it -- how difficult is it for a new agent to come on board

16    and try to be an undercover?

17    A.   Well, we actually try to use newer agents because --

18    especially if we get them from another area, if they're not as

19    well known, not as well known in our jurisdiction.  However,

20    if say a task force officer comes on from the sheriff's office

21    that was a very active officer on the street, if that officer

22    knows a lot of people, then a lot of people know that officer.

23    And if we put him in undercover, at least in Gillette, without

24    being very careful, you are putting him in -- him or her in a

25    huge amount of danger.

1  Q.  Now, you mentioned cooperating witnesses.  Just, just

2  describe how you handle cooperating witnesses.

3  A.  Well, I have to say cooperating witnesses are as common as

4  interviews are in our business.  Cooperating witnesses are

5  that important.

6  Q.  Why?

7  A.  Because we, we are unable to unearth the or expose the

8  rest of a organization or a group without people that know

9  about that group.  We can -- I can certainly ask someone on

10 the street if they know anyone that sells methamphetamine, but

11 typically unless the person is inside that group or has

12 contacts in that group they cannot help me.

13 Q.  How willing, generally -- and you give this example of

14 approaching someone on the street.  If you approached someone

15 you knew to be a drug distributor on the street and asked them

16 to talk to you, what are the chances they would talk to you?

17 A.  Fairly slight.

18 Q.  How is it that you get these individuals to cooperate?

19 A.  Well, many times we, we -- well, several, several

20 different ways.  We monitor local indices in order to see

21 who's been arrested.  We know a lot of the players.  We

22 certainly don't know every player in the Gillette, Wyoming,

23 area.  We know a lot of them.  When we see someone has been

24 arrested, we try to take that opportunity to go speak with

25 them.  If we know that they've -- if we get intelligence on

1    somebody from another source and we can't do anything else

2    with it, we'll go what we call cold shot somebody.  We will go

3    approach them and talk to them.  It rarely works, but

4    sometimes it does.  More importantly, in many times the first

5    thing we do in our cases after we make an arrest is, dependent

6    upon the situation, we see if one of the suspects, one or more

7    suspects would be willing to cooperate.

8    Q.  Do you -- when you approach a person who has been arrested

9    or who you know is in trouble and has some pressure on, on him

10   or herself and you talk to them and they speak with you about

11   what they've done and who they've sold to, do you believe them

12   just on their word?

13   A.  No.

14   Q.  When you instruct agents in the new agent DCI school that

15   you were discussing, what do you advise those agents about

16   dealing with cooperating witnesses?

17   A.  I usually advise agents, whether in that school or the

18   people I supervise or even the people -- my peers, the

19   information is only as good as what you can corroborate, and

20   that's through several avenues.

21   Q.  How do you corroborate information that's provided to you

22   by cooperating witnesses?

23   A.  Information provided by corroborating

24   witnesses -- cooperating witnesses can be corroborated

25   by -- in several manners.  Via surveillance, and like if, if a

1    certain cooperator says this person always -- Person X always

2    travels to this area to pick up dope, is what -- we refer to

3    it as dope, if we have good information on vehicle description

4    and area, we will go try to do surveillance to corroborate

5    that.

6         Via phone numbers, if we can get phone numbers of

7    suspects, we can run it through indices.  We can check with

8    other sources if that's their phone number.

9         Can we, uh -- I said physical surveillance.  A great

10   way to do it is through other interviews, other information

11   from other sources.  You can't, obviously, can't take any of

12   it wholeheartedly, but piece it together, and you can get a

13   broader idea, broader portion of the picture.

14   Q.  Do controlled buys help you corroborate information?

15   A.  Certainly.

16   Q.  And is it common to -- when you're corroborating

17   information, are you simply going into the future to look for

18   future information?

19   A.  No.  No, not at all.  Um, when you, when you speak with a,

20   an interviewee or a person being interviewed, you try to get

21   all the information that you can from them.  They may not want

22   to talk to you again.  You may not see them again.  So a lot

23   of times we think that this may be our one shot, so we try to

24   get information that may give us information about ongoing

25   cases, about cases that could be, and then also cases that we

1    already have to confirm or deny information we have on old

2    cases.

3    Q.  Have you received any awards or letters of recognition for

4    your work with DCI?

5    A.  Yes.

6    Q.  Have you testified -- well, briefly describe those.

7    A.  I was, uh, given three awards from the U.S. Attorney's

8    Office in casework I've done.  Well, two were drug cases, and

9    one was actually a, a general case.  I've had several letters

10   of recognition.  And, and I think I got some awards at the

11   basic academy as well.

12   Q.  Has the, has the -- you mentioned the U.S. Attorney's

13   Office.  Have you received any recognition from your state

14   superiors?

15   A.  Yes, I've gotten I think letters of commendation.

16   Q.  You think?

17   A.  I have, yes.

18   Q.  Previous testimony pertaining to narcotics trafficking.

19   Have you testified in state court about narcotics trafficking?

20   A.  I have.

21   Q.  How often?

22   A.  Oh, several times.  It kind of goes in cycles.  If you

23   make a batch of arrests, then you're going to end up in court.

24   For -- in state court you have to go to what's called a

25   preliminary hearing, so you go to several hearings.  But it

 1  kind of goes in cycles, but I would say maybe, maybe 10 times

 2  a year.

 3  Q.  Have you testified in any federal courts about narcotics

 4  trafficking?

 5  A.  I have.

 6  Q.  What kind of testimony have you provided in federal

 7  courts?

 8  A.  I've provided testimony on interviews.  I've provided

 9  testimony on my casework inside of a case.

10  Q.  Have you testified to grand juries?

11  A.  I have.

12  Q.  Have you testified before magistrate judges?

13  A.  Yes.

14  Q.  For a prelim or something of that nature?

15  A.  Yes, I have.

16  Q.  Have you testified at a jury trial in federal court?

17  A.  I have.

18  Q.  Have you been previously offered and accepted as an expert

19  in the area of narcotics trafficking?

20  A.  Yes.

21  Q.  When was that?

22  A.  Oh, I don't know the date, sir, but I could tell you the

23  case.  Um --

24  Q.  Just approximately, how long ago?

25  A.  I believe it was 2011.

1    Q.  2011.

2            MR. HEALY:  Your Honor, the Government offers Special

3    Agent McDonald pursuant to, coincidentally, U.S. v McDonald,

4    933 F.2d at 1519, and pursuant to Rule 702 as an expert in the

5    area of narcotics trafficking and investigation.

6            MR. JUBIN:  I'd like to approach, Your Honor.

7            THE COURT:  You may.

8            Ladies and gentlemen, during these times feel free to

9    stand and stretch and talk amongst yourselves and just relax a

10    little bit.

11       (At side bar.)

12            MR. JUBIN:  It's clear to me that Agent McDonald may

13    have some expertise with respect to general, the general

14    notion of narcotics trafficking.  My concern here is again --

15            THE REPORTER:  I'm sorry.  I'm sorry.  I couldn't

16    hear you.

17            MR. JUBIN:  Oh, okay.  It seems to me that there has

18    been considerable foundation laid with respect to Agent

19    McDonald's expertise concerning general matters of drug

20    trafficking.  The concern that I raised earlier remains, and

21    that is if he's going to start talking about the use of

22    firearms or guns in the course of drug trafficking that, I

23    think, is something that's not beyond the ken of the average

24    layperson and would not appropriately be the subject of

25    expertise.

1        MR. HEALY:  Your Honor, as I mentioned before, and

2   we've had a lot of discussions about this on the record, but

3   as I mentioned before, we don't intend -- the Government does

4   not intend to inquire to Special Agent McDonald about his

5   opinion on whether guns found in Mr. Molina and Miss Garcia's

6   home were possessed in furtherance.  I am going to ask him,

7   though, during the course of his investigations into drug

8   trafficking if he has recovered firearms and the frequency of

9   that, and that's the extent of the questions I'll ask him

10  about that subject.

11       THE COURT:  Sounds to me like it's a foundational

12  question.  I'll overrule the objection if there is one.

13       (End of side bar.)

14       THE COURT:  Members of the jury, the last question

15  that was pending here before they approached was to qualify

16  this witness in the area through his experience and training

17  in drug enforcement investigations and drug trafficking.  I am

18  going to allow him to express opinions.

19       Persons who, by virtue of training, education, and

20  experience in some art, science, field of endeavor, who may

21  shed light on a subject that will assist a jury which is not

22  familiar in those areas may express opinions pertaining to the

23  case.  You do not surrender your obligation to judge the

24  credibility of the witness and to ascribe such weight to it as

25  you think it deserves.  You certainly may consider the

 1    testimony about experience, training, et cetera, as well as

 2    the opinions themselves and the basis for the opinion in

 3    arriving at your own conclusion as to the weight and

 4    credibility that you ascribe to the opinion of this witness.

 5            Mr. Healy, you may proceed.

 6            MR. HEALY:  Thank you, Your Honor.

 7    Q.  (BY MR. HEALY)  Agent McDonald, you have -- in the course

 8    of your investigations are you only investigating large

 9    drug-trafficking organizations?

10    A.  No.

11    Q.  What other kind of narcotics investigations are you doing?

12    A.  I mentioned it just briefly, but we do many different

13    types of drug investigations.  I do -- we sometimes do one or

14    two to three controlled purchases and make an arrest with only

15    one or sometimes two suspects.  We do, like I mentioned,

16    interdiction stops.  Sometimes large amounts of narcotics are

17    stopped on the interstate with one or two persons.  We try to

18    follow that up.  We do, we do cases similar to when drugs are

19    taken into a detention facility.  I've done those.  I

20    also -- I've done cases where someone has been -- has died as

21    a result of drug use and then investigated that.

22            So narcotics is a, is a broad field, and you get

23    exposed to a lot of different types of investigative

24    techniques.

25    Q.  Have you in the course of investigating narcotics crimes

1   discovered firearms?

2   A.   Yes.

3   Q.   How frequently is that?

4   A.   It's not uncommon, but it's certainly not every time.

5   Q.   Thank you.  Drug-trafficking organizations, we

6   talked -- you talked a little bit about that in your, your

7   brief remarks earlier.  I want to sort of zero in on that

8   subject.

9            In your training and experience, have you learned

10  about how larger amounts of controlled substances are brought

11  into the Gillette area?

12  A.   Yes.

13  Q.   Please describe that to the jury.

14  A.   I have to add a little bit of background detail.  Is

15  that --

16  Q.   Please do.

17  A.   Methamphetamine in Gillette, Wyoming, is one of the -- the

18  price for methamphetamine is one of the highest, one of the

19  highest in the state, if not the highest.

20  Q.   Why?

21  A.   Well, several reasons.  It's the distance from a source

22  city, but also there's a lot of -- and there's -- the reasons

23  are varied and many, but there's a lot of skilled labor

24  positions, a lot of young people with disposable income.  I am

25  personally -- I've lived my entire life, minus being in the

1   Marine Corps, in, in and around Gillette, and it's always been

2   that way.  It's not a lot of -- people may or may have never

3   considered it a kind of a drug haven.

4   Q.  Have -- go ahead.

5   A.  So, for example, a gram of methamphetamine in Gillette,

6   Wyoming, is $200.  A gram of methamphetamine 140 miles away in

7   Casper runs between 125 and $150.  An ounce of methamphetamine

8   in northern Colorado between Denver and Greeley can run

9   between 1,000 and $1200.  But if you can buy an ounce of

10  methamphetamine in Gillette, it's typically between twenty --

11  well, the best price I've ever got on an ounce in Gillette is

12  2,000, but it's typically twenty-four to $2800.

13  Q.  So --

14  A.  Most -- I'm sorry.

15  Q.  -- there's considerable money to be made?

16  A.  Yes.

17  Q.  You mentioned grams and ounces.

18  A.  Mm-hmm.

19  Q.  Will you describe for the jury the quantities that you

20  usually see sold in Gillette, Wyoming, or any other area that

21  you've --

22  A.  Sure.

23  Q.  -- done your investigations in, and any street slang that

24  may be associated with those quantities?

25  A.  Sure.  I've seen -- seized, purchased, and purchased

1  undercover everywhere between a quarter gram, which is $50, to

2  a half a gram for a hundred, a gram for two.  Occasionally you

3  can get what they call two for three.  That's 2 grams for

4  $300.  There's also an amount called a teener, which is in

5  between a gram and what we call an eightball.  A teener is

6  about one and three-quarters grams, typically around 300 bucks

7  or more now.  Now, the -- between a gram and the other common

8  amount we see is usually an eightball of methamphetamine.

9  It's supposed to be 3 and a half grams of meth.  It's

10  one-eighth ounce of methamphetamine, methamphetamine.  Eight

11  eighths in an ounce, an eightball, that's where we come up

12  with that.  An eightball, since about -- it was, previous to

13  2010, about $400.  Since May or so of 2010 it's between --

14  well, I guess I've purchased it for 400, but it's typically

15  450 to 550.  So that's kind of the -- an eightball -- if

16  there's someone that distributes methamphetamine on a very low

17  level or on a lower level, if a person can purchase an

18  eightball of methamphetamine for $500 and they're an addict

19  and they need to use a portion of it, they can sell off 2 and

20  a half or 3 grams of that methamphetamine for $600, use the

21  remainder, and still pay for the next eightball.

22  Q.  So what is the most profitable way to, to sell

23  methamphetamine?  Is it, is it to sell it in larger quantities

24  or in smaller quantities?

25  A.  The most profitable way is to sell it in smaller

1  quantities.

2  Q.  Is it more dangerous to the seller to sell it in smaller

3  quantities?

4  A.  It is.

5  Q.  Why?

6  A.  You just expose yourself to so many more people.  If you

7  can -- you'll take a cut in profit if you sell ounces or half

8  ounces.  You drop the price to your distributors or to your

9  other associates, you don't make as much money, but you also

10 don't know everybody that they know.  Because when they get

11 that eightball and sell it to their three friends, who sell it

12 to their three friends, who sell it to their three friends,

13 you just expose yourself to so many more, more people, and

14 the, the -- I just lost my train of thought -- the opportunity

15 to be discovered by law enforcement is that much greater.

16 Q.  You mentioned source cities.  Is Gillette -- you've talked

17 about all this methamphetamine that is sold there and the way

18 people sell it.  Is Gillette a source city?

19 A.  For smaller communities it actually is on some occasions a

20 source city sometimes for Moorcroft, Wyoming, and sometimes

21 for Newcastle, but typically it's not a source city.

22 Q.  When you say source city in the more formal sense, for

23 lack of a better word, what kind of places are you talking

24 about?

25 A.  Well, for our area our source cities are, are typically

1   Denver, the Denver, northern Colorado area.  We also get some

2   from Salt Lake City.  I would mention Casper.  We do get a lot

3   of methamphetamine from Casper.  That's, of course, from

4   somewhere else.  We also at times get quite a bit of

5   methamphetamine from the Tri-Cities area of Washington state.

6   Q.   In your training and experience, have you had an

7   opportunity personally and through your training to learn how

8   methamphetamine is transported to Gillette?

9   A.   Yes.

10  Q.   How?

11  A.   I have personally seen it transported numerous ways,

12  everywhere from behind a car stereo, in a cubby in a car, in

13  someone's coat pocket hanging in the back of their car.  I've

14  seen backpacks.  We get a lot of stash cans.  What that means

15  is you have like a -- it looks like a Pringle's can -- in the

16  back of your car, but it's got a false bottom.  Take the false

17  bottom off; methamphetamine is secreted inside.  I've worked a

18  case where two individuals had a air, air nail or air, air

19  nailer, for lack of a better term, like a roofing gun.  The

20  back was taken off; the guts were taken out; there were

21  2 ounces of methamphetamine placed inside; put back together;

22  put in the back of a car.  People use like bottle jacks,

23  20 -- or I don't know, different tonnage of bottle jacks or

24  car jacks in the same manner.  You take the top off, pull the

25  innards out of it.  You can place methamphetamine inside of

 1  that, screw it down, and to -- if you just glance at it, you

 2  wouldn't know the difference.

 3  Q.  Was -- during your investigation in this particular case

 4  of these defendants, Miss Garcia and Mr. Molina, did the issue

 5  of bottle jacks come up?

 6  A.  It did.

 7            MR. HEALY:  Your Honor, may I approach the witness?

 8            THE COURT:  Yes, you may.

 9  Q.  (BY MR. HEALY)  I'm approaching you with what's been

10  marked as Government's Exhibit 53.  Have you seen that

11  photograph before?

12  A.  Yes.

13  Q.  Did you use it in this investigation?

14  A.  Yes.

15  Q.  Is this a photograph taken of any evidence collected in

16  this investigation?

17  A.  No, sir.

18  Q.  How did you use this photograph in this investigation?

19  A.  I used it during a proffer interview.

20  Q.  Is what's in this photograph something that would help you

21  explain the way that methamphetamine is hidden within bottle

22  jacks?

23  A.  It's basically a, a panel diagram or photograph, series of

24  photographs of a jack, car jack, bottle jack, in different

25  stages of, uh, disassembly.  When I showed this to the

 1   individual --

 2           MR. HEALY:  Your Honor, the Government offers

 3   Government's Exhibit 53 as a demonstrative exhibit and asks to

 4   publish to the jury.

 5           MR. JUBIN:  With an appropriate limiting instruction,

 6   no objection.

 7           THE COURT:  Ladies and gentlemen, this exhibit is

 8   offered as a demonstrative, I assume, to demonstrate to the

 9   jury how a bottle jack might be used to conceal something.

10           MR. HEALY:  That's correct, Your Honor.

11           THE COURT:  It will not be going back to the jury

12   room with you when you go to deliberate.

13       (Government's Exhibit 53 (Demonstrative)

14       received.)

15   Q.  (BY MR. HEALY)  Agent McDonald, just to be clear, this is

16   not an item of evidence that was seized in this case?

17   A.  Absolutely not.

18   Q.  Describe, if you will for the jury, and you can use -- it

19   becomes a little bit awkward sometimes, but you can use the,

20   the screen in front of you to touch, and it will -- it should

21   put an arrow there or a dot or something like that.  But

22   describe how bottle jacks were used in your investigation in

23   this case.

24   A.  The information I've received is they were used in exactly

25   this manner.  I have not actually test -- I haven't taken a

1  bottle jack apart, but according to the information I have,

2  this is exactly how they were used.

3        Of course, in the first photograph you see a bottle

4  jack fully assembled.

5  Q.  You can circle that, too, Agent McDonald.

6  A.  Okay.  (Indicating).

7        In the second one (indicating) you see the top of the

8  jack with the portion that would actually touch the frame of

9  the vehicle or whatever you're jacking up has been loosened

10 and taken off exposing the, the inner ram and the outer casing

11 of the, of the jack.

12       In number three you see that the outer portion

13 (indicating) has been taken away from the inner, call it the

14 threaded portion of the, of the jack.

15       And then in the last photograph you can see from a

16 top view the cavity (indicating) exposed in the thread

17 portion.  The, supposedly, the methamphetamine would be fitted

18 into this portion, and then the jack would be reassembled.

19       MR. HEALY:  Your Honor, I'd ask the clerk to please

20 print the exhibit that is on the screen so that we have this

21 for the record since it's been marked.

22       THE COURT:  You're asking a lot.

23       MR. HEALY:  I think it's been done.

24       COURTROOM DEPUTY:  I've got to follow my instructions

25 here.  One moment, Counsel.

1          MR. HEALY:  Your Honor, I don't know if the Court

2    wanted to take an afternoon break now, but this is a -- this

3    makes -- in terms of this testimony, it's a good breaking

4    point.

5          THE COURT:  Let's stand in recess for 15 minutes,

6    ladies and gentlemen.

7      (Proceedings recessed 2:56 p.m. to 3:20 p.m.)

8          THE COURT:  Thank you.  Please be seated.

9          Mr. Healy.

10         MR. HEALY:  Your Honor, again, solely for purposes of

11   the record, the Government offers Government's Exhibit 53a,

12   which is the demonstrative exhibit that has been marked by

13   Special Agent McDonald.

14         THE COURT:  It is, it is received.

15     (Government's Exhibit 53a (Demonstrative)

16       received.)

17   Q.  (BY MR. HEALY)  Agent McDonald, I want to move into more

18   specifics about this investigation, the investigation of

19   Mr. Molina and Miss Garcia.  How did you become involved in

20   this investigation?

21   A.  Well, I initially became involved in the investigation in

22   late 2010 when we received --

23   Q.  I don't want you to talk about information you received.

24   I just wanted to know when you began.

25            Were you present during the controlled purchase of

1   methamphetamine from Miss Garcia?

2   A.  Yes.

3   Q.  Tell the jury about your role during that particular part

4   of the investigation.

5   A.  During that controlled purchase I was just acting as a

6   surveillance, uh, officer.  I was riding with Special Agent

7   Hipsag.  While he was responsible for the informant, I was

8   trying to take notes, listen to the wire, watch the, the

9   surrounding area.

10  Q.  You heard Special Agent Hipsag, or Deputy Hipsag now,

11  testify that the vehicle that you were driving was parked

12  across the street from the Garcia Molina home?

13  A.  Yes.  It's actually on almost kind of a cul-de-sac, so we

14  were across the cul-de-sac.

15  Q.  I'm putting on the overhead in front of you Government's

16  Exhibit 25 that has previously been admitted.  Do you

17  recognize that building?

18  A.  Yes.

19  Q.  What is it?

20  A.  It is the Garcia Molina residence, 2790 Whitetail, A.

21  Q.  And their residence is on the left-hand side of that

22  building?

23  A.  As I look at it, yes.

24  Q.  Is that the residence you went to on March 23rd, 2011?

25  A.  Yes.

1   Q.  What did you observe at that residence, and what did you

2   hear?

3   A.  Well, when we arrived following the informant, I believe

4   we got there around 6:15 p.m. approximately, the informant

5   went inside.  Maybe 45 minutes later a dark-colored SUV

6   arrives, pulls into -- I believe pulled into the garage.  Two

7   people got out.

8   Q.  Did you recognize those people?

9   A.  I did.

10  Q.  Who were they?

11  A.  Mr. Molina and Miss Garcia.

12  Q.  Do you recognize Mr. Molina and Miss Garcia in the

13  courtroom today?

14  A.  I do.

15  Q.  Would you point them out, please?

16  A.  Mr. Molina is sitting to the left of Mr. Jubin in a green

17  buttoned shirt.  Mrs. -- Miss Garcia is sitting to the right

18  of Mr. Fleener in a pink shirt with glasses on her head.

19  Q.  Are these the same two people who exited the dark-colored

20  SUV on March 23rd, 2011 when you were watching their home?

21  A.  Yes.

22  Q.  What happened?

23  A.  Well, they went in -- they went inside.  Shortly

24  thereafter, Mr. Molina and another gentleman identified as

25  Shane Draper came outside, appeared to be working on a, on a

1   vehicle there.  We tried to listen to the wire.  You could

2   hear a lot of talking, clattering, off and on.  Go to -- at

3   one point it got -- the, the transmission cleared up.  It was,

4   if I remember, it was very quiet.  I remember --

5   Q.  Now, let me just back up a little bit.  You said that you

6   heard various voices.  What kind of voices were you hearing?

7   A.  When they first went in, it was sort of a jumble of

8   voices, you know, a female voice, uh, heard the informant

9   speaking with Miss Garcia.  Then it just turned into the CI

10  and Miss Garcia speaking after, after a few minutes.

11  Q.  You've talked about your investigations, and you heard

12  Deputy Hipsag testify.  Is it common or uncommon for wires to

13  be a little jumbled?

14  A.  It's fairly common.

15  Q.  Why is that?

16  A.  It's a combination of things, both the technology and just

17  the situation.  You know, it's a very small transmitter with a

18  very small antenna.  Well, even if it's long, if you crimp

19  that antenna or bend it, wad it up, it doesn't transmit as

20  well, but if you elongate it, it's easier to detect on a

21  person.  So it's kind of a -- you have to kind of mitigate

22  that as best you can.  Couple that with if it's put in a

23  jacket, especially if it's like a nylon jacket, the ruffling

24  is very loud.  The microphone is typically at least

25  almost -- if not fully, but at least partially covered.  So

1   there's a lot of different circumstances that kind of affect

2   not only the transmission but the quality.

3   Q.  You testified that several minutes after Miss Molina or,

4   excuse me, Miss Garcia and Mr. Molina entered the home and

5   Mr. Molina left, it became a little quieter.

6   A.  Correct.

7   Q.  Were you able to review Government's Exhibit 4b, which was

8   previously marked and offered through Agent Hipsag as the

9   recording of the wire, the controlled buy?

10  A.  Yes.

11  Q.  Have you reviewed it several times?

12  A.  I have.

13       MR. HEALY:  May I approach the witness, Your Honor?

14       THE COURT:  Yes, you may.

15  Q.  (BY MR. HEALY)  I'm approaching you or giving you what's

16  been marked as Government's Exhibit 4a.  Do you recognize that

17  document?

18  A.  Yes.

19  Q.  Are your initials in the right-hand corner of each page of

20  this document?

21  A.  Yes.

22  Q.  How did -- did you help prepare this document?

23  A.  I did.

24  Q.  How did you help prepare it?

25  A.  Just reviewing the, the audio, uh, multiple times trying

1   to transcribe it.

2   Q.  Did you prepare this in conjunction with a paralegal from

3   the United States Attorney's Office?

4   A.  Yes.

5   Q.  Would you please indicate when in terms of -- there are,

6   there are numbers on this document in the left-hand margin; is

7   that correct?

8   A.  Yes.

9   Q.  What do those numbers indicate?

10  A.  Pardon me.  That's the time elapsed on the, on the body

11  wire.  Like 15:22 is military time.  It's actually the wire

12  has been running for 15 minutes 22 seconds at that point.  So

13  at say 1:01:49 that's one hour, one minute, and 49 seconds.

14  Q.  Approximately when does the part of the recording start

15  that -- where you discuss how things got quieter and, and

16  Miss Garcia and the CI were alone?

17  A.  It starts around the 1:02 mark, but it actually quiets

18  down a little more about 1:07, 1:07:30.

19  Q.  So the transcript you prepared here starts at 00?

20  A.  Correct.

21  Q.  And when does it end?

22  A.  1:28:47.

23          MR. HEALY:  Your Honor, the Government offers

24  Government's Exhibit 4a as a tool to help the jury as it

25  listens to the actual recording of this wired buy.

1          THE COURT:  Let me give the jury an instruction.  You

2     will be hearing a sound recording of a portion of certain

3     conversations that are attributed to a confidential informant

4     and Ms. Garcia.  The conversations were legally recorded.

5     They are a proper form of evidence and may be considered by

6     you as you would any other evidence.

7          You are also and are given now copies of a transcript

8     prepared by Special Agent McDonald, with the assistance of a

9     paralegal, of the recorded conversations.  Keep in mind that

10    the transcripts themselves are not evidence.  They were given

11    to you and will be given to you only as a guide to help you

12    follow what is being said.  The recordings themselves are the

13    evidence.  If you notice any difference between what you hear

14    on the recordings and what you read in the transcripts, you

15    must rely on what you have heard, not on what you read.  If

16    you cannot hear or understand certain parts of the recording,

17    you must ignore the transcript as far as those parts are

18    concerned.  So it's the recording that is the evidence in this

19    matter.

20          MR. FLEENER:  Judge, may we approach?

21          THE COURT:  Yes.

22      (At side bar.)

23          MR. FLEENER:  I object to the transcripts being given

24    to the jury at this time.  I think, first, there needs to be a

25    showing that that particular portion of the transcript is

1   inaudible, and then, second, there needs to be some sort of

2   determination of authenticity and reliability at least of the

3   transcripts.  All we have now is the agent saying I listened

4   and wrote the thing down and this is what I believe it says,

5   which I don't think is proper at this point to hand to the

6   jury.

7           MR. JUBIN:  I'd join the objection.

8           THE COURT:  All right.  Any response?

9           MR. HEALY:  My response, Your Honor, is that there

10  is -- and I have a couple of -- may I grab a couple of cases

11  real quick, Your Honor?

12          THE COURT:  Sure.

13      (End of side bar.)

14          THE COURT:  Again, feel free to stand, stretch,

15  relax.

16      (At side bar.)

17          MR. HEALY:  Your Honor, I have a couple of cases

18  here, one that I know that Mr. Fleener is familiar with.  This

19  is United States v Watson, 594 F.2d 1330.  And at -- it's a

20  Tenth Circuit case, 1979.  At 1335 and 1336 the Tenth Circuit

21  discusses the use of a transcript and advises that the trial

22  court did not, um -- excuse me here.  I had this.  The

23  appellant argued that it was prejudicial error to provide the

24  jury with transcripts of the tapes during the playing of the

25  tapes.  The trial judge, however, did not admit the

1    transcription in evidence.  Instead he gave a limiting

2    instruction -- which the Court just did -- which he repeated

3    several times during the trial, instructing the jury to use

4    the transcript only to assist them in listening to the tapes

5    and not to consider the transcript as evidence.  This is the

6    only transcript we have for the trial, Your Honor.  So this

7    was left in the sound discretion of the court.  That case, the

8    Watson case is a case where parts of the tape were

9    unintelligible, like this case.  But there's another case,

10   U.S. v Mayes, and this case is at 917 F.2d 457.  It's also a

11   Tenth Circuit case from 1990.  And this --

12           MR. FLEENER:  What?  I'm sorry.  917 F.2d --

13           MR. HEALY:  917 F.2d.  In this case the appellant

14   argued the transcripts were unnecessary because the recordings

15   were clear.  So in the first case we had the recordings, parts

16   of it unintelligible.  This one they were clear; the jury did

17   not need the transcripts to assist them.  However, because the

18   court gave a proper limiting instruction, the Tenth Circuit

19   said it was perfectly fine to use the transcripts.  There was

20   also an argument that they were inaccurate, and the Tenth

21   Circuit said, well, that's an issue for the jury to decide.

22   Thank you.

23           MR. FLEENER:  I'd simply point out, and just so the

24   record is clear, I told -- I didn't hide the ball.  I let

25   Mr. Healy know and I let the Court's clerk know that this

1     issue was coming up.  One difference -- a couple differences

2     in the Watson case that I think are relevant here is that,

3     first, while Mr. Healy is correct that the, the court allowed

4     the playing of the -- or the transcript be played along with

5     the tape and gave a limiting instruction, there was also proof

6     of accuracy of the transcripts at a pretrial hearing, and the

7     court permitted their use during the playing of the tapes to

8     permit identification of the voices.  Here it appears what's

9     going to happen -- there wasn't any, any sort of hearing to

10    determine whether these transcripts were, were accurate.  And,

11    second, it appears that the transcript's going to be used not

12    simply to identify voices but actually to instruct the jury as

13    to what's being said.  So we'd still object and think that

14    unless the transcripts have been shown to be accurate

15    that -- and that the tape is shown to be inaudible that the

16    transcripts shouldn't be shown to the jury at this time.

17              THE COURT:  All right.  I think the limiting

18    instruction that the Court has just given covers that whole

19    area.

20              MR. FLEENER:  Thank you, Judge.

21         (End of side bar.)

22              MR. HEALY:  Your Honor, I have six copies to hand out

23    to the jury, if I may approach them.  And then it may be

24    helpful, too, if some of the jurors want to look at the

25    screen, I'll try to put the transcript on the Wolf as the

1    recording is played.  We intend to start the recording at

2    approximately 1:02:35, which would -- it appears, Your Honor,

3    that I can't use the Wolf at the same time it's playing.  So I

4    will just hand out the copies.  As I was saying, we will begin

5    the audio at approximately 1:02:35, which is the second page

6    of the transcript.  We'll play it for approximately

7    15 minutes.  And there are other portions of the transcript

8    that are here, and in addition the audio has been made

9    available to defense counsel, and they can play whatever

10   portions they think may be necessary.

11          Thank you.  May I approach the jury?

12          THE COURT:  You may.

13          MR. HEALY:  You now have seven copies, so I think

14   that one person will get his or her own and the rest will have

15   to share.

16          So, Your Honor, I'll ask the paralegal if she could

17   start this, which again is on the second page of the

18   transcript, at approximately 1:02:35.

19       (Audio recording played.)

20   Q.  (BY MR. HEALY)  Agent McDonald, I want to ask you a couple

21   of follow-up questions about what the jury just heard there

22   based on your experience in this area.  First of all,

23   are -- did you at any time become familiar with Jackie

24   Garcia's voice?

25   A.  Not previous to this.

1   Q.  Did you subsequent to it?

2   A.  Yes.

3   Q.  How did that happen?

4   A.  Pardon me.  I had a brief conversation with her.

5   Q.  The voice that you hear on this wire, does

6   it -- besides -- does it sound to you like the voice of Jackie

7   Garcia?

8   A.  Yes.

9   Q.  How is it that you have determined that?

10  A.  Just by comparison to the voice that I, that I heard her

11  using when we spoke.

12  Q.  When she went into the home on March 23rd, 2011, into her

13  home, did you recognize Miss Garcia as Miss Garcia at that

14  time?

15  A.  I did, but it was from a picture.

16  Q.  There is a discussion at around 1:07:38 about -- where

17  Miss Garcia is saying:  "Your going to give me this for doing

18  this favor for you, cause I gotta get another gram out of here

19  for someone else...You are about 2 to [sic] 3 points off."

20          Have you -- are you familiar with this term,

21  "points"?

22  A.  Yes.

23  Q.  What is this -- what does that mean?

24  A.  Well, you hear the term "points" a lot in, in this job

25  field.  It can mean several things, but in this case it's

1   like, uh, tenths.  Like if it's 1.8, the point is the 8.

2   Q.  At 1:08:42 there is a discussion about, "500 right?  For

3   an 8ball," and Miss Garcia answering in the affirmative.

4          You testified earlier about this, I believe, but how

5   much does an eightball typically go for in Gillette, Wyoming?

6   A.  About 500.  It can be 450 to 550.

7   Q.  All right.  At 1:09:28 Miss Garcia says:  "This is going

8   to be the same, about a quarter."

9          You've discussed points, and you've discussed

10  quarter grams, and you've discussed amounts.  What does that

11  mean to you?

12  A.  Well, that means to me, when they say it's about a

13  quarter, take it about a quarter gram or .25 grams.

14  Q.  When this deal was set up, what was the $400 supposed to

15  purchase?

16  A.  2 grams at 200 apiece.

17  Q.  So is this discussion a discussion about how much is being

18  actually purchased for that amount?

19  A.  Yes.

20         MR. FLEENER:  Objection.  That's speculation.

21  Q.  (BY MR. HEALY)  In your opinion?

22         MR. FLEENER:  It's still speculation.

23         THE COURT:  Overruled.

24  A.  In my opinion, yes, that's what is, what is being

25  discussed there.

1   Q.  (BY MR. HEALY)  Is there any point during this, this

2   conversation where that term that we heard in the phone calls

3   "cuatro" is used?

4   A.  Yes.

5   Q.  And where is that?

6   A.  About 1:10:25.  Miss Garcia says:  "How much did you give

7   me there?"  The CI says:  "Cuatro."

8            Cuatro meaning four, reference to 400.

9   Q.  At 1:11:02 when Miss Garcia says, "A little bit, I'd say

10  that's more than a little bit, it looks big, looks way bigger

11  than it should," do you have an opinion on what that means?

12  A.  Yes.

13           MR. FLEENER:  Speculation as well, Judge.

14           THE COURT:  Overruled.

15  A.  You're purchasing methamphetamine on the street, it can be

16  in several forms.  We usually deal with crystal

17  methamphetamine -- methamphetamine.  It comes in what is

18  referred to as shards, but they're basically like -- they're

19  salt crystals is what they are.  They don't look like typical

20  salt.  They're not as even as Epsom salt, but it has similar

21  consistency as Epsom salt.

22           So if you get a big shard, it's usually considered

23  better.  Sometimes it is; sometimes it's not.  But if you get

24  all powder, people usually think you got the bottom of the

25  bag, which could be lower quality.

1    Q.  (BY MR. HEALY)  Based on what you heard there and your

2    investigation at that time, do you believe at that time that

3    you had enough information to make an arrest of Miss Garcia

4    for a state or local crime?

5           MR. JUBIN:  Objection:  402.

6           THE COURT:  Overruled.  You may answer.

7    A.  I do believe we could have made an arrest.

8    Q.  (BY MR. HEALY)  Why didn't you?

9    A.  Several reasons.  It was one buy from one CI.  Um, many

10   times we like to have more than one.  We also like to do more

11   than one deal to see if we can see where that's -- say if we

12   were to purchase again, we'd like to follow the target, in

13   this case Miss Garcia, to her source.  We only have one

14   person.  Even though we have good evidence, at that point we

15   felt there was more to the case, and we wanted to develop it

16   further.

17   Q.  Okay.  Let me move you forward from March 23rd, 2011 to

18   the early part of 2012.

19   A.  Mm-hmm.

20   Q.  Did you become involved in the investigation of Kyle

21   Carothers and Whitney Rose?

22   A.  I did.

23   Q.  How did that happen?

24   A.  I developed -- I had developed a confidential informant

25   that had identified Rose and Carothers as sources of

 1  methamphetamine.

 2  Q.  Did you go through this process that the jury has heard

 3  about several times of trying to get a confidential source in

 4  to Miss Rose and Mr. Carothers?

 5  A.  We had, but I had been unsuccessful up until that point.

 6  Q.  Did you, did you use physical surveillance?

 7  A.  Yes.

 8  Q.  Did you talk to other people?

 9  A.  Yes.

10  Q.  Okay.  Now, you said that you had been unsuccessful with

11  CIs up to that point.  What changed in, in early 2012?

12  A.  Well, like I said, I was able to identify and interview

13  and establish a confidential informant, and when we sat down

14  initially -- one of the first things we go over in our initial

15  interviews or one of the first couple interviews are if you

16  are going to cooperate, exactly who do you know and

17  what -- who are your sources, who do you typically purchase

18  from, but not only that but who do you sell to.  Then we'd

19  go -- after that initial information gathering, we try to

20  corroborate that information, then go back and then we, as

21  agents, evaluate those targets.  Many times they've identified

22  targets we've been working on.  Maybe we have open cases.

23  Maybe they're people that we know of that we've been looking

24  to -- that we've had information on but nothing proactive,

25  and --

1   Q.  Were you able to get controlled buys in to Whitney Rose

2   and Kyle Carothers?

3   A.  Yes.

4   Q.  Based on that information were you able to apply for and

5   execute a search warrant?

6   A.  Yes.

7   Q.  During the course of that search what items of particular

8   interest to you were found?

9   A.  If I may, sir, it's -- during your opening you said the

10  search of that residence occurred May 23rd, 2011.  That's, I'm

11  sorry, that's incorrect.  It was May 23rd, 2012.

12  Q.  Thank you for that clarification.

13  A.  Okay.  It's -- sorry.

14  Q.  So on May 23rd, 2012 were you part of the search at Kyle

15  Carothers' and Whitney Rose's home?

16  A.  Yes.

17  Q.  Where was that?

18  A.  1074 Country Club Road, Number 705, I believe.

19  Q.  What items of interest were found during that search?

20  A.  Well, multiple items of interest, but we took, uh,

21  multiple pieces of paraphernalia.  We took suspected stolen

22  items.  We took approximately 35.5 grams of methamphetamine.

23  We took three pistols from the residence.  And we took a

24  little over $2,000 cash.

25  Q.  I'm putting on the overhead Government's Exhibit 7, which

1    has previously been admitted.  Do you recognize that photo?

2    A.  Yes.

3    Q.  What is it?

4    A.  It is the methamphetamine seized during the search warrant

5    at 1074 Country Club.

6    Q.  Were Miss Carothers and -- or Miss Rose and Mr. Carothers

7    present during the search?

8    A.  Yes, or initially.

9    Q.  Did you try to talk to them at that time?

10   A.  I did.

11   Q.  Did they want to talk to you?

12   A.  No.

13   Q.  At any time after that did they give an interview -- after

14   May 23rd, 2012 did they give an interview with you?

15   A.  They did.

16   Q.  What was, what was that interview?

17   A.  It's what we call proffer, a proffer interview.

18   Q.  What is a proffer interview?

19   A.  The proffer interview is -- the way I term it is it's an

20   official interview whereas -- or wherein the defense attorney,

21   their defense attorney is present.  Typically the prosecutor

22   is present.  There's been an arrangement between the

23   prosecutor and the defense attorney to allow the suspect to

24   provide information on all their known crimes or all their

25   criminal activity where they would receive immunity for --

1    even though they're telling us about it, we wouldn't -- we

2    would agree not to use that against them.

3    Q.   And let me clarify that.  Use all of their criminal

4    activity against them or just their statement about it?

5    A.   I'm sorry.  Just their statement about their criminal

6    activity.

7    Q.   So would it be fair to say that if you have independent

8    evidence of criminal activity, you can use that against them?

9    A.   Certainly.

10   Q.   Who's usually present at those proffers?

11   A.   Typically we like to have two agents present.  That's not

12   always -- it's not always available.  We -- the prosecutor is

13   typically present or at least appears by phone to explain the

14   proffer letter.  The suspect, of course, is present, and their

15   defense attorney is present.

16   Q.   When the proffer letter is explained, is there -- and when

17   you explain it, generally in your experience, is there, is

18   there any condition that must be followed in order to receive

19   that immunity?

20   A.   They have to be completely honest.

21   Q.   Is it true that in a lot of those cases where you do

22   proffers you've already gathered a lot of information?

23   A.   Yes.

24   Q.   Does that information help you determine whether they're

25   being honest?

1   A.  Yeah, we -- many times we'll even tell the subject that,

2   you know, we -- some of the questions we're asking you we

3   already know the answer to.  It's similar to when you talk to

4   your children when they've done something wrong.  You know

5   most of the answer -- you know most of the story.  You use

6   what you know to corroborate what they're saying.

7   Q.  Did you -- were you the lead agent in two -- in a proffer

8   interview with each of these people, Whitney Rose and Kyle

9   Carothers?

10  A.  I was.

11  Q.  What date did Whitney Rose give her proffer?

12  A.  I believe it was July 27th.

13  Q.  What, what year?

14  A.  2012.

15  Q.  Was her attorney present?

16  A.  Yes.

17  Q.  Did you also -- were you a lead agent on a proffer

18  involving Kyle Carothers?

19  A.  I was actually the only agent present at Mr. Carothers'

20  proffer.

21  Q.  What date was that?

22  A.  I believe it was August 17th.

23  Q.  Year?

24  A.  2012.

25  Q.  Was Mr. Carothers' attorney present?

1   A.  He was.

2   Q.  Following your interview of Miss Rose, did you ask her to

3   become a confidential informant?

4   A.  Yes.

5   Q.  Why Miss Rose?

6   A.  A large degree, she was the first one to, to cooperate.

7   Q.  Did you have prior intelligence about Miss Rose?

8   A.  Yes.

9   Q.  What kind of intelligence did you have that would suggest

10  to you that she would be a good person to be a confidential

11  informant?

12  A.  We had intelligence that she had been dealing cocaine and

13  methamphetamine for several years from several different

14  sources connected to some pretty large sources.

15  Q.  Did you hope that, other than any information she may have

16  provided to you, which I don't want you to discuss

17  specifically about the defendants, did you hope that she could

18  help you in your investigation of Mr. Molina and Miss Garcia?

19  A.  Yes.

20  Q.  And how were you hoping that she could help you?

21  A.  We were hoping that she'd be able to reinitiate -- or

22  reinitiate contact with Miss Garcia and/or Mr. Molina in order

23  to initially or hopefully make controlled purchases, find out

24  more about their source to provide us more information.

25  Q.  Was she able to do that?

1  A.  No.

2  Q.  Did she attempt to do it?

3  A.  She did.

4  Q.  Why didn't that happen?

5  A.  Oh, multiple reasons.  Mr. -- or Mrs. Garcia --

6  Miss Garcia --

7          MR. FLEENER:  Objection.  This is going to be

8  hearsay.  He is repeating what Whitney Rose must have told

9  him.

10          THE COURT:  Sounds like it.

11          MR. JUBIN:  I'd join.

12  Q.  (BY MR. HEALY)  Is the information that you are about to

13  provide information that was provided to you by Whitney Rose?

14  A.  That was, yes.

15  Q.  Okay.  Is there any information provided to you or that

16  you personally observed -- actually, is there anything that

17  you personally observed or that you -- information you

18  collected on your own and not from another source that

19  indicated reasons to you why this wasn't able to happen --

20  A.  Yes.

21  Q.  -- these controlled buys?

22          What information is that?

23  A.  What I personally observed is we attempted to make phone

24  calls, send text messages.  We never got anywhere with those.

25  Q.  Was -- you've earlier said that these smaller, I think you

1  said cells, drug-trafficking organizations within Gillette,

2  that it's a small community.

3  A.  Yes.

4  Q.  Was, was the arrest and search of the -- the arrest of

5  Mr. Carothers and Miss Rose, the search of their home, was

6  that something that was kept very secret in Gillette?

7  A.  No.

8  Q.  During your investigation was it -- did you learn the kind

9  of numbers of people that were buying methamphetamine from

10  Miss Rose and Mr. Carothers?

11  A.  Yes.

12  Q.  How many approximately would you say were buying from

13  them?

14  A.  Approximately 10 to 15 people.

15  Q.  Did there become a time in the work that Miss Rose was

16  doing for you -- and incidentally, outside of this

17  investigation was she able to provide you, um, to provide any,

18  any assistance that was helpful to you in this investigation

19  or others?

20  A.  Yes.

21  Q.  Did there come a time during her work with DCI that you

22  decided you were not going to use her as a CI any longer?

23  A.  Yes.

24  Q.  What happened?

25  A.  We started using her in approximately October.  After

1   maybe -- really the last proactive thing she did was early

2   November.  We were unable to do anything or to further the

3   case against Miss Garcia or Mr. Molina using Miss Rose.

4   Miss Rose kind of -- whereas she had been fairly, uh,

5   consistent with keeping contact with me, that fell off to some

6   degree, still contacted me some.  Shortly after that, uh, uh,

7   I'm trying to remember, but we, we just quit using her.

8   Q.  Did you suspect at any time that she may have been using

9   controlled substances again?

10  A.  Yes.

11  Q.  When did you start suspecting that?

12  A.  Well, late November or December.

13  Q.  Was that later confirmed?

14  A.  It was.

15  Q.  Agent McDonald, were you involved in the search of the

16  residence at 2790 Whitetail, Unit A, on January 16, 2013?

17  A.  I was.

18  Q.  Whose residence was that?

19  A.  It's the residence of Jackie Garcia and Mr. Molina.

20  Q.  Is that the residence depicted in Government's Exhibit 25

21  that you previously identified?

22  A.  Yes.

23  Q.  Describe what happened.  Just describe sort of generally

24  for the jury what took place that day.

25  A.  Well, we had applied for and were granted a search warrant

1    for the residence.  We then planned to -- on how we were going

2    to execute that, that search warrant.  We made a decision to

3    wait until Mr. Molina and Miss Garcia's children's

4    left -- children left for school.

5             So early that morning we set up on -- we staged,

6    prestaged for the execution of the search warrant.  When we

7    observed the children get on the bus and go, I believe it was

8    on the bus, we then went to the house, went to the door, and

9    attempted to make entry.

10   Q.  Tell the jury about that attempted entry.

11   A.  Well, I was the, I was the designated breacher, which

12   means I was the person with a ram tasked with making entry to

13   the house basically by hitting the door.  So when I went up to

14   the door and swung it, it bounced me off the step.  Basically

15   the door didn't move.  So I went back and hit it a couple more

16   times and decided that was futile and a decision I should have

17   made probably the first time.

18   Q.  After not being able to breach the door, how did you get

19   into the home?

20   A.  Well, we breached the front window.  In the, in the

21   photograph you can see the -- actually, if you look, the

22   window's been broken out.  We were gonna make entry there, but

23   the glass above it, the other officer or the other agent there

24   had told not to, not to go through there.  At that point

25   Mr. Molina actually came down the stairs, and we command -- or

1    we ordered him to open the door, and he did so.

2    Q.  Will you circle the window that you, you broke?

3    A.  (Indicating).

4         MR. HEALY:  John, I won't print this now, but I'll

5    print it when we're finished with the photo.

6    Q.  (BY MR. HEALY)  After you gained entrance to the home,

7    what happened?

8    A.  Well, we secured both Mr. Molina, who was in the front

9    room, and Miss Garcia, who was discovered upstairs.  After you

10   secure -- by secure I mean we handcuff them.  After they're

11   handcuffed, we then go -- or as each is handcuffed it's kind

12   of a fluid, a fluid event.  As they're getting handcuffed, the

13   other agents and officers are going through the building,

14   going through the residence ensuring there's no one else in

15   there, calling out "clear" through each room.  After we ensure

16   that it's -- the house is clear, we do what we call is a

17   double.  You go back through, search again slower, to ensure

18   there's no one else there.  We then bring -- by that time we

19   brought all the subjects located into one central location if

20   possible.  In this case it was the front room.

21   Q.  Agent McDonald, you heard Agent Ruby's testimony, did you

22   not?

23   A.  I did.

24   Q.  And is it -- do you agree with him that he was the

25   evidence technician during this particular search?

1   A.  Yes.

2   Q.  Have you had an opportunity to review all of the evidence

3   that was admitted conditionally by the Court?

4   A.  Yes.

5          MR. HEALY:  May I begin approaching the witness with

6   this evidence, Your Honor?  And just for sake of, of having

7   everything be really boring, may I continue to approach the

8   witness as necessary?

9          THE COURT:  You needn't ask again.  None of the

10  attorneys need to ask to approach.

11         MR. HEALY:  Thank you.

12  Q.  (BY MR. HEALY)  Agent McDonald, I'm approaching you what's

13  been marked as -- approaching you with what's been marked as

14  Government's Exhibit 10.

15         MR. HEALY:  And for purposes of the record, these

16  exhibits, these items of evidence that were identified by

17  number by Special Agent Ruby, they are bags of evidence that

18  are seized from certain areas.  Within each of those bags

19  are -- for example, if there is Government's Exhibit 10, if

20  there are more than one item in the bag that was seized, they

21  are identified as 10a and 10b.

22  Q.  (BY MR. HEALY)  Agent McDonald, what do you have?

23  A.  I have item number UB100A, a wallet containing an ID card

24  from Molina and miscellaneous cards.

25  Q.  Is that -- is the information contained within that bag,

1   Government's Exhibit 10, at all relevant to your investigation

2   of Mr. Molina and Miss Garcia?

3   A.   Yes.

4   Q.   Why?

5   A.   Well, the identification card, obviously, or

6   identifies -- is in the name of Sigifredo Molina Varela.

7   There's also a handwritten note with phone numbers that is

8   very significant to me.

9   Q.   Okay.  Back up.  Let's talk about the driver's license.

10  Is that marked as Government's Exhibit 10b?

11  A.   It's actually a Wyoming ID card, and it is 10b, yes.

12  Q.   And then you identified a scrap of paper with phone

13  numbers that is very significant to you.

14  A.   Yes, and that's 10a.

15  Q.   Okay.  Why, why is 10a significant to you?

16  A.   'Cause from a, a later interview these numbers were

17  identified as the phone numbers for the source of Mr. Molina,

18  source of methamphetamine.

19  Q.   Interview with whom?

20  A.   Mr. Molina.

21  Q.   Tell the jury exactly what he told you about these numbers

22  and where they would be found.

23  A.   Mr. Molina told us that the, the numbers located in his

24  black wallet, not his Denver Broncos wallet, is how he

25  referenced it in the interview --

1           MR. JUBIN:  Your Honor, excuse me, I object, and I'd
2   like to simply renew my objection, have a continuing objection
3   based on my earlier motion.
4           THE COURT:  Thank you, Mr. Jubin.  You may have a
5   continuing objection, which has been overruled.
6   A.  During that portion of the interview Mr. Molina stated
7   that the phone numbers in his wallet, in this wallet,
8   explained that they were really long numbers.  Both myself and
9   Agent Budd were fairly familiar with numbers originating in
10  Mexico.  Typically it's a 011 52 number.  We discussed that
11  with Mr. Molina.  He said that's Raul's numbers.  I believe
12  Agent Budd said he remembered seeing numbers, one said "el
13  numero de mi esposa" --
14  Q.  Would you slow down, please, a little bit?
15          THE WITNESS:  I'm sorry, ma'am.
16  Q.  (BY MR. HEALY)  Back up a couple of words.
17  A.  Okay.  Agent Budd told Mr. Molina that he remembered a
18  piece of paper with written "El numero de mi esposa" and "El
19  de la casa" and then another set of, uh, statement that he
20  couldn't remember was -- and Mr. Molina actually clarified,
21  stating those are numbers he could get ahold of Raul at, and
22  the bottom one was his -- the cell number, and it was actually
23  as noted "Mi cel Alex es."  So . . .
24  Q.  Who did he identify Raul as?
25  A.  His source of methamphetamine.

1   Q.  Okay.  I want to go into more of that later.  Again,

2   Government Exhibit 10b, the identification card, what is the

3   significance of that?

4   A.  Well, just identifies the owner of the card as Mr. Molina,

5   corroborating the fact that he does, at least does spend time

6   in the residence.

7            MR. HEALY:  Your Honor, Government renews its offer

8   of Exhibit 10.  10a and 10b are also offered.

9            THE COURT:  They are received.

10       (Government's Exhibits 10, 10a, 10b received.)

11  Q.  (BY MR. HEALY)  You may have to pile this up a little bit.

12  A.  Yes, sir.

13  Q.  Approaching you with what's been marked as Government's

14  Exhibit 11.  Do you recognize this item?

15  A.  Yes.

16  Q.  What is it?

17  A.  It's UB400A.  It's, uh, miscellaneous paperwork, paperwork

18  with a couple notebooks, some passwords, some alleged pay/owe

19  sheets, a media card, and a black wallet with some more

20  paperwork in Mr. Molina's name.

21           MR. HEALY:  And one moment, one moment.

22  Q.  (BY MR. HEALY)  I want to back up to Government's Exhibit

23  10 just briefly and place on the overhead --

24           MR. HEALY:  Could you print this out, please?

25           COURTROOM DEPUTY:  All right, hold.

1          MR. HEALY:  Thank you, John.

2    Q.  (BY MR. HEALY)  You described Government's Exhibit 10.  Is

3    this the item that you were discussing with the jury?

4    A.  Yes.

5    Q.  Agent McDonald, let's go back to Government Exhibit 11.

6    What of significance is contained within Government's Exhibit

7    11?  And first, what is -- what does UB mean to you?

8    A.  It means upper bedroom.

9    Q.  I'm putting Government's Exhibit 25 back on the overhead.

10   Would you please circle, and I'd ask the clerk to then save

11   and print, the upper bedroom that you are discussing.

12   A.  (Indicating).

13   Q.  So you've just circled the bedroom on the right-hand side.

14   A.  As I look at it, yes.

15   Q.  Directly above the front door?

16   A.  Yes.

17          MR. HEALY:  Your Honor, I'd mark that as Government,

18   for the record, as Government's Exhibit 25c and the previous

19   circle around the broken window as 25b.

20          THE COURT:  25b and 25c are received.

21      (Government's Exhibits 25b, 25c received.)

22          MR. HEALY:  Thank you, Your Honor.

23   Q.  (BY MR. HEALY)  What item of interest was found in

24   Government's Exhibit 11?

25   A.  Well, the, the notebook, the little white notebook that's

1    got a hand-drawn scene on the front.

2    Q.  And is that Government's Exhibit 11 B?

3    A.  It is.

4    Q.  Why is that significant?

5    A.  It contained several noted items of interest.

6    Q.  Okay.  First, were these items of interest relevant to

7    your investigation?

8    A.  Yes.

9         MR. HEALY:  Your Honor, the Government offers

10   Government's Exhibit 11 and 11 -- 11B.

11        MR. JUBIN:  I'm not sure I have a copy of 11B here.

12   Oh, it was 9?  Got it.  Changed the number.

13        THE COURT:  11 and 11B are received.

14   (Government's Exhibits 11, 11B received.)

15   Q.  (BY MR. HEALY)  11B.1 --

16   A.  Yes.

17   Q.  -- what is the significance of that, that doodling to you?

18   A.  Well, the only significance is the, the numerics on it.

19   When you see -- from other information in this investigation

20   that I learned about what Mr. Garcia and Miss -- I'm sorry --

21   Mr. Molina and Miss Garcia were supposedly charging for their

22   methamphetamine, these numbers are of interest because it was

23   very close if not what I was told they were charging, and the

24   2900 and 1900 correspond as well.

25   Q.  How does the 1900 correspond?

1  A.  Well, if you, if you go above, 2900 minus a thousand,

2  whatever is still owed, then you have 19, and another 6, and

3  it's down to 13.  You get a lot of numbers that just -- those

4  kind of numbers stick out to me as being a possible, being of

5  interest.

6  Q.  So if you found this --

7        MR. JUBIN:  Your Honor, I would object and ask that

8  the answer be stricken as speculative.

9        MR. HEALY:  May I respond, Your Honor?

10       THE COURT:  Sure.

11       MR. HEALY:  The agent testified that these numbers

12 correspond to numbers that he heard in his investigation about

13 the prices that Mr. Molina and Miss Garcia were charging for

14 methamphetamine.

15       MR. JUBIN:  Your Honor, it's not the price he

16 suggested.  He admitted he was speculating as to what it might

17 mean.

18       THE COURT:  I'll overrule the objection.

19 Q.  (BY MR. HEALY)  Agent McDonald, would this document alone

20 indicate to you, without any other information, that this was

21 a drug ledger?

22 A.  No.

23 Q.  11B.2, what is the significance of this portion of the

24 notebook?

25 A.  The significance of this portion of the notebook is the,

1   the notation of 800 and then the note on the side "for shit."

2   Q.  What does the notation, in your training and experience,

3   stand for "for shit"?

4   A.  It's a common reference or colloquialism for

5   methamphetamine, for drugs of any sort.

6   Q.  Again, would this information alone, with no other

7   information, indicate to you a drug ledger?

8   A.  No.

9   Q.  11B.3, what is significant about these notations?

10  A.  What's significant about these notations is the, is the

11  letters and the corresponding numbers, one specifically, the K

12  with the 28 below it.

13  Q.  Why is that significant?

14  A.  It's significant because 28 is just shy of an ounce.  An

15  ounce is 28.3 grams.  For K, you know, I know in this case

16  we've discovered that Kyle Carothers was selling

17  methamphetamine for, for Mr. Molina and Miss Garcia.

18  Q.  Again, 11B.4.

19  A.  Again, this is really, in conjunction with the other

20  letters, when it's a reoccurring letter with the same number

21  and they still correspond, it's of more interest to me.

22  Q.  11B.5, what is significant about this particular document?

23  A.  The phone number, if I find 11 -- the correct one, I

24  apologize.  Second from the bottom, Whitney's mom

25  307-670-2912, that's Whitney Rose's mom's cell phone number.

1  Q.  And that's significant to you because?

2  A.  It's a -- helps corroborate the fact that Whitney Rose was

3  known to Miss Garcia and/or Mr. Molina.

4  Q.  11B.6.

5  A.  Again with the K and the 28, just -- I don't -- I -- with

6  the reoccurrence of the same letter and number, it's of

7  interest to me.

8  Q.  But this item alone would not indicate to you by itself,

9  with no other information, any significance?

10 A.  No, it's just another piece.

11 Q.  11a, let me ask you about 11a.  What is it?

12 A.  It's just a note.  Just a note, notepad.  A Travelodge

13 notepad.

14 Q.  What part of 11a is significant to you?

15 A.  On the back there's just a notation of, you know, 2800

16 with 1555, and it's added.

17      MR. HEALY:  Your Honor, the Government --

18 A.  I apologize.  I believe that's 2500.

19 Q.  (BY MR. HEALY)  What is the significance of 2500 to you?

20 A.  Again, 2500 is a, I guess, the, the price of, of, the

21 approximate price of the methamphetamine being sold by

22 Miss Garcia and Mr. Molina.

23      MR. HEALY:  Your Honor, the Government offers

24 Government's Exhibit 11a.

25      MR. JUBIN:  Object as speculative.

1              MR. FLEENER:  Join.

2              MR. JUBIN:  I'm also concerned about what else might

3    be in that exhibit.  I don't know what's inside the notebook.

4    Is the entire notebook in the offered exhibit?

5              MR. HEALY:  It is.

6              MR. FLEENER:  We need to see it.

7              MR. JUBIN:  Let's see it.

8              THE COURT:  I think you need to look at it.

9              MR. HEALY:  They certainly can.

10             MR. FLEENER:  Do you have it?

11             MR. HEALY:  I think Agent McDonald does.

12             THE WITNESS:  This is 11a.  Do you want this, too?

13             THE COURT:  Well, while we're waiting, were you able

14   to tie any of these numbers down to a particular transaction

15   with anybody on a particular date?

16             THE WITNESS:  No, Your Honor.

17             THE COURT:  And were you able to tie the handwriting

18   to either of the defendants?

19             THE WITNESS:  No.

20             MR. HEALY:  Your Honor, may we approach?

21             THE COURT:  Sure.

22        (At side bar.)

23             MR. HEALY:  If Mr. Fleener and Mr. Jubin wanted to

24   review this evidence, it was, of course, available to them,

25   but if they're going to sit here now in front of the jury and

1   review it, maybe we should let the jury go so that they can go

2   through all of the evidence and review it and make sure they

3   don't have anything else that they're upset about or that they

4   want to use or want to object to.

5          MR. JUBIN:  Here's the concern.  I mean, if you're

6   going to put in a whole notebook that contains a whole bunch

7   of phone numbers, it contains things that aren't even talked

8   about, it's something -- it's just like throwing in something

9   that has no particular relevance and may be very misleading,

10  and I'm concerned about that.  I can show the Court one

11  example that the Government isn't tagging and suggesting, but

12  it has a "tu" and "yo" or you and me and has a whole bunch of

13  numbers, and certainly jurors who have no information about

14  this might think it has something to do with drugs because the

15  numbers are significant.  They're in the hundreds and

16  thousands.  And I believe this to be a dice game, but there's

17  been no testimony about it, there's been -- it's simply thrown

18  in with the rest of it with no information about it, and I

19  think that could -- has the potential to be incredibly

20  prejudicial.

21         MR. HEALY:  Two responses to that, Your Honor.

22  First, Agent McDonald's testifying what's significant to him.

23  If he thought that that was a drug ledger, I think he would

24  have included that.  The second is that's why

25  cross-examination can be effective.  So Mr. Jubin has an

1    opportunity to bring those points to Mr. McDonald -- to Agent

2    McDonald, because those are all over the notebooks, many of

3    which we aren't using.

4         THE COURT:  So what we have here is a mixture then,

5    according to the Government.

6         MR. HEALY:  Well, we have all sorts of things in

7    here, numbers that have no significance whatsoever for

8    whatever reason, Your Honor, but the problem is I didn't feel

9    comfortable tearing these out of these notebooks and marking

10   them separately without suggesting that this is or without

11   indicating, because of foundation reasons and all other things

12   and really even the arguments that are being made right now,

13   that the Government is selecting what it wants and everything

14   else shouldn't be shown to the jury.  So I didn't have a lot

15   of choice in how to do this.  And as I said, Mr. Jubin can

16   certainly cross-examine on any of the other issues.

17        MR. JUBIN:  One of the interesting things about what

18   Mr. Healy just said is he has admitted that what he's offering

19   into evidence violates Rule 402 and that is the rule of

20   relevancy.  There's a lot here, he says, that is simply

21   irrelevant, and I don't think we ought to be putting in

22   irrelevant evidence.

23        MR. HEALY:  I --

24        THE COURT:  Okay.  If you -- maybe the solution to

25   this would be for you to stipulate and enter into a

1   stipulation.

2          MR. JUBIN:  With respect to the --

3          THE COURT:  What goes in, what doesn't.

4          MR. JUBIN:  Without the opportunity to completely go

5   through it, it's kind of hard to -- I mean, I've certainly

6   seen these things.  I didn't know they were going to be

7   offered willy-nilly, the entire notebooks, relevancies and

8   irrelevancies together.

9          MR. HEALY:  I didn't intend to offer them

10  willy-nilly.  I was trying to offer them as they are supposed

11  to be offered.

12         THE COURT:  Well, I was concerned.  You know, he says

13  the number 28 represents a drug sale.  Well, I don't know.

14         MR. HEALY:  Judge, and I may be wrong on the record,

15  the record that was made, but I think what Agent McDonald said

16  was the numbers were significant to him because they matched

17  numbers that he knew were being -- in the range that

18  methamphetamine was being sold per ounce by Miss Molina [sic]

19  and Mr. Garcia [sic], not that they represented a drug

20  transaction.  And I mean, truth be told, the Government knew,

21  and that's why I've asked Agent McDonald that these numbers

22  alone the jury could look at them and say who cares, but I

23  think taken together the Government believes they're relevant.

24         So that's the Government's position with respect to

25  that.  Although with the way this is going, Your Honor, I am

1    also going to look at the evidence again tonight and see if

2    there's some culling that can be done.

3         MR. JUBIN:  One of the thoughts that occurs to me,

4    and maybe Mr. Fleener would agree, is that perhaps we would

5    consider a stipulation that, that the Government's exhibits

6    contain voluminous irrelevant materials and the jury shouldn't

7    speculate about them.

8         MR. FLEENER:  I'd agree to that.

9         MR. HEALY:  I think that's an odd request to have the

10   Government stipulate to.  I think what we should do is have

11   the jury recessed, it's 11 -- 4:40, and Mr. Jubin and

12   Mr. Fleener can look at this evidence and decide what they

13   don't like, and we can show them what is marked, and

14   they'll -- they can -- they've had all of this in their

15   possession, Your Honor.  They've seen it.

16        THE COURT:  Well, they might want to talk about the

17   irrelevance in front of the jury.  If that's the case --

18        MR. JUBIN:  That may be.

19        THE COURT:  -- then why not just receive it and they

20   can cross-examine.

21        MR. HEALY:  Okay.  Well, we've already received 11

22   and 10.

23        MR. FLEENER:  I would rather do that than --

24        MR. JUBIN:  In consulting with Mr. Fleener, I think

25   we probably will agree to simply withdraw the objection with

1    respect to relevance, and we'll point that out.

2           MR. HEALY:  I think that's a good idea.  I was

3    mentioning cross-examination as a great tool.

4           THE COURT:  Thank you.

5       (End of side bar.)

6    Q.  (BY MR. HEALY)  Agent McDonald, I'm approaching you with

7    what's been marked as Government's Exhibit 12.  Would you open

8    that item and describe what you have there?

9    A.  It's item UB2200 labeled Government Exhibit 12.  It's

10   legal paperwork in the name of Heidi Blankenship.

11   Q.  Why is that significant to you?

12   A.  It helps corroborate Miss Blankenship's association with

13   Miss Garcia and Mr. Molina.

14   Q.  Handing you what's been marked as Government's Exhibit 13.

15          MR. HEALY:  And, Your Honor, before --

16   Q.  (BY MR. HEALY)  Please take a look at that, Agent

17   McDonald.

18          MR. HEALY:  Before I move any further, the Government

19   offers Government's Exhibit 12.

20          MR. JUBIN:  No objection, for what it's worth.

21          THE COURT:  12 is received.

22      (Government's Exhibit 12 received.)

23          THE COURT:  Did you wish to reoffer 11a?

24          MR. HEALY:  Yes, Your Honor.

25          THE COURT:  Very well.  It is received.

1        (Government's Exhibit 11a received.)

2    Q.  (BY MR. HEALY)  What is Government's Exhibit 13?

3    A.  It is a copy of a pay stub from Slattery Enterprises in

4    the name of Sigifredo Molina.

5    Q.  Where was this seized?

6    A.  From the residence, from 2790 Whitetail.

7    Q.  Why is this significant to you?

8    A.  It's significant to show again that Mr. Molina is

9    connected to that residence.  It also shows the amount of

10   money he was earning during this time period.

11   Q.  What --

12           MR. HEALY:  Your Honor, Government --

13   Q.  (BY MR. HEALY)  Why is the amount of money he was

14   earning -- during what time period?

15   A.  The pay period shows 8/08/2011 to 8/21/2011.  Pay date is

16   8/26/2011.

17   Q.  Why is that particular item significant to you?

18   A.  It's significant to see -- or to, to show how much money

19   Mr. Molina was earning from this legitimate business after our

20   investigation showed that Mr. Molina was paying thousands of

21   dollars for methamphetamine.

22   Q.  Did you actually have confirmation of that from

23   Mr. Molina?

24   A.  I did.

25   Q.  What did he tell you about how much he was paying?

1   A.  He told me that he was paying approximately $10,000 for

2   5 ounces of methamphetamine, but it was typically -- would pay

3   5,000 on what we call a front, or you give someone 5,000 up

4   front, they'd give you another -- give you your 5 ounces, then

5   you owed another five when they returned.

6           MR. HEALY:  Your Honor, Government offers Exhibit 13.

7           MR. JUBIN:  No objection to Exhibit 13.

8           MR. FLEENER:  No objections, Judge.

9           THE COURT:  It is received.

10      (Government's Exhibit 13 received.)

11          MR. HEALY:  I'll publish briefly, Your Honor.

12          One moment, Your Honor.

13          Your Honor, may I confer with defense counsel?

14          THE COURT:  Certainly.

15          MR. HEALY:  Your Honor, in consultation with defense

16  counsel, we were, we were thinking that we would suggest to

17  the Court -- I know the Court is concerned about the jurors'

18  schedule and its own schedule.  We were suggesting that this

19  may be -- we may save time tomorrow if we take a break now,

20  rather than at 5:00, and we have a chance to go through some

21  of these items in more detail.

22          THE COURT:  Okay.  I notice that the time is now 4:46

23  or 7, so we're pretty close to the 5 o'clock termination time,

24  ladies and gentlemen.  I have an 8:30 hearing, I believe.

25          COURTROOM DEPUTY:  Yes, Your Honor.

1          THE COURT:  And I don't think it will take a terribly
2    long time.  I think we could start again at 9 o'clock tomorrow
3    morning.
4          MR. JUBIN:  Your Honor, I wanted to make sure you
5    were aware of the obligation I have with Chief Judge
6    Freudenthal.
7          THE COURT:  Oh, that's right.  That starts at 8:00,
8    doesn't it?
9          MR. JUBIN:  It does.
10          MR. HEALY:  I'll be there as well, Your Honor.
11          MR. JUBIN:  Mr. Healy and I are both involved in
12    that.
13          THE COURT:  What do you think?
14          MR. JUBIN:  It should be done in an hour.
15          MR. HEALY:  I think it will be.
16          MR. JUBIN:  I think we're safe to say 9 o'clock.
17          THE COURT:  All right.  Ladies and gentlemen,
18    remember the Court's admonition in this case.  Hopefully it
19    will save some time as we go forward.  I'm not going to repeat
20    everything that I've read to you earlier and mentioned again
21    at noontime at this point.  I would say this.  You've spent a
22    day now seated in a chair that you're not used to sitting in,
23    and it can't be the most comfortable thing that's ever
24    happened to you.  So you're going to need your rest, you're
25    going to need to eat a good meal tonight and to relax and get

1  plenty of sleep, and we'll get started at 9 o'clock tomorrow

2  morning and hopefully put in a good day tomorrow.

3          All right.  We'll stand in recess until 9 a.m.

4  tomorrow morning.

5          Ladies and gentlemen, take your notes with you into

6  the jury room.  Nobody needs to be reading your notes now.

7  Thank you.

8      (Jury out at 4:48 p.m.)

9          MR. HEALY:  We have all the transcripts, Your Honor.

10          THE COURT:  Let's make a brief record.  I observed

11  that all copies of the transcription that were given to the

12  jury have been returned to custody of the United States

13  Attorney's Office.

14          MR. HEALY:  Thank you, Your Honor.

15          THE COURT:  Anything further we want to do this

16  evening?

17          MR. HEALY:  No, thank you.

18          THE COURT:  All right.

19          MR. FLEENER:  No, sir.

20          THE COURT:  Well, we'll see you at 9 o'clock tomorrow

21  morning then.

22      (Proceedings recessed 4:49 p.m.,

23      May 8, 2013.)

24

25

1                          C E R T I F I C A T E

2

3

4              I, JULIE H. THOMAS, Official Court Reporter for the

5     United States District Court for the District of Wyoming, a

6     Registered Merit Reporter and Certified Realtime Reporter, do

7     hereby certify that I reported by machine shorthand the

8     proceedings contained herein on the aforementioned subject on

9     the date herein set forth, and that the foregoing pages

10    constitute a full, true and correct transcript.

11             Dated this 13th day of October, 2013.

12

13

14

15                         /s/ Julie H. Thomas

16                       JULIE H. THOMAS
                        Official Court Reporter
17                      Registered Merit Reporter
                        Certified Realtime Reporter
18                         CA CSR No. 9162

19

20

21

22

23

24

25